UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NATHAN P. GOLDSTEIN, as he is EXECUTIVE DIRECTOR, MASSACHUSETTS LABORERS' BENEFIT FUND,
Plaintiff,

v.

ESSENTIAL DEMO, INC.,
Defendant,

and

RISE CONSTRUCTION MANAGEMENT, INC.,
Reach-and-Apply Defendant.

No. 24-cv-10248-FDS

BEFORE THE HONORABLE F. DENNIS SAYLOR
UNITED STATES DISTRICT JUDGE

Evidentiary hearing

November 24, 2025
9:04 a.m. - 1:02 p.m.

John Joseph Moakley United States Courthouse
Courtroom No. 1
1 Courthouse Way
Boston, Massachusetts 02210

Jennifer M. Vaillancourt, RPR, CSR #154422
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way, Room 7205
Boston, Massachusetts 02210
E-mail: Jenn.m.vaillancourt@gmail.com

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
SASHA GILLIN, ESQ.
NICO J. MARULLI, ESQ.
Segal Roitman, LLP
33 Harrison Avenue
7th Floor
Boston, Massachusetts 02111
(617)742-0208
Sgillin@segalroitman.com
Nmarulli@segalroitman.com

ON BEHALF OF ESSENTIAL DEMO, INC.:
SAM S. CALANDRA, ESQ.
Calandra, P.C.
96 Cottage Street
Hudson, Massachusetts 01749
(978)273-2309
Sscalandra@calandrapc.com

ON BEHALF OF RISE CONSTRUCTION MANAGEMENT, INC.:
JOHN W. DINICOLA, II, ESQ.
DiNicola Law Group, LLC
399 Chestnut Street
2nd Floor
Needham, Massachusetts 02492
(617)279-2593
Jack.dinicola@dinicolalawgrp.com

INDEX PAGE


EXAMINATION: JAMES GROSSMANN

| | DIRECT | CROSS |
|---|---|---|
| MS. GILLIN | 8, 58 | |
| MR. CALANDRA | | 34, 50 |
| MR. DINICOLA | | 41, 57 |

EXAMINATION: CHRISTOPHER GROSSMANN

| | DIRECT | CROSS |
|---|---|---|
| MR. CALANDRA | 67, 95 | |
| MR. MARULLI | | 97, 120 |
| MR. DINICOLA | | 101 |

| EXHIBITS | PAGE |
|---|---|
| 41-49, admitted | 34 |
| 101-107, admitted | 120 |
| 50, admitted | 123 |

P R O C E E D I N G S

THE CLERK: All rise.

(The Honorable Court entered.)

THE CLERK: Thank you. You may be seated.

Court is now in session in the matter of Goldstein versus Essential Demo, Inc. Et al., Civil Action Number 2410248.

Would counsel please identify themselves for the record starting with the plaintiff?

MS. GILLIN: Good morning. Sasha Gillin for the plaintiff, Nathan Goldstein with Massachusetts Laborers' Benefit Fund. And with me is Nico Marulli from my office.

THE COURT: Good morning.

MR. CALANDRA: Good morning, Your Honor. Sam Calandra for Defendant Essential Demo.

THE COURT: Good morning.

MR. DINICOLA: Good morning, Your Honor. Jack DiNicola for reach-and-apply Defendant Rise Construction Management, Inc.

THE COURT: Good morning.

All right. This is a continuation of the hearing in this matter. I have pending Attorney DiNicola's motion for leave to withdraw as counsel, which is opposed.

The basic issue here, from my perspective, is that a

corporation cannot represent itself. It cannot proceed pro se, so either Rise Construction Management, Inc., if I allow the motion, either Rise has to obtain successor counsel or I will find it in default, meaning it cannot defend any of the claims against it, however those are framed.

So I -- it looks to me like Mr. DiNicola may be in a difficult position, but that's not the end of the story. So let me ask, Mr. Grossmann, what is your view on this topic?

Are you attempting to obtain successor counsel?

MR. JAMES GROSSMANN: I am seeking someone. Like, I contacted an attorney that was a family friend, and he doesn't do litigation. He's a contract attorney, so he is helping me find successor counsel.

THE COURT: So just to be clear, again, I can give a window of time to find successor counsel. Although, I don't want to delay these proceedings. I want to go forward today, but if I allow Mr. DiNicola out and I may, you know, give you a short window of time to find successor counsel, that means you'll be defaulted or the corporation, I should say, will be defaulted.

Exactly what that means we'll have to sort out, but it seems to me, at a minimum, it means that I will enter a finding because it would no longer be disputed that Rise Construction owes the disputed amount to Essential, that Rise Construction had funds available to pay that amount, and presumably, that

Rise failed to comply with the orders of the Court without cause. Whether we could go further, whether Plaintiff can pierce the corporate veil under these circumstances is a question for another day, but the bottom line is the defendant would be defaulted, meaning you concede everything factually and legally.

So what I propose to do is to leave that motion pending. What I am likely to do, at least as I sit here, is to issue an order that says that Rise has a very short period of time, say two weeks to find successor counsel to enter an appearance. Otherwise, the motion will be allowed, and the corporation, not having counsel, will be found in default.

But let's take it a step at a time. It's certainly been troublesome to get to this point, and I would like to proceed today with whatever we can accomplish in this hearing.

So, Ms. Gillin, where do things stand from your perspective?

MS. GILLIN: From our perspective, we have received some but not all of the documents that we requested from the defendant after the last hearing.

I have a few more questions for James Grossmann, and then I think we have some questions for Christopher Grossmann, and I think Sam -- Attorney Calandra has -- is going to be having some questions for him as well, so.

THE COURT: So the idea would be to continue the

examination --

MS. GILLIN: Yes.

THE COURT: -- of James Grossmann. I've forgotten where we left off.

I think, Mr. DiNicola, you did -- you had rested based on --

MS. GILLIN: On the documents we have. We have received some other documents.

THE COURT: So it would be completing that examination, and then allowing Mr. DiNicola or Mr. Calandra to examine.

MS. GILLIN: Yes.

THE COURT: Mr. DiNicola?

MR. DINICOLA: As is my understanding. If Ms. Gillin has more questions, she can ask more questions of Mr. Grossmann, and then Mr. Calandra, if he has any questions, and then it would be me.

THE COURT: Okay. All right. And, Mr. Calandra?

MR. CALANDRA: I concur, Your Honor.

THE COURT: Okay. All right. And, Mr. DiNicola, anything further either on what we're doing today or this question of the motion to withdraw?

MR. DINICOLA: No, Your Honor.

THE COURT: Okay. All right. Let's put James Grossmann on the stand.

JAMES GROSSMANN was sworn.

THE CLERK: You can have a seat. Please speak into the microphone.

THE COURT: So this is the continued examination of James Grossmann. Ms. Gillin.

MS. GILLIN: I have -- I have some documents here that -- may I approach?

THE COURT: Yes. I've been handed what's tabbed 41 through 49.

MS. GILLIN: Thank you.

DIRECT EXAMINATION BY MS. GILLIN:

Q. So I just wanted to introduce some of these documents for the record and ask you a little bit about them.

So if you can look at Tab 41, Exhibit 41, can you please identify this document?

A. It's a contract between BC Gourmet and Rise Construction Management.

Q. And what is the project for?

What project is this for?

A. I believe we're calling it 11.

Q. Parker?

A. 11 -- thank you. Sorry. 11 Parker, yes.

Q. And this is a contract that you signed, if you look at page 30 -- oh, no -- 35. It looks like --

A. Brian Regan signed it with our office.

Q. Brian Regan, and he's from Rise Construction.
A. Yes.
Q. Thank you.
If you look at Exhibit 42, can you identify this document, please?
A. This is a contract between Rise Construction Management and Essential Demo.
Q. And what job is this for?
A. 11 Parker Street.
Q. And if you look at page 10 of 17, and do you see -- looking at Article 11 and specifically the very last sentence there of 11.3, do you see where it says "In the event that MGL Chapter 149, Section 29E applies"?
A. I do.
Q. Do you understand that to be the Prompt Pay Act?
A. I do.
Q. If you look at Tab 43, can you please identify this document?
A. This is a contract between BRG 55 India, LLC, and Rise Construction Management.
Q. Is -- was Rise Together involved with this job at all?
A. It was not.
Q. What about Rise Development?
A. It was not.
Q. If you look at the next tab, 44, can you identify these

documents?
Do you know what these are?
A. They look to be bank statements.
Q. And that account number on the first page all the way to the right, sort of, in the middle of the page, is that -- ending 3191, is that Rise Development's account?
A. I -- I don't have it in front of me, but, yes, I believe so. I don't recall off the top of my head.
Q. If you look at page 37 of these documents, of this exhibit, do you see in October at the bottom of the page there are three incoming wire transfers?
A. Yes.
Q. Do you see those?
Do you know what those are for?
A. I do not.
Q. Did you approve those payments?
A. Meaning Rudiarius made an incoming wire --
Q. Yes.
A. -- to Rise Development?
Q. Yes.
A. Yes.
Q. So you caused those payments to be made, those wire payments.
A. I don't recall, but, yes, it would have had to have come from me, yeah.

Q. And then at the top, do you see where there are a number of checks, the same page?
A. I do.
Q. There's a check for $11,271.43.
A. I do.
Q. Do you know what that was -- who that check was for?
A. I do not.
Q. What about the one on October 27th for $13,600, do you know who that was for?
A. I do not.
Q. If you turn to Exhibit 45, do you know what this document is?
A. It seems to be a bank statement for Rise Together.
Q. Rise Together.
And do you have -- are you the signatory on that account?
A. I am one of them, yes.
Q. If you turn to page 9 of this document, do you see on July 2nd, towards the bottom of the page, there's an incoming wire transfer from 55 India Street, and it's for $568,352.61? Do you see that?
A. I do.
Q. Why is India Street owner paying Rise Together $568,000?
A. I don't recall. It could have been the Rise Construction Management account was frozen.

Q. Do you know that for a fact?
A. I do not.
Q. And then do you see that right -- the next?
THE COURT: I'm sorry. Oh, never mind. Never mind. This is 2025.
MS. GILLIN: Yes, 2025. Yes.
Q. In any event, Rise Together was not the -- was not a contractor on that job; correct?
A. Correct.
Q. Was -- and I think you just said Rise Development was also not involved with that job.
A. Correct.
Q. Do you see on July 3rd, there's a series of transfers to Rise Development's account?
A. I do.
Q. And does it seem like that -- the amount that's being transferred matches up to the amount that is received from 55 India Street?
A. It does.
Q. Why is that money being transferred into Rise Development's account?
A. I don't recall.
Q. Would you agree with me that this money belongs to Rise Construction?
A. I don't -- I don't recall. I would have to look at what

it was for at the time, you know, whose staff was getting paid at the time. At this time frame in July, the staff was hired by Rise Development.

Q. But Rise Construction is the name on the contract with the owner --

A. Correct.

Q. -- for 55 India?

A. Yes.

Q. So does this money received from 55 India Street belong to Rise Construction Management?

A. Again, it was for staff on the -- I don't know this. I'd have to look at the requisition and what was transferred. My assumption is that this was for costs that Rise Development was taking control of when Rise Development -- Rise Construction Management no longer had staffing.

Q. Did you produce the documents that I had requested regarding the -- the agreement between Rise Development and Rise Construction Management for --

A. Yes.

Q. You did.

A. I did.

MS. GILLIN: We have not received those, so if they are somewhere, I do not have those.

Q. If you look at --

A. Counsel, it was the -- it was the termination of School

Street that laid all of that out, so if you don't have -- if you have that, we can review that document. That's where that was.

Q. Was there a separate contract between --

A. Correct. It was -- Rise Development took over the staffing inside of that termination.

Q. For that job; correct?

A. No, for all.

Q. For every job they --

A. For the staffing that Rise Construction Management had, yes.

Q. So is it your testimony -- just to be clear, is your testimony that the reason that 55 India Street is paying Rise Together instead of Rise Construction or Rise Development, it's because that on a separate job there was a -- there was an agreement for a staff takeover by Development? Is that your testimony?

A. No. I think my testimony was I don't know why it went to this account. I think my assumption was was that the Rise Construction Management account was frozen.

Q. Who would know, I mean?

A. I can find that out. I don't know the dates. You're just asking this now. I'm happy to request that from Citizens.

Q. Okay. If you look at Exhibit 46, can you identify this document?

A. This is a bank statement from Needham Bank.
Q. Are you a signatory on the School Street development?
A. I am.
Q. Do you see on the first page there's a withdrawal transfer? And it looks like there's an Account 8783. Do you know what that is?
A. I do not know that account, but I see the -- I see the transaction.
Q. If you look at page 3, do you see there are -- on September 23rd, there are two transfers -- wire transfers out to Rudiarius Holding Corp for $200,000 and $500,000?
A. I do.
Q. Why is -- is Rudiarius involved in the School Street job?
A. Rudiarius is the ownership of my portion of this project on the development side, yes.
Q. Rudiarius is the -- so you -- Rudiarius is the owner --
A. Rise -- I'm sorry. I didn't mean to interrupt.
Q. No. I'm just trying to understand.
A. No. No. No. Okay. I'm sorry if that was rude. I didn't mean it.
I think we talked about it a little bit last time. You were asking questions around why the trust, and so I know this is a long explanation, but if we remember, Rise Development owns -- there's two owners of Rise Development. They own a portion of School Street Development, LLC.

The trust owned my portion of that. That's what we were in the process of doing, so this is a Rise Development -- this is -- Rise Development manages on behalf of the School Street Development this account and the development and also the construction, actually, has risk on the construction side.

And in this case, Rise Construction Management was terminated. These transfers were due to my portion of that and paying probably -- I don't know where they went to -- but subcontractors and payroll on this project.

Q. Why couldn't you have just -- so let me back up.

So you're telling me that who -- who's involved with Rudiarius?

Who are the officers or managers of Rudiarius?

Is it just you?

A. No. There are no officers or managers.

Q. Well, Rudiarius Holdings, LLC, is a corporation; correct?

A. Correct.

THE COURT: Well, LLC, is --

MS. GILLIN: Yes.

THE COURT: -- it a limited liability company?

MS. GILLIN: Sorry. It's limited liability.

THE WITNESS: No. Sorry, Your Honor. Holdings is actually a corp. It's getting -- what I said last time, that is actually getting dissolved. I created -- when I created it on an app, by accident, I made it a corp, but technically, at

this time, it's a corporation.
Q. I thought you had told me that you had paid a lawyer in Wyoming to create these -- this company --
A. No.
Q. -- correct?
A. No. What I said last time was the lawyer, when you asked about that payment, was transferring my ownership from this development to the trust. That's what the lawyer was doing. We did give you the documents from ZenBusiness, which is an app, that I created these documents on an app.
Q. How --
A. The corporate documents. Sorry.
Q. How is this not just siphoning assets from an entity that is -- that you are in charge of or to an entity that you are in charge of?
How is that not just siphoning assets that don't belong to you to an entity that you are in charge of?
A. Your language of siphoning, I don't understand what you mean.
Q. Well, what is this 700,000-dollar transfer?
A. It went to pay vendors from that job.
Q. Well, we asked for evidence of all of the payments that went to vendors on these jobs.
A. Correct.
Q. We do not have that. So how are we to know whether or not

that actually went to payments?

And why -- what is the purpose of transferring it to Rudiarius if School Street Development could have just paid them?

A. Because it's -- School Street Development is not attached to the accounting software QuickBooks, so you put it in an account that speaks to QuickBooks.

Q. And Rudiarius is?

A. Rudiarius has QuickBooks, so does School Street Development has QuickBooks.

Q. You just said School Street Development does not have QuickBooks.

A. No. I didn't say that. This is the first time I said QuickBooks, but School Street Development, along with Rudiarius, has QuickBooks, and that's why you transfer an account so that it is attached and speaks to the accounting software. And we have requested all of the documentation for everyone. It just hasn't come in yet.

THE COURT: Wait a second. I'm not following that. So School Street Development is developing this job; yes?

THE WITNESS: Yes.

THE COURT: And which job is this again?

THE WITNESS: This is School Street, Your Honor.

THE COURT: School Street.

And are you saying it cannot pay its employees or subs

or other vendors directly, that the money has to go to Rudiarius in order to pay those?

THE WITNESS: No. What was happening at the time, Your Honor, is we let our license lapse on QuickBooks, and we were -- Rudiarius had an agreement with QuickBooks so that we could use it. So it was maybe poor judgment, but it wasn't connected to the software.

So this money -- I -- this money, whether it went to School Street Development and/or School Street Development gave it to Rudiarius, was going out to vendors, and we have the tracking of all of that.

THE COURT: And am I right that there are no documents presently before the Court to suggest that the money went out of Rudiarius to these vendors or employees as we sit here?

THE WITNESS: I don't believe so.

THE COURT: Okay. I'm sorry. Go ahead, Ms. Gillin.

MS. GILLIN: Thank you.

Q. And do you see there's a deposit on 52 School Street of $741,974?

A. I do.

Q. Do you see that?

What was that payment from?

What was that payment?

A. From the loan.

Q. What loan? What loan?

A. The loan from Needham Bank.
Q. That is a loan payment from Needham Bank to fund this job.
A. Correct. So school -- School Street Development through Rise Development has a construction loan to build this project, and that's a monthly requisition coming in.
Q. So do you see there's a withdrawal on the 22nd? It says 52 School Street --
A. Yes.
Q. -- Anderson, do you see that? And it's $2250?
A. Yes.
Q. Who is that?
A. I don't know.
Q. Could that be Brian Anderson?
A. No. No. It could be -- it says "Inspection fee," so David Anderson of Anderson Consulting Group does permitting for us. Again, I can get back to that transaction, but --
Q. Okay.
A. -- my -- I suspect that's what that is.
Q. So at least in some circumstances, School Street Development can pay somebody; correct?
A. Correct.
Q. Do you -- if you go to page 8, do you see there's a deposit of $372,222?
A. I do.
Q. What is that -- who is that from?

A. Again, any deposit coming into this account is most likely from the loan.

Q. You say "most likely." Is it possible that there are other deposits that are not the loan?

A. It's possible. I haven't studied every single one of these, but it's possible.

Q. Well, it's not the same amount as the previous loan, correct, the previous deposit, right? It's not in the same amount --

A. Correct.

Q. -- because if you look back, it's 741,000.

A. You are correct.

THE COURT: And it's roughly half.

THE WITNESS: But -- so can I explain that?

THE COURT: Okay.

THE WITNESS: Every month you complete work on site and you complete administrative work. You package it. You put it together. The amounts are different every month.

You then submit it to the bank. The bank hires an inspector to come out and inspect that progress is complete, and that happens every month. Every month is a different amount coming from the loan.

THE COURT: Right.

Go ahead.

Q. Do you -- do you see another payment to -- withdrawal,

Anderson, 52 School Street, the same amount for $2,250?
A. I do.
Q. And is it your testimony that that's also an inspection?
A. I -- I don't recall. That's what my assumption is. I'd have to go back and look.
Q. And do you see another wire out of the company for $320,000? Do you see that?
A. I do.
Q. And it's to Rudiarius Holdings Corp.
A. I do.
Q. Do you know what that was for?
A. Again, to pay vendors.
Q. And if you look at page 10 of these documents.
A. Yes.
Q. Okay. There are two deposits into the account, $34,937 on June 13th and another, $87,000, on June 20th. Do you see that?
A. I do.
Q. Okay. And is it your testimony that those are also payments from the -- from Needham Bank?
A. Yes.
Q. And then there's another wire out to Rise Development for $115,117.60. Do you see that?
A. I do.
Q. Okay. And what was that for?
A. Again, to pay vendors. I'd have to look specifically

which vendors.
Q. Okay. So you're paying -- so some -- so some of these payments went to Rise Development for vendors. And is it your testimony that Rise Development then paid the vendors?
A. It seems to be, yes.
THE COURT: So in June, you say vendors were being paid out of Rise Development, but then in July and I think August, September, they're being paid out of Rudiarius. Why -- why did you switch from Rise Development to Rudiarius to pay vendors?
THE WITNESS: I think that's when our -- our license with QuickBooks lapsed, Your Honor.
THE COURT: School Street's license?
THE WITNESS: Rise Development's license.
Q. And if you look at Exhibit 47, if you turn to page 7, do you know what this document is?
A. I do not, but at the top, it says "Wire transfer request."
Q. Okay. Do you -- did you make this request?
Were you the one that initiated this wire transfer?
A. I don't -- which one? There seems to be three, sorry, or is there just one?
Q. There's just one.
A. Okay.
Q. Do you recall?
A. I don't recall.

Q. Well, it would have had to be you, right, because --
A. There's a few users on it, but more than likely it was me. I don't recall, but yes.
Q. Do you see where it says "Message to beneficiary"? Do you see that?
A. Yes.
Q. And it says, "June payment to RCM." Would I be correct if that's Rise Construction Management?
A. I don't know, but yes. I see the RCM there.
Q. And there are dates at the bottom, and it looks like this was -- this -- this wire was made on July 25th, 2025.
A. Correct.
Q. And this was from School Street Development to Rudiarius Holding Corp; correct?
A. Correct.
Q. And it's $320,000.
A. Correct.
Q. Would that note -- where it says "Message to beneficiary," would that indicate that that money was really for Rise Construction Management?
A. No.
Q. Why not?
A. I don't know. It could be a mistype. I don't know why it says that, but this was, obviously, a June payment that then went out to vendors. At the time, Rise Construction Management

was terminated on this project. This is School Street, again, Needham Bank.

Q. So who's -- who wrote -- I mean, somebody had to give this information to the bank; correct?

So who gave the June payment to RCM?

A. Anyone can make notes inside of this. So that could have been Keiran. I can find that out sometimes that -- those are -- those are internal notes. The bank doesn't participate in that.

Q. Right.

So you don't know who it is.

A. I don't.

Q. So is it your testimony that somebody else at Rise or at School Street may have issued a wire payment to Rudiarius Holdings Corp, which you are the member of or -- is Rudiarius Holdings Corp, is that an incorporated -- it's incorporated. It's registered, but is it a corporation or is it an LLC?

A. It's a corporation.

Q. Okay. So you're the officer of that, I think you testified, sole officer.

A. Correct, a manager.

Q. Okay. And is it your testimony that somebody at School Street issued a payment to -- knew to issue a payment to Rudiarius Holdings Corp without your involvement?

A. No. I don't think that's what I'm saying. I think I'm

acknowledging that 320 grand that was in the previous went for payments to pay vendors.

You had asked about June payment and was this for RCM. And I'm saying no. I don't know what that note is, who put it there, but that is not from the bank nor is it part of the approval.

Those are normally accounting notes that get made inside of this. And at the time, again, Rise Construction Management was terminated on this project.

Q. I thought you had told me that Rudiarius Holdings Corp was a -- was a -- just an entity for your family trust.
A. Correct. And it owns my portion of Rise Development, correct.
Q. Can you turn to page 9? Do you see this -- it appears to be a wire transfer request for an incoming domestic wire; is that correct?
A. Yes.
Q. And it appears that it is from Rudiarius Holdings Corp. Do you see that?
A. Yes.
Q. And it lists an address, by the way, of 12 Ericsson Street for Rudiarius Holdings Corp. Do you see that?
A. I do.
Q. Is that -- is Rudiarius headquartered at 12 Ericsson?
A. It is not. It's an address in Wyoming when you set up a

trust. That could be a mailing address.
Q. Does it -- does Rudiarius Holdings get its mail at 12 Ericsson?
A. Not currently.
Q. Where does it currently get its mail?
A. To Wyoming. It's -- I believe it's 1309 Coffeen Street in Sheridan.
Q. Why is Rudiarius Holdings Corp incorporated in Wyoming?
A. I think we talked about that last time. Because when I researched best places to set up a trust, Wyoming and the Dakotas kept coming up, so that's why I did it there with the app.
Q. And do you see at the -- towards the bottom under where it says "Wire information," it says "Originator to ben" -- I think that means beneficiary -- and it says, "Loan payment, loan payment on behalf of Rise Development"? Do you see that?
A. I do.
Q. Why is Rudiarius sending money to School Street Development saying it's a loan payment on behalf of Rise Development?
A. My assumption is this was a mortgage payment that Rise Development did not have the money to pay. So Rudiarius paid on its behalf. That's what this incoming wire seems to be.
So the bank direct withdrawals also direct pays, so those deposits you were asking about, those are just a direct

payment from the bank itself to our bank account, and then a direct withdrawal happens monthly for the mortgage payment.

Q. Do you have loan documents between Rudiarius and School Street Development?

A. I don't know. I don't.

Q. Was there interest charged on these loans?

A. There was not.

Q. Were they paid back?

A. I'd have to go and see the accounting. They could have been. I don't know.

Q. Who was the person who was in charge of keeping, I guess, requisition or keeping track of these loans?

A. It would be -- it would be me. I mean, we're very short-staffed, so.

Q. Okay. And then on page 12, there is another incoming wire for three days later. Do you see that? And it's also from Rudiarius Holdings Corp.

A. I do.

Q. And it's for $60,000.

A. Correct.

Q. And this says for the originator to beneficiary, it says, "Loan for repay, loan to School Street" -- "School Dev." Do you see that?

A. I do.

Q. Okay. Do you know what that is referring to?

A. We were behind two months of mortgage payments, so I assume this is the second mortgage payment.
Q. And then if you look at page 15.
A. Yes.
Q. This appears to be a wire transfer request for $500,000, and it looks like it was made on September 23rd, 2025. Do you see that?
A. Yes.
Q. And it's one day after the previous wire transfer we just asked -- we just talked about; correct?
A. Correct.
Q. Okay. And this one is actually a payment from School Street Development to Rudiarius Holdings; correct?
A. Correct.
Q. And then the message to beneficiary says "July and August 2025 construction payment." Do you see that?
A. I do.
Q. And then it says "Partial due to limits and loan repayment to RCH, paid interest payment for School Street." Do you see that?
A. I do.
Q. What is that referring to?
A. So two things here, this is a July and August payment, and this note is kind of making sense to me. That's why two mortgage payments were paid prior, because the bank won't

release the loan payments until the mortgage was current, so the mortgage got current.

The partial due to limits is because any single wire limit within this account is 500,000. And then the loan repayment, I think, is a typo. It should be Rudiarius Holdings Corp.

Q. Okay.

A. As -- you know, when it says "Paid interest payment for School Street," that is the mortgage. It's an interest-only loan.

Q. So Development -- did Development have a -- they were the ones who had the mortgage, or School Street had the mortgage?

A. It's actually signed personally by Brian Anderson and I.

Q. Who was the -- it's just you guys, or is there a company on the mortgage?

A. I don't recall. I believe we provided that. I -- typically, you sign just personally, though, through an LLC, but it's personally guaranteed.

Q. And then there's another wire transfer request on page 17, and this one is also the same day for $200,000. Do you see that?

A. I do.

Q. And it says, "July and August construction payment, partial due to limits." Do you see that?

A. I do.

Q. So School Street Development is paying Rudiarius rather than Development the July and August construction payments.
A. July and August construction loan payment, yes.
Q. Why couldn't School Street Development pay Rise Development?
A. Again, at the time, we swapped accounting software, and I believe that's why we did this.
Q. But you'll agree with me that Rise Development was -- their account was conducting business at this time, correct, in --
A. Sure. Yes.
Q. Okay. And then if you look at Exhibit 48, do you recognize this document?
A. I do not.
Q. Just going back to something, why didn't you just renew QuickBooks -- School Street's QuickBooks license?
A. Because it was like $15,000 and we just didn't have it at the time.
Q. Why couldn't you loan it to yourself from Rudiarius?
A. I don't -- I don't know.
Q. Back to Exhibit 48, do you recognize this?
A. I do not.
Q. I think last time you had mentioned that your son possibly had made a website.
A. Yes.

Q. And this says Rudiarius Holdings; correct?
A. It does.
Q. Is this the website that your son had made?
A. It could be. I don't know.
Q. You never saw the website.
A. I have -- no. I don't recall. I never really looked at it. And, honestly, the Rudiarius Holdings is actually .US, not .com, so he might have even started it under the wrong domain.
Q. Okay. Do you see where it says "Contact us. Drop us a line"?
A. I see the drop a line, yes.
Q. Do you know where that goes to if you click on it?
A. I do not.
Q. Do you have an e-mail for Rudiarius Holdings?
A. It would be Holdings.US, not .com.
Q. Do you have an e-mail -- do you have like an e-mail address that goes to you at Rudiarius?
A. I do, not .com, .US.
Q. .US. Okay.
And where it says "Investing in future opportunities," do you know what that means?
A. I do not.
Q. And then the last one I have here is -- for Exhibit 49, I think you had -- in the last day of hearings, we had talked a little bit about the Avidia Bank accounts, and there was

transfers to an account ending 8250. Do you remember that?
A. I do.
Q. Okay. And I think at the time you said you don't -- you didn't recall what that was. Do you -- does this document refresh your memory at all?
A. It doesn't. But I -- can I just correct one thing? My belief was that those two account numbers was the same operating account. It was wire in -- I'm sorry -- not same, same payroll account. Sorry. I'm slow.
Because I don't recall two separate, and, again, when we were going over those transactions last time, those made sense to me because they were all just weekly payrolls in and out for the most part. I know there were others, but for the most part, all of those transactions were monies in to the payroll and then monies out, obviously, to ADP.
So I -- I don't recall two separate accounts. I did -- Avidia did reach out per your request and said, are you opposing sending, and I said, no, please send all the bank accounts, so I assume that's where this comes from.
Q. Okay. So you don't recall Rise Construction Management having an operating account with Avidia.
A. I don't. I don't recall it that way. I remember it as there was a loan account that we had talked about, which was an interest carry on the loan on Mystic Valley Parkway, and then there was a payroll account.

MS. GILLIN: I think that is -- that concludes my questions.

THE COURT: All right. Exhibits 41 through 49 are admitted.

(Exhibits-41-49, admitted.)

Mr. Calandra?

MR. CALANDRA: Thank you, Your Honor.

CROSS-EXAMINATION BY MR. CALANDRA:

Q. I just have a couple questions of questions for you.

When Rise Construction Management, prior to their termination on the projects, what was your day-to-day role?

A. On which projects? I'm sorry.

Q. Let's --

A. The ones in question here?

Q. Yeah, the ones in question. We can go through all of them.

A. Not School Street, I guess that's what I'm asking. Meaning like 35 Braintree, those projects?

Q. Let's take them one at a time.

A. Okay.

Q. Prior to Rise Construction Management being terminated on 7 to 9 Central, what was your role on that project?

A. On that project?

Q. Yes.

A. Very little day-to-day role. I was principal at the

company, so it was more people running that project, John Hernon and others.
Q. And then on 11 Parker?
A. Same.
Q. 35 Braintree?
A. Same.
Q. 52 School?
A. 52 School, because I was on the development side, I participated a little bit more, and then I think at -- at the time of the termination was much later, and we went from 70-plus people working there down to 12, so my -- my role was -- I didn't have an official title, but I was operationally involved in that.
Q. When you say "a little bit more," what does that mean?
A. That's a great question. I would say that I was more aware of the day-to-day operations on that project.
Q. Such as?
A. Construction activity, billing, client interaction, loan interaction. Client being the investors. Sorry.
Q. Were you involved in the day-to-day billing?
A. No, not out on site. So for clarity, not like a superintendent or project manager.
Q. So you delegated those tasks to the project manager or the --
A. Yes, sir.

Q. -- project superintendent.
A. Yes, sir.
Q. Did you have day-to-day conversations with the project managers and projects superintendents?
A. I did.
Q. And what were the nature of those conversations?
A. Generally, what was happening out on site and the status of the project.
Q. Okay. 55 India?
A. That role, when we shrunk staff, I would say I was closer to a project executive, again, no title, but closer to a project executive of what was happening on that project.
Q. And prior to shrinking the staff, what was your day-to-day?
A. The project hadn't started. It was in preconstruction, so it was in planning.
Q. 86 Essex?
A. Again, that was -- I was fairly removed from that project.
Q. What does that mean, "fairly removed"?
A. Sorry. I operated as a -- we still had a significant staff. I operated more as a company executive and not a project-level executive.
Q. And what does a project-level executive do?
A. I think oversees the staff executing the work much closely than at a corporate level where you're operating a company.

Q. And then Nevins Hill?
A. Nevins Hill, I would say is the latter, much like 35 Braintree Street.
Q. I think it was 52 School or 55 India, but there was a couple of projects where you said -- you testified that Essential had done no work.
A. Correct.
Q. So if you're working at a higher level, at a level where you're removed from the day-to-day, how did you become aware of that?
A. So those are two separate projects. Can I clarify them individually?
Q. Why don't you clarify which projects you said they did no work on first.
A. 55 India.
Q. Okay.
A. So that's the clarity I was heading for, 55.
Q. Is that the only project you said they did no work at?
A. Correct. And then what I said on School Street, 52 School, was that they did project management, and I didn't believe that they had laborers out on the jobsite. Now, I could be wrong there, but --
Q. When you say you "didn't believe," what did you base your belief on?
A. I didn't know of any work that they had out there, hearing

from the staff, meaning, you know, typically, when there's either a cleanup crew, a demolition crew, or somebody, I would have heard that and I hadn't --

Q. Do you recall who the staff was on that project?

A. -- heard that.

For?

Q. 52 School.

A. For Rise Construction Management?

Q. Yeah.

You -- I think you just said you knew from staff on the project --

A. Okay.

Q. -- that --

THE COURT: Hold on. You're talking over each other.

THE WITNESS: Sorry.

THE COURT: One at a time.

THE WITNESS: Sorry.

Q. You -- you -- I thought you said you knew from staff on the project that they hadn't done work, and I'm asking who was the staff on that project you're referring to?

A. Sorry. I would have been referring to the Rise Construction Management staff.

Q. Do you know who in particular?

A. So --

Q. Who was managing?

A. Yes. Out on the site was Keiran, Keiran O'Reilly, and Eric -- I can't believe -- I'm just nervous. I can't remember his last name, but those are the two superintendents. And then, from a project management perspective, was Anthony Luongo. Eric Berardi. Sorry.
Q. Okay. So you don't have firsthand knowledge of the work that Essential may or may not have done on that project.
A. On 52 School Street, that's fair. Correct.
Q. And on 55 India, what is the basis for your understanding that they did no work on that project?
A. One, that I was very involved with ownership and the team at Essential on setting that project up, and I know that they did not complete any of the scope that was discussed as potential work out on that project. I do know that Derenzo completed that work.
Q. What do you mean "very involved"?
A. As a project executive, like I said earlier.
Q. On this particular job, what is a very involved project executive doing?
A. Day to day you're overseeing a project manager and a superintendent on this job; we had one of each, interacting with ownership, interacting with the design team, and interacting, from a business perspective, with subcontractors.
Q. Is a project executive involved on a project day to day? Are you on site day to day?

A. I am not on site day to day but involved, yes.
Q. "Involved, yes," what does that mean?
A. From a -- from a business and administrator perspective.
Q. And who was the project manager on 55 India?
A. Tim Galvin.
Q. And what were Tim's responsibilities on 55 India?
A. Subcontractor management, administration, things like submittals, call it technical administration, submittals, shop drawings, all of the administrative side, and then monthly requisitions.
Q. And if you weren't on the job day to day, would you rely upon Tim for information regarding what was happening on the project?
A. Out in the field would be the superintendent.
Q. And so then for the day-to-day work in the field, would you rely on your project superintendent?
A. Yes.
Q. So, again, on 55 India, your knowledge of what was completed out there is based upon a report from your project superintendent.
A. Correct.
Q. Okay. So you don't have any firsthand knowledge of the work that was completed on the site other than what was reported to you.
A. Yes. Fair.

MR. CALANDRA: Thank you very much.
That's all I have, Your Honor.
THE COURT: Mr. DiNicola?

CROSS-EXAMINATION BY MR. DINICOLA:

Q. Mr. Grossmann, what was the approximate revenue of Rise Construction Management in 2020?
A. Eighteen million, 20 million.
Q. What was the approximate revenue for Rise Construction Management in 2021?
A. Closer to 50 million, probably just over 50 million.
Q. What was the approximate revenue for Rise Construction Management in 2022?
A. Closer to 80 million.
Q. What was that?
A. It was closer to 80 million.
Q. Eight zero?
A. Eight zero, sorry, just over.
Q. Same question for 2023?
A. It was right around the same. It started to come down a little bit, but it was probably between 70 and 80 million.
Q. And same question for 2024?
A. Was less than 20.
Q. And what are you projecting for 2025?
A. Closer to 12.
THE COURT: This is gross revenue.

THE WITNESS: Yes. Yes, Your Honor.
Q. Okay. So what happened?
What happened?
How did we go from 20 million up to 80 down to 12?
A. So right around 2022, 2023, we really started to grow, and we were getting a lot of work, and at the same time, we were awarding a lot of work to subcontractors.
In that time frame of 2022 into 2023, specifically or kind of in the middle of 2023, we had numerous subcontractors default, maybe not claim bankruptcy but, essentially, default and -- and no longer perform on the projects. Some of them eventually claiming bankruptcy.
But we had, I believe, seven defaults, five of which ended up -- a company going out of business in one form or another on the subcontracting side.
Q. Okay. And how many -- how many projects did this impact?
A. Oh, probably three-quarters of our sub -- of our contracts.
Q. And these subcontractors that went out of business, were they on one project or multiple?
A. I'm sorry. Multiples. And that's why that few -- you know, one electrician had eight projects with us.
Q. Okay. So when that happened, you had, essentially, eight defaults across various -- from that particular sub across multiple projects; is that right?

A. Yes.

Q. As of May 2025, Rise Construction Management, what were their current projects at that time?

A. 55 India Street. The other projects were either completed or terminated on.

Q. Okay. So May 2025, the only source of revenue would be 55 India; is that correct?

A. Correct.

Q. And what about June 2025?

A. Same.

Q. July 2025?

A. Same.

Q. August 2025?

A. Same.

Q. September 2025?

A. Same.

Q. October?

A. Same.

Q. And November?

A. November, we just worked out the termination for convenience on 55 India last week, and we'll be -- and then we'll be off that project officially.

Q. And are there any projects in the pipeline for Rise Construction Management?

A. No. In fact, 55 India Street wasn't a project within our

pipeline. It was -- we were approached and asked to take the project on, so that wasn't something we were pursuing.

We knew at the time we were financially unstable, and that's why we took it given the terms where the owner paid vendors directly, and we were more administrative.

Q. I believe you had testified upon examination by Ms. Gillin about transferring responsibility for payroll for your employees from Rise CM to Rise Development. Do you remember that testimony?

A. I do.

Q. Okay. And when did you do that?

When did Rise CM do that, what month?

A. I'm sorry. I don't remember the exact month, but it might have been March or April.

Q. Of 2025?

A. Yes.

Q. And then were these people employees of Rise Development, or were they 1099 workers?

A. So what we did at that time, we signed employee contracts. As you can imagine, and rightfully so, people get nervous about will their check be there.

And so at that time, we sat everyone down and said if you stick with and help us at least finish up the projects we have on the development side, here will be your contract, and we'll work together that way.

Q. How many people now work for Rise Development --
A. I believe --
Q. -- at this time?
A. I believe today might be nine or 10. It was at one point 13 and then came down, but I believe today it's probably 10.
Q. And does Rise Development still have these business deals for projects as -- on the development side?
A. It does.
Q. Nevins Hill is one of the projects that Rise was on; correct?
A. Correct.
Q. And what is -- where -- was Rise terminated on that job?
A. Rise was terminated on that project.
Q. And are you aware that Essential Demo is claiming that Rise owes Essential money for work on that project?
A. I am aware, yes.
Q. Okay. And did Rise receive money from the owner of Nevins Hill on behalf of Essential that it has not paid Essential?
A. No.
Q. 35 Braintree, that project, you're aware of that project.
A. I am.
Q. And was Essential a subcontractor on that project?
A. They were.
Q. And did Rise receive money from 35 -- from the owner of

35 Braintree Street that it had warned Essential that it had not paid Essential?
A. No.
Q. 7 to 9 Central, you're aware of that project; right?
A. Yes.
Q. And was Essential a subcontractor to that --
A. Yes.
Q. -- on that project?
A. Yes.
Q. And has Rise received payment from the 7 to 9 Central owner on behalf of Essential that you have not paid to Essential?
A. No.
Q. Okay. 35 Braintree, was Rise terminated from 35 Braintree?
A. Yes.
Q. And do you know if that was for default or for convenience?
A. It was for convenience. It was a partial termination for convenience.
Q. Okay. Now, are you aware of -- did you make any efforts on behalf of the Mass. Laborers' Union to receive -- for them to receive money that was due the owner of 35 Braintree to Rise?
A. Yes.

Q. Can you describe those efforts, please?
A. I was continually working with principals at Essential to understand -- because -- take a step back. When we were terminated -- when Rise Construction Management was terminated on that project, the ownership structure also signed consent with each subcontractor, essentially, having the subcontractor acknowledge that the termination was in place and that the owner would pay them directly.
So -- so at that point, while we handled the administration of the contract, a lot of billing and payment happened outside of our view.
And at the time, I was speaking to both Attorney Gillin and the team at Essential, we thought it -- there was an open invoice of somewhere in the realm of $76,000.
And I would continually work on the principal at Jones Street, who was the developer, about trying to get that paid. I do know that eventually they settled. I have since seen correspondence where Jones Street explains that it's not 76,000, that they had made an interim payment that we weren't aware of, and I believe there was a settlement arrangement between Jones Street and both Essential and the -- and the pension fund.
Q. Do you know the value of that settlement?
A. I don't know the exact. It was in the 50,000-dollar range.

Q. And that money was money that was due to Rise from Jones Street; is that correct?
A. Correct. It would have fallen under that consent time frame.
Q. 7 to 9 Central, what type of termination was that?
A. That was a termination for convenience.
Q. And was that the same ownership group as 35 Braintree?
A. It was not. It was a separate ownership group, G -- GNC maybe.
Q. Okay. And what was the arrangement that you had with the owner of 7 to 9 Central with respect to subcontractor payments?
A. Likewise, they had sent a notice saying they were paying subcontractors directly. That was in October of '23, and the invoices that are open from Essential are October of '23, so all payments stopped going to Rise Construction Management and were getting paid directly to subcontractors.
Q. That's all I --
A. Just --
Q. Go ahead.
A. I'm sorry. It -- just for clarity around timing, you had asked what happened. At the time of October/November, there was an involuntary bankruptcy pushed on Rise.
And that made a lot of owners very nervous about subcontractors getting paid, so that was the precipice behind these three or four jobs other than Nevins Hill, to your point

earlier, to issue these -- termination for convenience and pay direct because they just wanted to make sure that the dollars they were receiving from their banks were going to the subcontractors.

THE COURT: I'm sorry. Was an involuntary bankruptcy proceeding filed or just threatened?

THE WITNESS: It was filed, sir. It made the -- it made the news. Everyone -- I didn't know at the time what an involuntary bankruptcy was. I think everyone made the assumption that we were bankrupt.

And so at that point, all payments stopped coming in to Rise Construction Management, and many of these development entities, while we worked through it and eventually settled that case, all of these development entities started paying the subcontractors directly, I assume, as a defensive posture.

THE COURT: And that was roughly October 2023.

THE WITNESS: Yes.

THE COURT: And what happened with that bankruptcy proceeding?

THE WITNESS: Eventually dismissed. We settled with the plaintiff.

THE COURT: So no debts were restructured or discharged.

THE WITNESS: No, sir. No, sir.

THE COURT: And who was the plaintiff?

THE WITNESS: There were a few that eventually dropped. You have to have three, so there were three benefit funds. None of the vendors, other vendors, to Rise Construction Management had joined.

And we eventually settled with Local 103. That electrician I mentioned earlier who went out of business did not pay their dues. We had paid them. We had shown that we paid them. We eventually settled with 103 for a payment over time.

MR. DINICOLA: That's all I have.

THE COURT: Anything further, counsel?

MS. GILLIN: No, none for us.

MR. CALANDRA: I do, Your Honor, please.

THE COURT: Yes.

RECROSS-EXAMINATION BY MR. CALANDRA:

Q. You just testified that you did not receive any money from the owner on behalf of Essential that you hadn't paid through to Essential.

A. I'm sorry. On which project?

MR. DINICOLA: Objection, Your Honor.

Q. Did you just testify --

THE COURT: I'll allow the question. He can disagree if he thinks it's wrong. Go ahead.

THE WITNESS: Thank you.

THE COURT: Let's hear the question.

Q. Did you just testify that Rise Construction Management or Rise Development or one of the other entities did not receive money from any of the owners on the projects on behalf of the -- of Essential?

MR. DINICOLA: Objection, Your Honor.

I think this needs to be limited to which project on a one-off basis instead of a generalized question because my questions were very direct.

THE COURT: Well, let's -- let's hear the answer to the general question, and then we can drill into it.

A. I -- I believe I was answering for the question in time, so Attorney DiNicola was asking specifically around a project and did -- did you, on 35 Braintree Street, receive monies on behalf of -- that were due to Essential.

And the context -- now before the termination, we, obviously, did and paid out, but after the termination, we did not receive any money, and so in that context for those projects, we did not receive money, and those were 11 Parker, 35 Braintree, Nevins, and 7-9 Central.

THE COURT: Let me make sure I have this testimony straight. So for these four projects, 35 Braintree, 11 Parker, Nevins Hill, and 7 to 9 Central, when you received money coming in -- when Rise received money coming in that was due to the subs, it was paid out. Then there was a termination or terminations on all four projects, and then the owners started

paying the subs directly.

THE WITNESS: Correct, after those terminations.

THE COURT: Okay. And that's those four projects.

THE WITNESS: Yes.

THE COURT: And that occurred in roughly the fall of 2023.

THE WITNESS: They were all in the same month of '23, yes.

THE COURT: October, November, thereabouts.

THE WITNESS: It might have been middle of October to middle of November, Your Honor.

THE COURT: Okay. I'm sorry, Mr. Calandra.

Q. So just to be clear, on those projects prior to the termination, is it your testimony that you did not receive any money from an owner that was on the account of Essential that was paid for Essential?

A. No. Prior to, it was a normal requisition process in that we billed. We were paid, and we paid out.

Q. Okay. If you were --

THE COURT: Normal requisition process meaning the sub sends an invoice; right? The work has been done.

THE WITNESS: Correct. We assemble the -- we submit --

THE COURT: You notify the lender or funder, whoever it is --

THE WITNESS: Exactly, yes, sir.

THE COURT: -- and they say okay and they send you the money --

THE WITNESS: They sends us the money --

THE COURT: -- to be paid to Essential.

Q. You also testified in response to my questions earlier that you weren't involved in the day-to-day of project operations. So what is the basis of your belief that you did not receive money from an owner on behalf of Essential that was not paid to Essential?

A. In this case specifically, the --

Q. Which case specifically?

A. In -- what's in -- I'm sorry. For those four projects specifically that we're talking about, 11 Parker, 35 Braintree, Nevins Hill, and 7-9, are based upon the correspondence; so specifically 7-9 Central Street terminated us in October of '23, and that termination says that they're paying the subcontractor directly.

And then from there, its correspondence from Essential to that owner that we provided 35 Braintree much similar -- the documentation that then says we are no longer paying you. It's on each one of those.

Q. I apologize. My question wasn't clear.

I'm asking you: Prior to termination on any of those projects, for any of the billings you submitted to the owners,

did you not bill to the owners an amount for a subcontractor that you then later received from the owner in payment that you did not pay to the subcontractor?
A. Not that I'm aware of.
Q. And how would you be aware of that?
A. Back in 2022, 2023, I had a partner who handled all of the financials, and we would have a weekly finance meeting.
Q. And you would expect him -- what was the person's name? Excuse me.
A. Brian Anderson.
Q. Brian Anderson. Would you expect Brian to tell you if he was advance billing for the subcontractors?
A. I'm sorry. I don't understand what the term "advanced billing" means.
Q. Let me be clear. Would you have conversations about whether or not your bills to the owners included amounts for the subcontractors, for example, Essential, that you then later received payment from the owner for that you did not pass through to the subcontractor?
A. There were -- we had open payables that we would review. I don't recall anything specifically on Essential, but there were open payables that were reviewed regularly.
Q. I'm not talking about open payables.
I'm talking about submitting a bill to the owner --
A. Uh-huh.

Q. -- with an amount included for a subcontractor that you later received a payment for from the owner that you didn't pass through to the sub such as Essential.
A. Yeah. In that time frame before when Brian was, I might not have known that.
Q. Would Brian take it upon himself to do that?
A. I don't -- I don't know. I don't think so.
Q. Okay.
A. It's not standard practice.
Q. I'd like to refer to Exhibit 38. I believe everybody has a copy of that.
MR. CALANDRA: Can I approach the witness with a copy?
THE COURT: Yes. Although -- so is there another copy, or can you display it? I don't seem to have brought mine. You can use the document camera over there. There you go. Okay. Go ahead.
Q. Okay. This is Exhibit 38, and attached to Exhibit 38 is an Exhibit B. Do you recognize this document?
A. I do.
Q. And what is this document?
A. This is the termination for Nevins Hill.
Q. And who's it from?
A. From the lawyer representing the owner.
Q. And who's it to?
A. John Hernon.

Q. I'd like you to take a moment and read at the bottom of the first page paragraph 3 and then continue on to the next page, which is on the back side of the document, and read the top two paragraphs.

THE COURT: If you can move the document up.

MR. CALANDRA: I apologize. Sorry.

Q. Do you understand what the owner is saying to you in this?

A. I do.

Q. And what is the owner saying to you with respect to, on this particular project, payments to subcontractors?

MR. DINICOLA: Objection, Your Honor.

THE COURT: I think he can testify as to his understanding of what the owner is saying.

A. The owner is making claim on two fronts; one, that Rise Construction Management did not meet its obligation from a schedule perspective; and then on a second, that Rise Construction Management received money that it did not pay out to subcontractors.

THE COURT: Based on fraudulent certifications, that's what the owner says.

THE WITNESS: Based on the requisition process, yes. When they say certified, Your Honor, that's -- it gets notarized and the project manager signs it.

THE COURT: But to get the money Rise has to certify that it's paying its subs; right?

THE WITNESS: Correct.
THE COURT: Or has paid its subs.
Go ahead.
Q. To your knowledge, did Rise ever certify a requisition to the owner on the 7 to 9 Central project -- excuse me -- on the Nevins project for which this letter applies where Rise included an amount for a subcontractor, such as Essential, that Rise later received a payment for from the owner that Rise did not then pay to the subcontractor such as Essential?
A. To my knowledge, no.
Q. And what would that knowledge be based on?
A. In talking to the project team.
Q. And who was that?
A. John Hernon mostly would have handled this.
Q. Would John have taken it upon himself to certify a requisition that would do that?
A. No, I don't believe so.
MR. CALANDRA: Thank you. That's all I have.
THE COURT: Mr. DiNicola?
RECROSS-EXAMINATION BY MR. DINICOLA:
Q. So Exhibit B, the letter from the lawyer for Nevins Hill, do you have that in front of you?
A. Yes.
Q. October 23, 2023; correct?
A. Correct.

Q. Okay. You -- do you know what was the last requisition on Nevins Hill that was funded by the owner?
A. June.
MR. DINICOLA: Thank you. That's all I have.
MS. GILLIN: I have one question.
THE COURT: Go ahead.
RE-DIRECT EXAMINATION BY MS. GILLIN:
Q. Mr. Grossmann, I think you had testified on the first day about a job that Rise had done for DRT Ellery or DWT Ellery, does that sound familiar, the Ellery job?
A. Yes.
Q. And that case is in litigation; correct?
A. Correct.
Q. And is it true -- it's true, is it not, that Ellery -- can you, by the way, tell me is it DWT?
A. Correct, but if you say Ellery, they're one and the same.
Q. That owner has accused Rise of similar billing issues as this owner on Nevins -- on the Nevins project; correct?
A. Not -- if I can explain a little bit.
Q. Could I just finish my question?
A. I'm sorry. I apologize.
Q. Including paying subcontractors -- not paying subcontractors while certifying that the subcontractors had, in fact, been paid; is that correct?
A. The -- that is not correct. It's a little bit different,

and sorry to interrupt. So a few things. When you say "owner," that is one where we're a developer also, so we're part of DW RT, which is the development entity for that. One of the partners, DivcoWest is the DW, did make claim very similar in that payment and -- and schedule.

And we counterclaimed for 3 million dollars' worth of open change orders on that project. And so the payments that weren't made, our position, and we've documented it, is that the payments that subs had completed work for were unapproved change orders due to the construction management firm.

Q. Okay. So on that project, which, by the way, Essential also worked on that project; correct?

A. I believe so, yes.

Q. Okay. And your defense for that -- in that litigation is that, yes, the subs weren't paid, but the subs had -- all of the work that they weren't paid for was unapproved change orders.

A. No. I -- I think so, but if I can expand, I think what I'm saying just to add clarity to that is Rise Construction Management was not paid either.

Q. But they're claiming that Rise Construction was paid, correct, the owners in that project, in that litigation?

In fact, Rise was sued for fraud; correct?

MR. DINICOLA: Objection.

We have two questions all at once. Can we do one

question, please?

THE COURT: Fair enough.

Q. Rise was sued for fraud in that case; correct?

A. I don't recall the exact wording, but it could be correct.

Q. Do you have any reason to think that it's not correct?

A. We did -- we counterclaimed, and we actually had a judge acknowledge the counterclaim and that we had good ground to stand on, and that, in fact, DW RT -- these are exact words -- was most likely first to breach.

Q. And the second one -- the second question, I think, was: Is it your understanding that -- or is it your -- is it your position that the reason that subs weren't paid on that job was because they had -- all of that work constituted unapproved change orders?

A. Correct. So our position back to the ownership entity was that there were over 3 million dollars in changes, and those happened in a couple ways.

There was a water damage insurance claim that was not paid yet, and there were open HVAC design changes that occurred as well.

Q. Okay. And was one of the claims also that Rise had certified that the subcontractors had, in fact, been paid?

A. I don't recall that.

Q. Okay. What is the status of that litigation?

A. I think --

MR. DINICOLA: If you know, say you know. If you don't, then you don't.
A. I don't know. Last -- my last recollection they did reach out looking for us to drop our counterclaim and them to drop theirs.
Q. Is it in mediation? Was it mediation?
A. No. It might have been arbitration. That might be arbitration.
Q. So I think you had also testified that on the 55 India Street job that you weren't looking for work at that time and they approached you; is that correct?
A. That is correct.
Q. And do you recall a meeting with the Laborers and the benefit funds where you came to the funds office? Do you recall that?
A. I do.
Q. Do you recall representing that you had work that Rise was pursuing including bidding on ICE detention centers? Do you recall that?
A. No, not -- I don't recall if it was ICE, but we were -- not as Rise. I was as a consultant pursuing potentially federal government work, yes.
Q. And do you recall a -- stating that you were also working on a job at 7 to 11 Curtis Street?
MR. DINICOLA: Objection, Your Honor.

Is this -- objection. I believe they're coming into settlement discussions here that were held with Ms. Gillin.

MS. GILLIN: This was not settlement discussions. This was --

THE COURT: Let me -- give us a more or less simple question, I think, was he involved? First, let's take it a step at a time.

MS. GILLIN: Yes. Yes. Let's go there.

A. I am a developer. I'm part of that development entity.

Q. Is Rise Construction Management also involved in that?

A. We were, and we never did work. We -- and we terminated for convenience. We terminated too.

Q. Who's "we"?

A. I'm sorry. Rise Construction Management terminated the contract.

Q. But at some point, Rise did perform work on that job.

A. We did not perform work on that job.

Q. Okay.

A. The site work was done directly by the development entity, Sawjen.

Q. And that job also was a -- was subject to litigation; correct?

A. That job with the site work contractor, the neighbor.

Q. But Rise Construction Management was also sued as part of that; correct?

A. Was named, yeah.
Q. Okay. And the site developer -- well, can you describe what the claim was in that?
A. So the site work contractor put in -- it's a bit technical, but put in -- to dig the foundation you put in what's called earth retention, so earth support, so essentially big I-beams you put in the ground to dig a hole to hold the dirt on the other side back. That had failed.
Q. And it was, in fact -- it was in danger of collapsing the home of the next-door neighbor; correct?
A. That was a claim later from a technical perspective shown not to be true.
Q. But they got an injunction; right? They got --
A. They did.
Q. -- a stop of work.
A. Correct.
Q. And in that lawsuit, they named Rise Construction Management as the general contractor; right?
A. They did.
Q. And Rise Construction Management filed an answer to that; correct?
A. I don't recall. Could have, yes.
Q. So was Rise Construction Management involved --
A. No.
Q. -- in that project?

A. Nope. So Rise Construction Management was pricing in the preconstruction, and then the foundations were hired by Sawjen. We actually -- I'm sorry. At that meeting, we talked about this, and I was very transparent in that the partner in that is an individual and had brought on a site work contractor that did the work he had a relationship with. He did the work, so Rise Construction Management did not take that on.

From the point of injunction, I severed the relationship of Rise Construction Management well over a year ago plus, probably a year and a half ago, and Sawjen then hired that site work contractor to finish the foundations and they're done out there now.

Q. Are you involved in Sawjen?

A. I am a 50 percent partner in that.

Q. When you "we" -- when you were saying "we" before, are you referring to Development or Construction, or what entity are you referring to?

A. I'm sorry. When I said we terminated, Rise Construction Management terminated. Sorry.

Q. Okay. And who was their contract with?

A. Sawjen, LLC.

Q. And is Sawjen the developer?

A. Sawjen is the development entity that owns, yes.

Q. And they own that project --

A. Correct.

Q. -- that piece of land.
A. Yes.
MS. GILLIN: Thanks. I think that's all I have.
THE COURT: Anything else, Mr. Calandra?
MR. CALANDRA: No, thank you.
THE COURT: Anything else, Mr. DiNicola?
MR. DINICOLA: No, Your Honor.
THE COURT: Thank you. You may step down.
THE WITNESS: Thank you.
THE COURT: Ms. Gillin.
THE WITNESS: I'm sorry, Your Honor. What do I?
MR. DINICOLA: Just leave them.
THE WITNESS: Leave them. Sorry.
THE COURT: Ms. Gillin?
MR. CALANDRA: Your Honor, could we take a five-minute break? Is that possible?
THE COURT: Yes.
THE CLERK: All rise.
(The Honorable Court exited.)
(Brief break from 10:32 a.m. to 10:38 a.m.)
THE CLERK: All rise.
(The Honorable Court entered.)
THE CLERK: Thank you. You may be seated. Court is now back in session.
THE COURT: Ms. Gillin?

MS. GILLIN: So I think we'd like to have -- Mr. Calandra is going to be putting up Chris Grossmann.

THE COURT: Okay.

MS. GILLIN: So we'll have questions.

THE COURT: Go ahead.

MR. CALANDRA: Your Honor, Essential calls Mr. Christopher Grossmann to the stand.

THE COURT: And just so you know the schedule, I have a sentencing that's supposed to take place at 11, which will probably take on the order of half an hour. It may be running late because the lawyer and interpreter are in a different courtroom, but as soon as we get word that they're ready, we'll pause this. I'll do the sentencing, and then we'll come back. It should take half an hour but no guarantees.

CHRISTOPHER GROSSMANN was sworn.

THE CLERK: Thank you. You can have a seat. Please speak into the microphone.

MR. CALANDRA: Your Honor, I also have a binder of exhibits. They're just generally labeled right now. Perhaps 1 through 7.

THE COURT: Just so the record's clear, because I have -- it's 1 through 7. For purposes of this, we'll just call them 101 through 107. Okay. You can call them 1 through 7 now, but on the record, we'll call them 101 through 107.

MR. CALANDRA: Okay.

THE COURT: Go ahead.

DIRECT EXAMINATION BY MR. CALANDRA:

Q. Could you please state your name for the record?

A. Christopher James Grossmann.

Q. And where do you work?

A. Essential Demo, Inc.

Q. And what was your role with Essential?

A. Owner, treasurer, and operator.

THE COURT: Are you the president of the corporation?

THE WITNESS: No.

Q. Who is the president of the corporation?

A. Marc Mattera was.

Q. And what relation to you is Marc?

A. Business partner for Essential Demo.

Q. And in your role as treasurer and operator, what did you do?

A. I handled all the project management, billing, and collections of the business, everything from working with the customers to find out what their job is, to getting the manpower on the job, billing for it, making sure we're getting paid for it, and it's -- you know, everything's being paid to the vendors.

Q. And so when you say "project management," what do you specifically mean?

A. Project management would be basically managing the

project, everything from submittals to labor invoices, making sure that the project was being completed as per the direction of the contractor.
Q. Okay. So you were -- were you on the jobsites on a day-to-day basis?
A. No.
Q. How often would you visit the sites?
A. I try to get to every site once a month.
Q. Okay. And how long have you been with Essential?
A. Since we started it, so 2021.
Q. Okay. And were you involved on the projects -- we'll call the Rise projects?
A. Uh-huh.
Q. Were you involved with 7 to 9 Central?
A. Correct, I was.
Q. Were you involved with 11 Parker?
A. Correct.
Q. Were you involved with 35 Braintree?
A. Correct.
Q. And 52 School?
A. Correct.
Q. 55 India?
A. Correct.
Q. 86 Essex?
A. Correct.

Q. And Nevins Hill?
A. Correct.
Q. Were you involved with the Rise invoicing on those projects?
A. Yes. I handled all the invoicing.
Q. And what does that mean to be involved with?
A. So on a T and M basis, every week we would send employees to a project to go work. I would, at the end of the week, collect their time and their daily slips that they had signed by the contractor, Rise Construction, someone on site.
As I would collect those, I would create a billing in our system for it, then I would send the billing out the following Monday to all the project managers and the jobsite accountants, and then go through the project managers on their open invoicing that they haven't paid for yet, and any upcoming project request from their superintendents in the field.
Q. Okay. So you had an integral role in the accounts receivable.
A. Correct.
Q. The monies you were receiving in payment for your services?
A. Yes, absolutely, yeah.
Q. Okay. I'd like you to turn to Exhibit 38.
A. Okay.
Q. And I'd like you to turn to page Exhibit A-001.

A. Okay.
Q. And what is this document?
A. This is a list of all the open invoices and the balance that hasn't been paid yet by Rise Construction.
Q. And who prepared this document?
A. I prepared it with help of counsel.
Q. Okay. And what is the basis for the information included in this summary?
A. All the information here comes out of our files and our accounting system, which we use on a day-to-day basis, QuickBooks. Everything that we get from the field including signed slips goes into a job folder, then into QuickBooks, and then these are the reports that we print out for open invoices by customer.
Q. In Column B, what date does that represent generally?
A. Column B is the date that the money was due.
Q. The date of the invoice?
A. Date of the invoice, yeah.
Q. And then Column C is?
A. The invoice number out of our accounting system.
Q. And then the Column D?
A. The project that we worked on that it got billed to.
Q. And then in Column E?
A. The amount that was billed.
Q. And in Column F related to credit supply for Essential --

A. Uh-huh.
Q. -- what is Column F?
A. Column F is either a credit that was applied that they're -- that they made a payment towards the invoice or a -- I don't see any here -- but it would also include a credit that I would have applied for.
Q. So the day you applied a credit.
A. Yeah.
Q. And what is Column G?
A. Column G is the payor, who paid it, what jobsite.
Q. And then Column H?
A. How it was paid.
Q. And Column I?
A. Reference number that we used.
Q. Okay. And then Column J?
A. Is how much was paid towards that balance.
Q. And then Column K?
A. Is the remaining open balance.
Q. Okay. I'd like you to turn to page Exhibit A-002.
A. Uh-huh.
Q. And what is the total that you -- that Essential is claiming that is unpaid?
A. It's at the bottom there, $360,595.44.
Q. And what do the line items Essential open invoices per project represent?

A. Essential -- so they represent the projects. I could go -- do you want me to go through each one?
Q. No, just generally what is that?
A. Those are projects that we performed work on and haven't been paid on yet.
Q. Is that the amount owed on each project?
A. Correct.
Q. I'd like you to turn to Exhibit A-003.
A. Uh-huh.
Q. Page Exhibit A-003 of Exhibit 38.
A. Yeah.
Q. Do you recognize this document?
A. Correct. Yes, I do.
Q. And what is this document?
A. This document is an invoice out of our accounting system for --
Q. Is this a document that you use in the regular course of your business?
A. Yes.
Q. Is this a document that you regularly used in submitting for payment from Rise?
A. Yes.
Q. And in general, what does a document like this include?
A. So it includes the project name, the customer name, the date of the invoice, the invoice number, the date the invoice

is due, and then what the invoice was for, which would be -- this one is a monthly billing requisition, the amount that's due, and then if there's any payments made towards it, and then the remainder that's open.
Q. Is this a true and accurate copy of the document included in your accounting system?
A. Yes, it is.
Q. Okay. And for each of the invoices listed on page Exhibit A-001 --
A. Yeah.
Q. -- have you included a copy of the invoice?
A. Yes, I have.
Q. Okay. I'd like you to turn to Tab 1, Tab 101 -- excuse me -- of your binder.
A. Uh-huh.
Q. And turning to the second page, do you recognize this document?
A. Yes.
Q. What is it?
A. So this is Essential Demo services proposal for labor rates to be completed on a job.
Q. Is this a document that you regularly use -- Essential regularly uses in its business?
A. Yes.
Q. Did Essential regularly use this with Rise?

A. Yes.
Q. And what project is this one for?
A. This one's for 7-9 Central Street.
Q. Okay. And what is the basis of the -- what is the work that you're proposing to provide here?
A. So this -- in general, for this job or -- any time we do a proposal like this, this is generally for the GRs of a jobsite, the general requirements --
Q. Okay.
A. -- which is temp labor on a job, which would be general cleaning, general maintenance on the job, sweeping, making sure the stairwells are cleaned out, the jobsite's safe, fencing is completed and kept safe and kept up.
Q. And you stated that that was called generally general requirements.
A. General requirements, yeah.
Q. Okay. And what was the basis for payment?
A. So we asked for two-week payment terms, weekly billing and payments.
Q. And do you recognize the signature on -- the signatures on the third page?
A. Yeah. One is Essential Demo, the president, Marc Mattera, and the other is from the contractor, Brian Regan.
Q. And did you bill Rise on this project per the terms of this contract?

A. Yes. We billed them weekly.
Q. Did Rise pay you in full for the invoices?
A. Not all the work, no.
Q. Can you flip back to Exhibit A 38?
A. Yeah.
Q. Page Exhibit A-001.
A. Uh-huh.
Q. And identify for the 7 to 9 Central project from Column C and D which invoices weren't paid?
A. Invoice 1376, Invoice 1397, 1411, 1414, 1415, 1468, 1478.
Q. Did Rise at any time reject any of those invoices?
A. No.
Q. Did Rise ever make a statement in writing certified in good faith citing the contract as a basis for the rejection of those invoices?
A. No.
Q. Did you attempt to collect those invoices from the owner?
A. Yes. When I realized that I wasn't going to get paid, I reached out to --
Q. And when was that?
A. I stopped getting paid around -- from this job around September of '23, I believe it was, right, so I'll go back to the invoice dates -- yeah, around September of 2023, I was having trouble collecting.
Q. And why was that?

A. According to the Rise personnel, they just told me they didn't have the money left to pay for it, so I reached out -- they told me I wasn't going to get paid, so I liened the project. I put a mechanic's lien on the project.
Q. Okay.
A. The owner needed to collect his payment from the bank, which the bank won't pay you as an owner unless you have a clean -- no liens on the job, so I reached out to the owner. We spoke, and he said he would make a payment for our -- on Rise's behalf, and -- you know, to get my lien off, and then I could go after Rise.
When I specifically asked the owner, I said, you know, what is going on here? Why am I not being paid? His claim was I paid Rise everything that was owed to them on the GRs, so --
MR. DINICOLA: Objection, Your Honor.
Hearsay.
THE COURT: I'll allow it for what he was told not for the truth of the matter asserted.
A. Yeah. So I was told that I would not get paid the rest of it directly from him, that I would -- because he's made payments to Rise and -- overpayments to Rise, that I would have to get the rest of the money from Rise.
Q. Did you attempt to get the rest of the money from Rise?
A. Yes. I tried multiple times to settle on all the open debts.

Q. So the amount that you're claiming --
A. Uh-huh.
Q. -- is due from Rise is the amount that you attempted to collect from the owner; is that correct?
A. Correct.
Q. That the owner refused to pay because it was your understanding that they had paid it to Rise already?
MR. DINICOLA: Objection.
A. It's my understanding from the conversation with the owner that they paid out all the GRs to Rise Construction.
Q. How did you bill Rise for the invoices?
Was it on the T and M?
A. Those were based on -- yes, a T and M basis.
Q. Do you know if Rise included your invoice to Rise --
A. Uh-huh.
Q. -- with the T and M as part of its backup to the owner in their billing to the owner?
A. I don't know what Rise does on their billing to the owners. I don't get to see that. But from my understanding of speaking to the owner, the owner says he never seen any of these bills.
MR. DINICOLA: Objection, Your Honor.
THE COURT: So, again, I'll allow it not for the truth of the matter asserted, but this is what this witness was told.
Q. So it's your understanding, then, that your invoice and

backup included with the invoice was not something submitted to the owner.
A. Correct.
MR. DINICOLA: Objection again.
A. That's my understanding.
THE COURT: Again, I'll allow it. It's his understanding.
Q. I'd like you to turn to Tab 102A.
A. Uh-huh.
Q. And do you recognize this document?
A. Yes.
Q. And what is it?
A. This is a standard subcontract from Rise Construction to Essential Demo, Inc.
Q. And how does it differ from the last contract we saw?
A. So this is a contract for hard bid work and not T and M work.
Q. What does "hard bid work" mean?
A. Hard bid work says I get a scope of work from the contractor. I price that up and say, this is what that work will cost you in full, unless there's changes to the contract, based on the scope of work that you supplied me. Then we sign an agreement that I will complete that work for that much money.
Q. Does it require you to submit time and materials tickets?

A. No, only if I do change order work.
Q. And does it have a specific sum?
A. Yes, it has a specific sum.
Q. And what was the --
A. 125,000.
Q. Okay. And turning to page -- page 17 of 17 of this document --
A. Uh-huh.
Q. -- do you recognize these signatures?
A. Yes. So the first signature is Rise Construction, Brian Regan; subcontractor is Marc Mattera, the manager -- the president; and then the last signature is Tommy Hill.
Q. Okay.
A. Which, I think, was the PM on the job.
THE COURT: Let me just interrupt for a moment. So those of you in the courtroom who are here for the 11 o'clock sentencing, we're going to pause this matter as soon as we're ready to go. The prosecutor and the interpreter are in another courtroom in the building and they're going to let us know as soon as they're available, and then we'll get started on that. Hopefully, there won't be much delay.
Go ahead, Mr. Calandra.
Q. What was the basis for payment on this project?
A. So this was based on AIA recs, which you bill month to month, and then you collect 30 days after the ending of the

month.
Q. What does it mean to be an AIA rec?
A. Architectural international something, so, basically, it's a bill for the work completed throughout that whole month based on a schedule of values that you provided to the job, so your schedule of values is based on the scope of work that's being done, and you bill a percentage of that work as completed for the month.
Q. I'd like you to turn to Exhibit 38.
A. Yeah.
Q. Page Exhibit A-032. Now, this is not specific to this project, but is this the document that you're referring to?
A. Yes. This is an AIA rec, yes.
Q. This is representative of the document that you would have submitted on --
A. Correct.
Q. -- 11 Parker.
A. Uh-huh.
Q. And the items that are listed here in this document, what do we -- is there a name for those?
A. So your contract sum, the change orders, the contract sum to date, the total completed, the retainage.
Q. But the items in general?
A. Oh, the schedule of values.
Q. Okay. And so you would -- how would you bill, according

to the schedule of values?
A. Yeah. You bill according to the schedule of values on a percentage of actually complete, so if you go and do 50 percent of the work that month, you can -- you would bill 50 percent of the line item value.
Q. Okay.
THE COURT: And I assume there's a retainage in all these contracts, sort of, for punch list and other items at the end of the job.
THE WITNESS: Yeah. So they're allowed to keep a 5 percent retainage on the -- on these projects, except for the T and M. There's no retainage held on T and M work.
THE COURT: Okay.
Q. And on page 2 of 17 in Tab 102.
A. Yeah.
Q. At the top, what was the retainage on this project?
A. 5 percent.
Q. And what was the scope of work on this particular subcontract?
A. So on 11 Parker, we had two contracts. One was for demolition on the job and the other was for concrete.
Q. I'd like you to turn to Tab 102B.
A. Yeah.
Q. Is this the second subcontract you're referring to?
A. Correct. This is the concrete.

Q. And what's the subcontract sum of this subcontract?
A. 116,000.
THE COURT: Is this to pour concrete as opposed to demolish concrete?
THE WITNESS: Yes. Correct.
Q. And on page 17 of 17, do you recognize the signatures?
A. Yes, the same signatures.
Q. And were the payment terms under this subcontract the same as --
A. Yeah.
Q. -- the payment terms of the prior subcontract we just looked at?
A. Yeah. AIA rec billing, net 30 with a 5 percent retainage.
Q. And did you submit invoices to Rise?
A. Yes, we did.
Q. On these projects, both of them?
A. Yes.
Q. Did they fully pay for the invoices you submitted?
A. They haven't fully paid all the invoices, no.
Q. Referring to Exhibit 38, page Exhibit A-001, could you identify the invoices that Rise didn't pay?
A. Invoices 1022, 1003, 1025, and 1042.
Q. Did Rise ever reject these invoices?
A. No.
Q. Did they ever reject these invoices in writing, certified

as made in good faith with reference to a contract?
A. No.
Q. Did you attempt to collect these from the owner?
A. I did not speak with the owner on this project to try and collect. I did not have his contact information. We did lien the project to try to collect these, and the owner bonded over the lien.
Q. Okay.
THE COURT: What does that mean?
THE WITNESS: So the owner goes in and provides a lien to the job, since he's the owner of the building, to say if there is money to be collected, the bond works as an insurance to pay off.
THE COURT: So it's a substitute for the lien.
THE WITNESS: Yes.
THE COURT: A form of security.
THE WITNESS: A form of security. Thank you. Yes.
THE COURT: Go ahead.
Q. Was this work direct for Rise?
A. Yes.
Q. I'd like you to turn to Tab 103A.
A. 103A.
Q. The second page after the page entitled Exhibit B1.
A. Yeah.
Q. Do you recognize this document?

A. Yeah. This is a short-form contract between Essential Demo and Rise Construction for 35 Braintree Street.
Q. And is this contract similar in nature to the last contract that we just looked at?
A. This is different. This was a short-form contract for T and M work to be provided on the project.
Q. And what was the scope of the T and M work you were to provide?
A. General cleaning, general requirements, you know, fence and management safety, general labor.
Q. And did you bill Rise for the work you completed on this project?
A. Yes, weekly.
Q. Weekly?
A. Yeah.
Q. Okay. And referring to Exhibit 38, page Exhibit A-001, can you identify the invoices that Rise hadn't paid?
A. 1695.
Q. Okay. And I'd like you to turn to Exhibit 3B, 103B -- excuse me -- Tab 103B.
A. Tab 103B, yeah.
Q. Do you recognize this document?
A. Yes. This is an invoice, 1695, the open invoice.
Q. And what does this represent?
A. This represents T and M billing reconciled for the -- for

the equipment that we rented for the project.
Q. And why did you rent the equipment?
A. On behalf of Rise Construction, they had us rent the equipment and bill them for it since they -- they don't have contracts to rent stuff from.
Q. And what was the equipment used for?
A. So it was used for -- the generator was used for general work on the job; I think they ran, like, the elevator off of it and some other stuff, and then some heaters to heat up certain areas of the building.
Q. Okay. Did Rise ever reject this --
A. No.
Q. -- invoice?
Did they ever reject it in writing, certified as made in good faith --
A. No.
Q. -- with reference to the contract?
A. No.
Q. Did you ever seek payment from the owner for this?
A. Not for this, no.
Q. I'd like you to look at Tab 104.
A. Uh-huh.
THE COURT: It looks like we're going to be ready to go on the sentencing around 11:15, maybe a little later, just as an update.

Go ahead.
Q. And on the second page --
A. Uh-huh.
Q. -- do you recognize this document?
A. Yeah. This is a contract between Essential Demo, Inc., and Rise Construction for the 52 School Street project. This is an interim cleaning contract.
Q. And what's the value of this subcontract?
A. 220,000.
Q. And what was the nature of the work?
Is this a T and M contract as well?
A. This is a little bit different. So the general T and M work gets hard bid by us, and then we basically manage the T and M work on a basis of how many hours completed on the project.
We billed this on a schedule of values instead of weekly T and M slips, so we own the amount of labor on the job, and the GC doesn't have to manage weekly slips and billing. It gets billed like a regular contract on an AIA rec.
Q. And did you submit invoices to Rise for this project?
A. Yes.
Q. And can you identify in Exhibit 38, page Exhibit A-001 --
A. Yeah.
Q. -- invoices that Rise didn't pay?
A. Yeah, 52 School Street, which is 1617 and 1665.

Q. You received credits on 1617 and 1665. What were those for?
A. Correct. So when Rise was having issues, they were trying to make payments to us to catch up, and they made -- I believe that was based on a wire transfer, and I was directed by John Hernon, their PX, to apply the amounts to those open invoices.
Q. And so the balance after the application of the credit is the amount you're seeking.
A. Correct.
Q. And what's that amount?
A. So the open amount is 54,749.25 and $3.42 cents.
Q. And is that similar for 1665?
A. Yes.
Q. Okay. Did -- did Rise ever reject these invoices?
A. No.
Q. Did they ever reject them in writing, certified as made in good faith --
A. No.
Q. -- with reference to the contract?
A. Nope.
Q. On this project, is it your understanding -- do you know if Rise submitted your invoices with their invoices to the owner?
A. Again, I don't see Rise's invoices. I did have a conversation with the owner on that job as well to try and

collect my money, and, again, I was told that --
MR. DINICOLA: Objection, Your Honor.
THE COURT: I'll allow it again, that the witness was told this and not for the truth of the matter asserted.
Go ahead. You may continue.
A. I was told by the person I talked to, the owner, Ryan, that they've already made payments for this.
Q. Payments for this, for this invoice?
A. For -- for general requirements.
Q. Payments to who?
A. To Rise Construction or to Rise. I don't know, whatever Rise.
Q. And what did Ryan tell you to do?
A. He told us to -- we would have to collect it from Rise, the open invoice, the open amount.
Q. Okay. Did you attempt to do that?
A. Yes, with no luck.
Q. And it hasn't been paid.
A. It hasn't been paid, no.
Q. I'd like you to turn to Tab 105. Do you recognize this document?
A. Yes.
Q. And what is it?
A. So this is a proposal from Essential to Rise Construction for 55 India.

Q. And what is the nature of the work on this project?
A. So this would be for an interim cleaning contract, same thing as 52 School Street.
Q. And how were you billing for this project?
A. This would be billed on AIA recs.
Q. Okay. And do you recognize -- please turn to the last page of this.
A. Yes.
Q. Do you recognize those signatures?
A. Yes. That's my signature and then James Grossmann.
Q. Okay. And you submitted invoices for this project.
A. Correct.
Q. And what did you include in the invoice?
A. So the invoice was billed per percentage of work of what we agreed upon on the AIA rec.
Q. And who did you submit that to?
A. I forget the project manager at the time; I don't think they're with the company anymore, and Jim Grossmann and Jim Tamburello, the superior on site.
Q. Do you remember the name of the project manager?
A. I don't. I'd have to go back to my e-mails.
Q. And looking at Exhibit 38, page Exhibit A-001.
A. Yeah.
Q. Can you identify the invoices that --
A. Yeah, 3015859, 3015859R, 3015905, 3015905R, and 3015920

and 3015920R.
Q. And what does the R signify?
A. The R signifies the retainage that's going to be held -- that's being held from the invoice.
Q. Were these invoices ever rejected?
A. No.
Q. Were they ever rejected in writing, certified as made in good faith --
A. No.
Q. -- with reference to the contract?
A. No.
Q. Did you attempt to collect these?
A. Yes, through Rise, and then again I called the owner on this project to try to collect from him.
Q. And what was your understanding of why the owner wasn't going to pay you?
A. So on this, he says that this would fall under GRs and GCs and that his payment to Rise for GRs and GCs was complete to date.
MR. DINICOLA: Same objection, Your Honor --
THE COURT: Same ruling.
MR. DINICOLA: -- as for the others.
THE COURT: Same ruling.
Q. We'll turn to Tab 106, the second page in.
A. This is a T and M proposal for 86 Essex Street.

Q. And what's the value of this?
A. There's no value on a T and M contract. It's just based on an hourly rate.
Q. Okay. And what does this include again?
A. This includes --
Q. The scope of work?
A. Includes T and M labor rates, go out there, sweep, clean up, keep the jobsite safe.
Q. And did you submit invoices to Rise for this project?
A. Correct. Yes.
Q. And looking at Exhibit 38, page Exhibit A-001 --
A. Uh-huh.
Q. -- which invoices haven't been paid?
A. Invoice 1378.
Q. Okay.
A. And the remainder amount is 902.
Q. On 1378, there's a credit applied, what is that credit for?
A. So we provide different labor rates, so if you look at the two different labor rates, one's a little bit more than the other, so that would be more commercial union labor rates, a foreman versus a regular worker, just a general worker.
So we were billing them foreman rates versus -- and there were just general workers, so we gave them a credit for the difference there.

Q. You're referring to line 12.
A. Yes.
Q. How about line 11, do you recall what that credit was for?
A. Oh, yeah. That was -- so, again, a check that was paid to for us for 4,409.87.
Q. And then the balance due is the difference between the amount in Column E versus the paid in Column J?
A. Correct.
Q. Okay. I'd like you to turn to 107. Do you have a 107?
A. Yes.
Q. For some reason, it's not in my book. And what -- do you recognize this document?
A. Yeah. This is a document for T and M labor for the Nevins Hill project between Essential Demo and Rise Construction.
Q. Okay. And is this a T and M contract as well?
A. Correct. Yes.
Q. And do you recognize the signatures on the last page of this document?
A. Yeah. It's my signature and Brian Regan's.
Q. Okay. And what was the scope of work on this project?
A. General labor, general requirements, and cleaning, sweeping, keeping the job safe.
Q. Okay. And did you submit invoices to Rise --
A. Yes.

Q. -- for this work?
And did Rise fully pay for all those invoices?
A. No.
Q. Looking at Exhibit 38, page Exhibit A-001 --
A. Yeah.
Q. -- can you identify the open invoices?
A. Yeah.
Q. Unpaid invoices?
A. 1170, 1342, 1351, 1364, 1379, 1391, 1405, 1419, 1442, and that's it.
Q. And on lines 7 --
A. Uh-huh.
Q. -- and 10 --
A. Yeah.
Q. -- there's a credit applied. What's the nature of those credits?
A. So those were payments that were made to us but not paid in full, so we credited. So line number 7 would be a check that was paid to us for 7,892, and there was a remainder of 2,388.48 on the job on that project for that invoice.
Q. And the line item -- where is it -- well, line item 7, those were both paid by Rise; is that right?
A. Yes.
Q. Did you attempt to collect the balance due from anybody?
A. Yes. I tried collecting from Rise. I was directed by

John Hernon that they could not make payment for this, so I went to the owner. I tried to collect from him. I spoke to him several times.

Q. When you say "him," who was that?

A. I forget the name of the owner, but he worked for New Boston Ventures. He was the person I was directed to speak to. I spoke to him several times. He said that he would not make payments to us because he's already paid Rise in full.

MR. DINICOLA: Objection.

THE COURT: Same ruling.

A. Yeah. He would not make payment to us because he already made payment in full to Rise, so I put a lien on the job, and in this case, they bonded the lien on this job too as well.

Q. Okay.

THE COURT: Are we wrapped up with that invoice?

MR. CALANDRA: Yeah. We're -- well, a couple questions real quick.

Q. Did Rise ever reject any --

A. Never rejected any.

Q. Did they ever reject in writing certified --

A. No.

Q. -- submitted in good faith with reference to the contract?

A. Never rejected anything.

MR. CALANDRA: I do have some follow-up questions, but if this is a good break.

THE COURT: Let's pause there. We'll take a brief recess while we get set up for the sentencing, and we'll resume this hearing when that's completed.

THE CLERK: All rise.

(The Honorable Court exited.)

(Break from 11:18 a.m. to 12:03 p.m.)

THE CLERK: All rise.

(The Honorable Court entered.)

THE CLERK: Thank you. You may be seated. Court is now back in session.

THE COURT: All right. Mr. Calandra.

MR. CALANDRA: Thank you very much.

DIRECT EXAMINATION BY MR. CALANDRA:

Q. There was some testimony earlier this morning about settlement agreements that you had entered into, specifically for the 35 Braintree project. There was a settlement agreement. Do you recall that?

A. Yes, I do.

Q. And that was in exchange for a payment from the owner; is that correct?

A. Correct. There was a settlement with the owner for payment of 50K, I believe.

Q. Do you recall if Rise was a party to that agreement?

A. No. Rise was not.

Q. And through that settlement agreement you had --

THE COURT: I'm sorry. Was this Braintree?

MR. CALANDRA: Yes, 35 Braintree.

THE COURT: I'm sorry. Go ahead.

Q. And through that agreement, you had released the owner of all liability.

A. Correct.

MR. DINICOLA: Objection, Your Honor.

If there's a settlement agreement, let's have it as an exhibit.

THE COURT: He can paraphrase it. If we have it, certainly we can mark it as an exhibit.

MR. CALANDRA: I do not have it, but I could produce it certainly.

THE COURT: Go ahead. Objection's overruled.

Q. Your recollection of the settlement agreement, did it release Rise of liability?

A. No, it didn't. It was just to get the owner released from the liability, and the remainder would still be owed by Rise Construction.

Q. What was your expectation?

A. To collect the rest from Rise.

Q. To collect the rest from Rise. Okay.

And as you testified earlier, it was your understanding that the owner expected you to collect from Rise.

A. Correct. Yes.

MR. DINICOLA: Objection.

THE COURT: I'll allow that.

In any event, it was a partial payment of the amounts you say were owed from the owner, settlement agreement, owner gives you this money, releases you from liability. Rise is not a party to the agreement, and, in your view, Rise is liable for the unpaid balance.

THE WITNESS: Correct, Your Honor. Yes.

THE COURT: Okay.

MR. CALANDRA: That's all I have, Your Honor.

THE COURT: All right. Ms. Gillin?

MR. MARULLI: Your Honor, if I may.

THE COURT: Go ahead. I'm sorry. Could you remind me who you are?

MR. MARULLI: Of course, Your Honor. My name's Nico Marulli. I'm an associate at Segal.

THE COURT: Go ahead.

CROSS-EXAMINATION BY MR. MARULLI:

Q. Good afternoon, Mr. Grossmann. Just a couple questions. Going back to the 7 to 9 Central project, you testified that -- thank you -- that the -- you had conversations with the owner in September of 2023 --

A. Uh-huh.

Q. -- to resolve your mechanic's lien; is that right?

A. Correct.

Q. And did the owner represent to you that you would be paid anything other than what was necessary to pay off the mechanic's lien?

MR. DINICOLA: Objection, Your Honor.

Could I just have a standing objection to the hearsay testimony of what owners tell him?

THE COURT: Yes. Although, I want to make sure I understand the question here. This one might be a little bit different.

I'm sorry. Could you put the question to the witness again?

MR. MARULLI: Of course, Your Honor.

Q. Did the owner represent to you that he intended to pay you anything other than what was required to resolve the mechanic's lien?

THE COURT: He's asking what the owner said about his then-existing intentions, so --

MR. MARULLI: Yes, Your Honor.

THE COURT: -- not hearsay, and I'll allow it.

A. At that point, the owner knew how much was open because we had a lien on the job for that amount. The owner --

THE COURT: Well, hold on. You can't testify about what somebody else knew.

THE WITNESS: Okay. Sorry.

Q. Just what he represented to you about his intentions.

A. So what he represented to me was to make payment for X amount of dollars for us to resolve the lien from the job and that Rise would be responsible for the remainder that was open.
Q. So for clarity, the owner did not represent to you that he intended to assume all of Rise's debt.
A. No. Rise --
MR. DINICOLA: Objection, Your Honor.
THE COURT: Overruled.
A. No. The owner did not accept responsibility for the total amount.
Q. You were here earlier for James Grossmann's testimony; correct?
A. Correct.
Q. Did you hear him say that 7 to 9 Central sent a notice it was paying subcontractors directly in October of 2023?
A. I never received any notice from 7-9 Central or 35 Braintree for that fact. Specifically, on those two projects, every bit of work that I've done for those was at the direction of Rise Construction with a Rise Construction project manager and site superintendent on site who requested the work.
Q. So you never received that notice.
A. Never received the notice, no.
Q. And really quickly, outside of your business relationship with Mr. Grossmann, do you have any other relationship with Mr. Grossmann -- relationship to Mr. Grossmann?

A. He's my brother.
Q. He is your brother.
A. Yeah.
Q. Were you present for Mr. Grossmann -- Mr. James Grossmann's testimony regarding the Rudiarius entities?
A. Yes.
Q. And you heard him describe them as part of a family trust.
A. Yes.
Q. You, as his brother, do you have any personal knowledge regarding that family trust?
A. Up until today, I thought Rudiarius was an actual business that I heard that he owned, not a trust.
Q. And when did you hear that?
A. About six months ago through another ex-employee of Rise Construction.
Q. And who was that ex-employee?
A. John Hernon.
Q. And what exactly did he tell you?
MR. DINICOLA: Objection, Your Honor. Hearsay again.
MR. MARULLI: He's a representative of the party opponent.
MR. DINICOLA: He is not a party opponent. He is a former employee.
THE COURT: Former employee of Rise Construction

Management. Since there's no jury, let me hear the answer, and then I'll decide whether I admit it or not.
A. He told me that Rudiarius, whatever the name of the company was, was a company that was bidding U.S. work, U.S. government work.
THE COURT: I'll strike that because I think that's hearsay and marginally relevant anyway.
MR. MARULLI: Understood.
That's all I have.
THE COURT: Okay. Mr. DiNicola?
MR. DINICOLA: Thank you, Your Honor.
CROSS-EXAMINATION BY MR. DINICOLA:
Q. Mr. Grossmann, is there a difference in residential billing rates versus commercial billing rates with the Laborers' Union?
A. Correct, there is, yeah.
Q. What is that difference?
A. So my billing rate for residential labor at the time we were doing business would have been someplace between 73 and 79 dollars, and our commercial rate would have been someplace around 105 to 110.
Q. So that's --
THE COURT: You mean the nature of the job?
THE WITNESS: So the nature of the job, so in the contract with the Laborers' Union it specifically calls out

what our residential rate can be used on, which is any -- I'm going to mess this up, but I'll get as close as possible -- any building that's being privately funded for the use of occupancy of residential living space and is wood framed or below 70 feet, I'm pretty close on that, I think, right, and -- and so basically, if it's for residential use, someone's going to go live in there, it's going to be less than five stories, and it's wood framed, then you could use the residential rates. If it's not wood framed, it's concrete and metal, you have to use commercial rates.

Now, specifically on jobs -- you're probably going to ask about Nevins Hill, so on Nevins, right, there was an agreement on the job because it was metal framed and it was -- it didn't meet the requirements, they said you could use residential rates, but you have to go 50/50 where you have to use commercial rates and -- so if I had four guys on the job, two had to be commercial and two had to be residential.

THE COURT: Okay.

Q. Do you have the exhibit book that Mr. Calandra gave to you?
A. Yeah.
Q. Can you look at Exhibit 1 or we're calling it 101?
A. Yeah.
Q. And this is a proposal for 7 to 9 Central from Essential to Rise; correct?

A. Correct.
Q. And you were utilizing the 2022 residential rate; is that right?
A. Correct.
Q. If you can go to Exhibit 106 --
A. Uh-huh.
Q. -- please, and this is -- this is your -- Essential's proposal to Rise for 86 Essex; is that correct?
A. Correct.
Q. And it's residential rates; correct?
A. No. This is commercial rates, so the building --
Q. Maybe I can't read, but doesn't it say "2022 residential rate sheet"?
A. 2022, yes, it does. Yeah.
Q. Thank you.
Turn the page to Exhibit 7, 107.
A. Uh-huh.
Q. Are you there?
A. Yeah.
Q. Okay. And is this, again, an Essential document to Rise Construction for Nevins Hill?
A. Correct.
Q. And you also write on here "2022 residential rate sheet"; correct?
A. Correct. That says that there.

Q. Now, in the dispute with the Mass. Laborers' Union, didn't Essential dispute the proper rate to apply?
A. Not that I'm aware of.
Q. No. So there was never a dispute between Essential and Mass. Laborers' for the proper rate for you to pay your workers on these jobs.
A. The proper rate, I might have had a dispute where I didn't pay enough benefits and they had to come out.
Q. Did Mass. Laborers' ever -- ever make a claim to you that you should have been paying commercial rates instead of residential rates?
A. No.
Q. This is the first you've ever heard of it.
A. Yes.
Q. Okay. So 35 Braintree, did you approach the owner of 35 Braintree to collect funds?
A. Yes.
Q. And you did that because you knew that the owner had terminated Rise; correct?
A. I wasn't aware that Rise was terminated from the project because Rise was still there every day and they were the ones calling me in to do the work.
Q. Okay. So no one from Rise ever told you that they were terminated.
A. No.

Q. Is that your testimony?
A. That's my testimony.
Q. Okay. But did Rise ever tell you that you need to go to the owner to get paid, that the owner was taking over the subcontractor payment?
A. Yes. And when I went to Bianca Carlson, she told me specifically for the labor invoices that she paid out all the GRs to Rise and that is still Rise's responsibility.
Q. And did Rise ever -- did you ever talk to Rise about that allegation from the owner?
A. Yes. I talked to John Hernon a lot about that.
Q. Okay. And he showed you how much Rise had been paid by the owner; correct?
A. He's never given me the specific amount, but he told me that Rise had been paid in full for the GRs.
Q. Didn't he tell you the specific amounts that he was -- that Rise was paid for 35 Braintree, for Nevins, and 7 to 9 Central, didn't he provide that information to you?
A. He gave me the info for specific amounts for Nevins Hill, yes.
Q. And 7 to 9 Central; correct?
A. No.
Q. So it's your testimony that he only gave you specific information about amounts paid on one job.
A. On Nevins Hill.

Q. And on Nevins, he showed you information that established that Rise had not gotten paid the money for the invoices that you had submitted and are unpaid for Nevins; correct?
A. So what John Hernon showed me was --
Q. Yes or no, sir.
THE COURT: Let him answer. Let him answer.
A. So what John Hernon showed me that you guys have is the termination from Nevins Hill and the letters that -- to Rise Construction denying the recs for the month of September and October, I believe, so he showed me those letters.
Nowhere in those letters did it claim what was paid and what wasn't paid, so all my billing, once I seen that Rise was terminated, stopped.
What I was aware of was that I was being paid out of GRs, and what the owner told me -- again, hearsay, I'm sorry, right -- but what the owner told me there was that Rise overbilled on their GRs and that's why he wouldn't pay me out, and my billing was going through GRs.
Q. Okay. You testified that you had a lien on Nevins.
A. Correct. Yes.
Q. And was that lien bonded off by the owner?
A. Yes.
Q. What happened?
A. I don't know. They bond over, and then I don't know what happens after that. I'm not a lawyer.

Q. Did you hire a lawyer?
A. For that specific job, I had a lawyer, who at the time, we couldn't pay, so the lawyer pulled out and wouldn't -- didn't want to do business with us anymore.
Q. So you had a lien on Nevins and you didn't pursue it.
A. No.
Q. And then you also said you had a lien on 11 Parker; correct?
A. No. I said not on 11 Parker. Oh, yes, I'm sorry. We liened 11 Parker included, yes.
Q. And then that owner bonded that lien off too.
A. Correct.
Q. And you didn't pursue that at all.
A. No.
Q. Bear with me, please.
A. Uh-huh.
Q. Do you have the big binder?
A. No, I don't.
Q. May I approach? I think it might be hidden underneath the desk there.
A. Oh, it is. Yeah. I got it.
Q. Thank you very much.
A. You're welcome.
Q. When you get a chance, can you please turn to Exhibit 30?
A. I'm here.

Q. Okay. And is Exhibit 30 a series of invoices from -- that relate to Essential's work on 7 to 9 Central?
A. Correct.
Q. And they're all sent to you at Rise Construction; is that correct?
A. Yes.
Q. Every single one of these, is that how you normally bill?
A. Sometimes my name goes in there, yes. When I don't have a contact, it defaults to my name on the job.
Q. Why wouldn't you send it to the PM or to your brother?
A. So those are the actual invoices. We do send it to the PM, and I produced all the e-mails of the invoices going out to the PM and then -- with the backup and with everything included.
Then we also follow up every week with the statement of open invoices that goes to the PM, the accounting, and to Jim Grossmann.
Q. Can you turn to Exhibit 31?
A. Uh-huh.
Q. So these are two more invoices on 86 Essex that you sent to yourself; right?
A. Yeah. 31 is -- sorry. Correct. Yeah.
Q. Does Essential use DocuSign?
A. Yes, we do, yeah.
Q. And have you personally used DocuSign before?

A. If I didn't, it would be Maria would -- my admin would use it, yes.
Q. Okay. If you can take a look at the little white binder, you can put that one -- the big one to the side, please.
A. Yes.
Q. If you go to Exhibit 5, so it's 105.
A. Yeah.
Q. You testified before about this -- I'll wait until you get there. I apologize.
A. Yeah.
Q. And this is your proposal to Rise for 55 India; correct?
A. Correct.
Q. And if you go to the last page --
A. Uh-huh.
Q. -- is it your testimony that that is your signature, Christopher Grossmann on 9/25/24?
A. That's my digital signature, yes.
Q. And it's not a DocuSign document, is it?
A. No.
Q. And is it your testimony under oath that Mr. James Grossmann signed this document on October 20, 2024?
A. Yeah. She -- she would have got that signed, and you can see Mr. Grossmann had notes on this, so what this was to be used for is sometimes on jobsites what happens -- or projects what happens is we don't have an actual contract in place yet,

what they want, so they'll make notes on this, and then the actual contract will get issued to use that we'll DocuSign from Rise Construction, and that's why it says there to be incorporated into Rise Construction's subcontract.
Q. Is it your testimony, sir, that James Grossmann typed his name in there on October 20th, 2024?
A. As far as I know, yes.
Q. And what is the basis of that knowledge?
A. I would have to go to Maria. When Maria gets things signed, she puts them back into the folder.
Q. Now, for 55 India, did you understand that the owner was going to be paying you directly?
A. From what I understood originally when I talked to Jim Grossmann was that the owner was going to pay the subcontractors directly, but then I received an e-mail from the project manager on the job later on stating that the owner wasn't going to pay for the GRs directly, that the GRs were going to be paid to Rise and then Rise to us, and that's why I wouldn't work on the job.
Q. Okay. That's why you wouldn't work on the job.
A. Correct.
Q. So you didn't perform any work.
A. No. I did perform work. I found that out after I did the work and I had bills out to them and I was trying to collect from Rise and the owner.

Q. Okay. So this -- the last page with the signatures --
A. Yeah.
Q. -- this is your document; right? This is an Essential document.
A. Yes.
Q. And under billing, it says you will bill monthly and owner will pay your requisitions directly.
A. Correct.
Q. Did you copy and paste that from something?
A. Probably from their proposals or their contracts, yeah.
Q. So when did you find out you weren't going to get paid directly by the owner?
A. So the last e-mail I got on that, I believe, was in February or March of '25, we got an e-mail from one of the PMs stating that they would be paying directly -- sorry -- that Rise Construction would be paying directly.
Q. Who wrote you that e-mail?
A. I forget his name. I don't have my e-mails in front of me.
Q. Tim Galvin?
A. Tim Galvin. Thank you.
Q. Okay. Did he also send you an e-mail rejecting your invoices because there was no signed contract and you performed no work?
A. So he did reject the contract, but, you know, we did that

work long before he was actually out there on the job, and we worked based on Jim Tamburello requesting us to go, we went out to that job twice with labor. And if you look at the invoice, the invoice wasn't just for all labor; it was for the project management upfront and for the mobilization.

Q. We'll look at that.

So did you buy Jersey barriers and put Jersey barriers on the job?

A. I don't know who bought the Jersey barriers.

Q. Did you bill for it?

A. We billed for the movement of the Jersey barriers, yes, and the setup of them.

Q. So you didn't bill for the actual Jersey barriers, then.

A. No.

Q. So if you look at the first page of Exhibit 105 there.

A. Uh-huh.

Q. Your item number 2 --

A. Yeah.

Q. -- does that indicate that you're going to supply and install the Jersey barriers?

A. Yes. That's what it says, yeah.

Q. And temp fencing and fence green; correct?

A. Yeah.

Q. And you never supplied any of that, isn't that correct?

A. No.

Q. It is not correct.
A. No. I agree with you. It's correct.
Q. You agree. All right.
So you did not supply any of that. And did you bill for any of that?
A. I would have to see the bill, but I can guarantee that we didn't bill in full the 38,000. We probably held some back.
Q. Do you happen to have -- there are some exhibits that are kind of loose with some tabs? Do you see any of those up there?
A. Yeah.
Q. See if you can find 36.
A. Yeah. I'm on it.
Q. Okay. Let's make sure everybody else is too.
MR. DINICOLA: Your Honor, are you there?
THE COURT: 36. No. Can you use the document camera? I'm not sure I do.
MR. DINICOLA: Sure. I'll try.
Q. Okay. Mr. Grossmann --
A. Uh-huh.
Q. -- before you is what's been marked by the Laborers' Union as Exhibit 36, and this is a -- an application and certificate for payment from Essential Demo to Rise Construction for the 55 India Street job; is that correct?
A. Correct.

Q. All right. And is that your typed-in name under contractor?
A. Correct. It's an electronic generated, yes.
Q. And then it was notarized by Maria.
A. Correct.
Q. Is that the Maria you were referring to earlier? Okay.
And in this application for payment, you are requesting payment for $61,107.16; is that correct?
A. Correct.
Q. All right. And then we go to the next page, and this is the continuation sheet; right?
A. Uh-huh.
Q. And you had -- you had some testimony about this type of document before with Mr. Calandra talking about a schedule of values; right? Do you remember that?
A. Yeah.
Q. All right. So then under B, description of work, is all the categories of work that you were supposed to do under this subcontract; correct?
A. Correct.
Q. And then C is the value placed by you for those particular items of work; correct?
A. Correct.
Q. All right. So for this period, for project management, you're claiming $15,000. Do you see that?

A. Yes.
Q. And then for project mobilization, Jersey barriers, fence and scrim net, you're claiming $38,323.33; is that right?
A. Correct.
Q. And you didn't supply any of that to this job; is that correct?
A. I provided labor to get that stuff done, but if you're talking about the materials, no.
Q. Okay.
A. But I also never received a change order to this to take that out of the contract from Rise Construction.
Q. Okay. But there was never a subcontract signed; correct?
A. Correct, but we had an agreement in place.
Q. What agreement?
A. We had this agreement in place that was in --
Q. The proposal that we talked about?
A. Yes.
Q. You're calling that the subcontract agreement.
A. I'm calling that the agreement, yes.
Q. Okay. And then the third item, office cleaning, deliveries, traffic sidewalk?
A. Uh-huh.
Q. You claim that you performed $5,000 worth of work. Do you know what that was?
A. Yes. It's making the sidewalks clean and walkable. It's

going into the office, cleaning out the trash, basically whatever the -- Jim Tamburello, the super on site, would direct them to do.

Q. And so you -- did you provide laborers for this work?

A. Union laborers, yes.

Q. And did they check in with the foreman, the labor steward every day?

A. I would believe so. We called it in to the -- to the laborers, so.

Q. There should be some record of whatever labor you provided.

A. Yeah.

Q. And you should have it; right?

A. Yeah.

Q. And Mass. Laborers' should have it too.

A. Yeah.

Q. The plaintiff?

MS. GILLIN: Objection.

THE COURT: Calls for speculation, I suppose, but I'll allow it.

Q. The next page is application for payment number 2.

A. Uh-huh.

Q. And here, you're claiming -- the next page is the continuation sheet, so you're claiming you worked another $12,000 worth of work during that month; correct?

A. Correct.
Q. And who was the -- who was the project manager?
A. At this time, I don't know. It could have been Tim Galvin.
Q. I'm sorry. Bad question.
Do you see how you're billing for project management on line item 1?
A. Yes.
Q. Who -- who are you billing for with that?
A. Okay. So we set it up to basically be like GCs on a jobsite, the same thing, so instead of claiming -- if you look at the labor rates, there's management in that labor rate, so instead of doing that, we moved it out, so the two people that are considered project management on that job would be myself and Maria Chaplain.
Q. So the person that notarized your signature?
A. Yeah. So it would be me, her, and then we do have a superintendent that worked for us too, Anthony Malerba, that was a union superintendent that would manage the labor.
Q. Okay. What's Marie's job title?
A. Administrator, admin.
Q. So she didn't have any -- she didn't perform any work on this job.
A. She's a project admin, so she would do the billing. She would manage any submittals, any correspondence that goes back

and forth on the job.
Q. And how often did you go to this job?
A. Honestly, I was there -- I was excited about it, so I was going there once a week until we were not told to go there anymore.
Q. Were you there once a week while you had your laborers there or was this before?
A. Again, we had laborers there for two days, so Anthony Malerba would go to those jobsites with the laborers.
Q. You only had laborers there for two days.
A. I got to go back and see how many. I'm guessing that's how many days that they were there.
Q. The next page is application for Payment Number 3. This is through January 31, 2025 --
A. Okay.
Q. -- right?
A. Yes.
Q. And you're claiming a total value -- total earned less retainage of $86,282.16; right?
A. That is total earned, yes.
Q. Right.
And this -- was this the last requisition that you submitted?
A. Yes.
Q. And is it your testimony that you earned $86,282.16?

A. So did I earn it? Yes, because we had an agreement to bill monthly, so yes.
Q. And you supplied two days' worth of labor; correct?
A. I'll go back and look through my documents and provide it to counsel.
Q. And you did not supply the Jersey barriers or the fencing; correct?
A. Correct, I did not.
Q. All right. So for about two days of labor, Rise owes you $86,000. That's what you're saying here.
A. Yes.
Q. Okay. Was there a trailer on site?
THE COURT: You're still on India?
MR. DINICOLA: Yes. I'm sorry.
Q. On 55 India, do you know if there was a trailer on site?
A. I do not remember, but you could probably answer that before I could.
Q. Well, I can't. That's why I'm asking you.
Do you remember if there was a trailer on site?
A. I don't remember if there was, no.
Q. Okay. Has Essential sued Rise Construction?
A. No.
MR. DINICOLA: That's all I have. Thank you for answering my questions.
THE WITNESS: Thank you.

THE COURT: All right. Anything else, Mr. Calandra?

MR. CALANDRA: I'm good, Your Honor. Thank you very much.

MR. MARULLI: If I may, Your Honor. I have documents. They are not marked as exhibits. Do you want me to introduce them?

MS. GILLIN: Sure.

MR. MARULLI: I'm sorry. I'm not quite sure what the numbering would be for this one. Was the last one 49?

THE CLERK: I believe it would be 41.

MR. DINICOLA: No. We've got 41 through 49 already.

THE CLERK: I'm sorry. 50.

THE COURT: I can't remember if I admitted the white book, 101 through 107, but it's admitted.

(Exhibits-101 - 107, admitted.)

MR. MARULLI: May I approach, Your Honor?

THE COURT: Yes.

RECROSS-EXAMINATION BY MR. MARULLI:

Q. Mr. Grossmann, are you familiar with this document?

A. Yes.

Q. What is it?

A. This is the e-mail going back and forth between me and Tim Galvin about payment on 55 India.

Q. And when he says "I am reaching out about your recent inquiries into the November requisition," what is he referring

to?
A. Probably Requisition Number 1 or Number 2.
Q. And what did you understand Mr. Galvin to mean when he said, "Your portion of the November requisition was cut by the owner, slash, architect on the account of there not being any work in place from Essential at the time and there was not an executed contract. We have since sent them that contract. We have now included your billing in the December requisition, which we expect to be funded much quicker than November's"? What do you understand that to mean?
A. Can I go into a little bit of detail? It will be a long answer.
Q. Sure.
A. All right. So that to me is, one, a GC owns every contract going to the owner for review before it gets final signed, so I believe that that's what was going on. So the owner was taking a look at our contract saying, yeah, we're good with it, sign it, and send it back to us for final -- to us for signature to have Rise sign it.
Specifically, him saying there's not any work in place, that's an owner who doesn't go to the job and doesn't know what subs are doing what on the job, especially that they still haven't got the official contract signed.
So from my understanding, that is the typical process of a, you know, guy going out there and saying, yeah, they

didn't do the work, because the owner, he goes to the job once every couple of months, right, don't pay them. It's just typical of what happens in the business. And then once they have the contract and everything's signed, yes, everything will go through properly.

Q. Okay. And when Mr. Galvin said "We have since sent them that contract," which contract is he referring to?

A. The contract for the interim cleaning that was proposed here provided by counsel.

Q. The one we were just looking at?

A. Yeah.

Q. And when he said "We have now included your billing in the December requisition, which we expect to be funded much quicker than November's," did you take that to mean that you were going to get paid?

A. I was going to get paid, yeah.

Q. Okay. And the last sentence there, "For this December rec and moving forward, our GRs are straight lined, meaning your payment will come from us not the owner. Once the December requisition is funded, we will make sure you receive your funds," what did you understand?

A. That's when I got the first inclination that they were not going to be paying directly from the owner to me, and seeing what happened in the past with Rise, that's when I said I will not work on this job unless I am getting paid. That's when I

stopped and I wouldn't send anybody else to the job.
Q. And just for clarity, can you please identify all of the people on this e-mail exchange including those cc'd?
A. Yeah. So Chris and Maria, that's me and Maria Chaplain, James Grossmann, Jim Tamburello, which was the super on site, Shaun Leonard, I think he's an assistant PM. Up above, it's myself, Tim Galvin, Maria Chaplain, James Grossmann, Jim Tamburello, and Shaun Leonard, yeah.
Q. And when was Mr. Galvin's e-mail sent to you?
A. So this e-mail was sent January 28th, 2025.
Q. And that's after all of the --
THE COURT: It was sent to you January 22nd.
THE WITNESS: I'm sorry. Sent to me on the 22nd. I would send it back to him the 25th, yes.
Q. And did that e-mail postdate all of the invoices that you had sent to Rise for 55 India?
A. Correct. Yes.
MR. MARULLI: No further questions, Your Honor.
THE COURT: This will be marked as Exhibit 50.
(Exhibit-50, admitted.)
THE COURT: Mr. DiNicola, anything further?
MR. DINICOLA: No, Your Honor.
THE COURT: Anything else, Mr. Calandra?
MR. CALANDRA: No. Thank you, Your Honor.
THE COURT: Thank you. You may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: Is there additional evidence from the plaintiff?

MS. GILLIN: Your Honor, no. There's not additional evidence that we want to put on, but I do want to just state for the record that there is evidence that we've asked for and that has not been received or produced to us.

You know, one of the things that Mr. DiNicola was asking about was -- you know, or he was objecting to was the questions about what Rise received from the owner and whether they received it.

We've asked for that. I mean, it's a very simple thing to, you know, produce documents about what was -- they requested and what they actually received, and we could all, you know, have that evidence and answer the -- answer those questions here.

And we haven't received any of that. We haven't received any of the -- the -- you know, these agreements between Development and Rise Construction on these loans. There was, like, one document that they did produce, which I think is in evidence, about, you know, a loan up to $25,000 between these companies, but there's not -- we didn't receive anything about this, you know, transferring of employees and agreement to continue to fund their -- their employee benefits for Rise -- from Rise Construction over to Rise -- no, from

Rise -- yeah, from Rise Construction to Rise Development.

We haven't received documents between, you know, Rudiarius, any of the Rudiarius entities of what they do. We asked for shareholder certificates for these companies. We haven't received that.

I mean, there's a whole list of things that were testified about and we've asked for and haven't received, so, I guess, you know, to the extent that Rise is going to rely on the fact that, look, we were never paid by the owners, you know, we don't even have evidence of that. Like, we don't -- we don't have the answers, so, I guess, you know, I would request that there be, you know, an adverse inference against them for that, for not producing these documents that would prove that they, in fact, were not paid.

THE COURT: So just thinking out loud here, that process would have to start with you putting in the record that you have requested specific documents. It could be informal, a letter or e-mail, I suppose, as opposed to a formal Rule 34 request, but, regardless, you have to indicate on the record you requested these documents, indicate what you did and did not receive.

I could draw some reasonable inferences. It, kind of, depends in the ordinary course certain documents, you know, would exist. It, kind of, depends.

I -- if we're talking about a Wyoming family trust,

maybe my confidence level is a little bit lower than, you know, for an ordinary business that has accounts receivable and payable and so forth.

But regardless, it would have to be -- you would have to say this is what we asked for, here's what we got, here's what's missing, and then here's, you know, the adverse inference you want me to draw, which segues into, what happens next?

At some point, I want to close the evidence in this hearing and to hear or read or both closing arguments. One of the things that I'm still somewhat fuzzy on is exactly what Plaintiff says Essential Demo is owed by Rise Construction because the numbers have moved around a little bit, at least as far as I can tell. I may be wrong, but I'm just --

MS. GILLIN: No. That's correct, yeah.

THE COURT: So I'd want to know what it is you think these numbers are, what it is you think you are -- what the Laborers' funds are owed. That's, obviously, Question 1.

Question 2, was Essential able to pay that?

Question 3, was if Essential couldn't pay it because it wasn't paid by Rise, was Rise able to pay those bills and, kind of, what happened, I guess, maybe to make that more broadly.

And part of that is the sequence and timing of all of this. I think the original order was issued in May, and it

looks like a lot of things happened after May.

And then the final question in my mind is to the extent that Rise Construction Management does not presently have funds, whether the corporate veil should be pierced in some form or another so that other entities should be required to assume that obligation and were there any fraudulent transfers or similar transfers of funds that either rendered Rise Construction insolvent or otherwise for equitable reasons should be accessible for these purposes.

But, again, to back up, I need to know what the evidence is. I want to close the record at some point soon. The record can include what ought to be there but what is not, so to speak, and I need a summation, and, of course, I don't just need these things from you. I need them from all three parties here.

So what do you think we should do next, Ms. Gillin?

MS. GILLIN: So for some of the -- the record of what we have asked for, a lot of it is in our discovery requests, which are in the -- have been submitted into evidence.

I would -- you know, one of the things that -- we asked some of these questions, you know, has that been produced, and Mr. Grossmann, said, yes, I think it has, you know, and it hasn't, so what I would suggest on this is maybe it would make sense for me to go back and actually do an affidavit from myself to the Court and, you know, I would give

a copy to everyone else of what we have requested.

Some of my correspondence was with Mr. DiNicola, and I think over last weekend he had -- you know, he had said that there was no more documents forthcoming or that he would send them if they -- he got them, and he hasn't sent anything further.

So I think it might make sense just for me just to, you know, sit down and write an affidavit that I could put into evidence of what we requested during this hearing and what we haven't received, you know, to get it all in one place.

As for the amount owed, I think we could do that. I mean, we've been relying mainly on what they tell us, and, frankly, there's a little bit of a circus here of -- like, you know, there's a lot of shifting goal posts here about what has been paid, what hasn't been paid, and we've been trying to piece it together too, but I think at this point, we would be relying on Essential's information.

The -- the sequence and timing I do think that makes sense for us to get something on the record, maybe briefing, if you want, on what we think happened. I mean, I think at this point, you know, we have -- discovery's supposed to close at the end of this month. I don't anticipate that --

THE COURT: Which is?

MS. GILLIN: I think it's the 30th.

THE COURT: Today's what -- the 24th? And we have

Thanksgiving and so forth, so it's -- I think that's a -- that's a week from Sunday.

MS. GILLIN: Yeah. And we've -- you know, we've issued written discovery to both defendants. We haven't received any written discovery from either of them.

I feel at this point that this was a little bit of a deposition. I'm not sure if, you know, at this point I'm going to hold other depositions. I wasn't planning on it.

So, I guess, what I had anticipated was that we would move for summary judgment in the near future and --

THE COURT: That's one of the -- of course, it's a reach-and-apply defendant. Do we wind up with a judgment here, an order? It's not --

MS. GILLIN: I think --

THE COURT: I don't know. I'm going to put the ball in your courts collectively in terms of procedurally where I go from here. This is not a typical --

MS. GILLIN: Yeah.

THE COURT: -- plaintiff versus defendant scenario.

MS. GILLIN: Yeah. I mean, I think what I would -- I mean, you had issued an order, which I think was pretty clear about the likelihood of success. Things haven't changed much on the merits of that, I think, at this point.

They didn't comply with the order. I think there's been a lot of testimony that there were a lot of shell

corporations that I would suggest were used to hide assets that were meant for Rise Construction Management and then they were siphoned off to Rudiarius or whoever else, and we can sort of tie all that up with a bow at some point here, whether it's in briefing or in a closing argument.

But, you know, I think a judgment and a -- maybe a -- a -- you know, a written opinion or something on the -- piercing the corporate veil is going to be important here for us to actually be able to collect this.

I mean, at the end of the day, as I said from the beginning, this is about people's health and pension benefits, and the funds have been, sort of, put through this circus of, like, trying to track this down.

And we've expended so much in legal fees of trying to get to the bottom of this, and it's not something the funds can either -- we can easily say, oh, you know what, it's going to cost a lot of money, so let's just give it up.

I mean, we have a fiduciary duty to do this, and, you know, there's been a lot of testimony that they had the money, one of these entities had the money at that point, and we could have, you know, easily put this to bed, you know, a year ago or six months ago, and here we are.

We've all spent -- you know, not that I don't like spending time with you all -- but we've all spent, you know, several days now together trying to figure out exactly what's

owed here, and these are, sort of, simple questions.

So I -- I guess at this point, I would like a judgment against both defendants. We can -- you know, we can brief that and move for summary judgment.

If they're going to be moving to -- if he's going to withdraw and they're not going to have counsel, I guess that's going to affect it. There might be a default judgment.

THE COURT: All right. Let's do this -- here's what I would like to do, and I'll hear from other counsel as well. Let's focus on completion of the evidentiary record. Okay. And I'll just leave it open that way, that if you -- we don't have to rush this, I suppose. In other words, if you want to take depositions, do formal document discovery practice, I -- I'm not closing the door on that. Okay. I do think we ought to get moving on this thing.

But what I would propose is that if you're going to submit an affidavit saying, here's what we sent, here's what we've received, that may be that -- Thanksgiving is this Thursday, maybe a week from today.

MS. GILLIN: Sure.

THE COURT: Is that too optimistic? And we reconvene maybe a day or two afterwards about where we are and where we go from here.

And at some point, somehow, I am going to need, I guess, further motion practice, briefing, whether it's called

summary judgment or whatever it is, I'm not quite sure, and, of course, Essential is a party. It's in a different position than Rise, but I want to set a timetable for whatever that looks like. We can have closing arguments. We can do it all in the papers. We can do both.

But, I guess, a step at a time is what do we need to do so that we can say that the record is complete? And because this is a preliminary proceeding, a preliminary injunction, it doesn't have to be all the discovery that would ever be obtained in this case. I mean, I certainly decide preliminary injunctions all the time on an incomplete record, you know, its likelihood of success on the merits and all of that.

But anyway, so that's what I would propose, and if you have an affidavit indicating this is what you've requested, here's what you've received, here's what you're missing, that you do that a week from today by -- is that December 1st -- Monday, December 1st, and that we reconvene within a day or two.

Mr. Calandra, what is your reaction to that? In other words, I'm making no decision other than that right now.

MR. CALANDRA: As an interim step, I think that's fine. It's consistent with my view that we should answer the three questions before we move on, because that's what brought us here in the first place. Ultimately, we'd like to see discovery extended so we can finalize that before any motions

for summary judgment.

THE COURT: And, again, we can talk about that. I'll listen to any reasonable proposal.

MR. CALANDRA: Okay.

THE COURT: The parties have a right to take discovery, I guess. I don't have to do all this at once.

MR. CALANDRA: Of course. Of course.

THE COURT: I'm -- I'm trying to be reasonably practical here and not, you know, run up --

MR. CALANDRA: Well, succinctly, then, I agree.

THE COURT: So, anyway, let's take it a step at a time. And these are the kinds of -- I'd like answers to some of these questions. What do you think you need? What do you want to do? What's the timetable? Could we get the troops home by Christmas? And if not, you know, when, when could we wrap this up?

MS. GILLIN: Your Honor, if I may.

THE COURT: Yes.

MS. GILLIN: I just -- I would strongly oppose extending discovery on that. I mean, we've -- we've all been aware of what's happening in this for so long. I mean, they had the option -- months to do -- to issue it, and we're, like, at the close of this, and I don't even what -- what else we would need.

THE COURT: I'll just -- I'll listen. That's all.

MS. GILLIN: Okay. Okay.

THE COURT: I'll listen to what anybody proposes, and I'll try to do what's reasonable and fair taking into account -- again, we aren't talking about 350 million dollars.

MS. GILLIN: Right. Yeah.

THE COURT: You know, but, Mr. DiNicola, and I have something for you on the withdrawal motion as well, but the interim of the timetable, does this, at least in the short term, work for you?

MR. DINICOLA: Yeah. That's fine. I just have -- you know, we may need to move that date either to Tuesday -- to come back to talk about this.

THE COURT: Yes.

MR. DINICOLA: Either to the Tuesday or the Thursday. I've got something on Monday, and I've got something on Wednesday.

THE COURT: What about Tuesday, the 2nd, for a conference, not a further evidentiary hearing?

MR. DINICOLA: I'm sorry. I apologize, Your Honor. I could do Wednesday afternoon. I could do Tuesday, Wednesday afternoon, or Friday. I'm sorry. I made a mistake.

THE COURT: What does Wednesday afternoon look like, Matt?

MR. CALANDRA: This is December.

MR. DINICOLA: Yeah.

MR. CALANDRA: I can't do that Thursday or Friday, but I can Wednesday.

THE CLERK: How about Wednesday at 3:45?

THE COURT: And we can do that by -- why don't we do it by Zoom.

MS. GILLIN: That works for us.

THE COURT: Okay. And Mr. McKillop will send a link. And because it's going to be Wednesday, not Tuesday, Ms. Gillin, to ease the burden on your Thanksgiving holiday, I'll say any affidavit be filed by noon on Tuesday, which will give me time to look at it but will give you a little more time.

MS. GILLIN: Thank you.

THE COURT: Tuesday, December the 2nd.

Now, in terms of the motion to withdraw, I'm trying to balance a couple of things here. I mean, Mr. DiNicola entered an appearance, which normally means, as a lawyer, you're obligated to see it through.

On the other hand, I am sympathetic. If Mr. DiNicola isn't being paid and his relationship is something less than perfect, at some point, I might be inclined to let him out, but I'm going to say that -- Mr. James Grossmann, that the time to obtain successor counsel is now, and I may issue a written order to that effect, that basically would let Mr. DiNicola out after some period of time to permit the corporation to find

successor counsel.

At some point, a lawyer's legal obligation starts to edge over into something reassembling actual slavery, and I'm not at that point yet, but I'm not going to let it go forever either, I don't think.

And a corporation cannot represent itself. If Mr. DiNicola is permitted to withdraw and there's no successor counsel, the norm, I think, is that Rise Construction Management would be in default and basically concede every factual and legal issue against it, to put it in somewhat simplified terms. But that's another decision I don't need to make right now except to say, again, the time -- the time is now, so all right.

So unless there's anything else, we will reconvene by Zoom at 3:45 on Wednesday, December the 3rd. Whatever affidavit plaintiff is going to file will be filed no later than noon on Tuesday, December the 2nd. And otherwise -- I'm not closing the evidentiary hearing yet, and otherwise, we'll stand in recess. Have a good Thanksgiving, all. And we'll see where we are next week. Okay.

MS. GILLIN: Thank you.

THE COURT: All right. Thank you.

THE CLERK: All rise.

(The Honorable Court exited.)

(Adjourned at 1:02 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

I, Jennifer M. Vaillancourt, do hereby certify that the foregoing is a correct transcript from the record of proceedings taken on November 24, 2025, in the above-entitled matter to the best of my knowledge, skill, and ability.

/s/ Jennifer M. Vaillancourt_ December 1, 2025

Jennifer M. Vaillancourt, RPR, CSR Date
Official Court Reporter