UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:24-cv-10248-FDS

NATHAN P. GOLDSTEIN, as he is Executive Director, Massachusetts Laborer's Benefit Funds,
Plaintiff

vs.

ESSENTIAL DEMO, INC., et al,
Defendants

*********

For Hearing Before:
Judge F. Dennis Saylor, IV

Evidentiary Hearing

United States District Court
District of Massachusetts (Boston)
One Courthouse Way
Boston, Massachusetts 02210
Thursday, November 13, 2025

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhr3tubas@aol.com

A P P E A R A N C E S

SASHA N. GILLIN, ESQ.
NICO JOHN MARULLI, ESQ.
ANNA BOTTRELL, ESQ.
Segal Roitman LLP
33 Harrison Avenue, 7th Floor
Boston, MA 02111
(617) 742-0208
Email: Sgillin@segalroitman.com
For Plaintiff

SAM S. CALANDRA, ESQ.
Calandra, P.C.
96 Cottage Street
Hudson, MA 01749
(978) 273-2309
Email: Sscalandra@calandrapc.com
For Defendant Essential Demo, Inc.

JOHN W. DiNICOLA, II, ESQ.
DiNicola Law Group, LLC
399 Chestnut Street, Second Floor
Needham, MA 02492
617-279-2593
Email: Jack.dinicola@dinicolalawgrp.com
For Reach and Apply Defendant Rise Construction Management, Inc.

# I N D E X

PRELIMINARIES................................ 6
OPENING STATEMENT BY MS. GILLIN.............. 11
OPENING STATEMENT BY MR. DiNICOLA............ 18

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- | --- |
| JIM GROSSMAN | | | | |
| By Ms. Gillin: | 25 | | | |
| By Mr. Marulli: | 159 | | | |
| By Mr. DiNicola: | | | | |
| By Mr. Calandra: | | | | |

E X H I B I T S


EXHIBIT 1......................... 23
EXHIBIT 2......................... 32
EXHIBIT 3......................... 44
EXHIBIT 4......................... 44
EXHIBIT 6......................... 38
EXHIBIT 7......................... 38
EXHIBIT 8......................... 40
EXHIBIT 9......................... 40
EXHIBIT 10........................ 27
EXHIBIT 11........................ 110
EXHIBIT 12........................ 125
EXHIBIT 14........................ 77
EXHIBIT 15........................ 135
EXHIBIT 17........................ 78
EXHIBIT 18........................ 142
EXHIBIT 19........................ 148
EXHIBIT 20........................ 140
EXHIBIT 21........................ 149
EXHIBIT 24........................ 163
EXHIBIT 25........................ 87
EXHIBIT 29........................ 169


(Continued.)

(Continued.)

EXHIBIT 30........................ 170
EXHIBIT 31........................ 181
EXHIBIT 32........................ 107
EXHIBIT 33........................ 82
EXHIBIT 34........................ 95
EXHIBIT 35........................ 93
EXHIBIT 36........................ 185
EXHIBIT 37........................ 100
EXHIBIT 38........................ 27
EXHIBIT 39........................ 180

P R O C E E D I N G S

(Begins, 10:00 a.m.)

THE CLERK: Nathan F. Goldstein vs. Essential Demo, Inc., et al, Civil Action Number 24-10248. Would counsel please identify themselves for the record, starting with the plaintiff.

MS. GILLIN: Good morning, your Honor, Sasha Gillin for the plaintiffs, Massachusetts Laborers' Benefit Funds, and with me I have Nico Marulli and Anna Bottrell from my office.

THE COURT: All right, good morning all.

MR. CALANDRA: Good morning, your Honor, Seth Calandra for the defendant, Essential Demo.

THE COURT: Good morning.

MR. DiNICOLA: Good morning, your Honor, Jack DiNicola for the Reach and Apply Defendant Rise Construction Management, Inc.

THE COURT: All right.

This is an evidentiary hearing, um, and I'm going to try to set the table, and I'll ask counsel to correct me if I have any of this wrong.

The plaintiff, um, is the Executive Director of the Massachusetts Laborers' Benefit Funds. The lawsuit was filed against Essential Demo Inc. to recover, um, unpaid contributions to employee benefit funds mandated

by a collective bargaining agreement. That amount is not disputed as of the time of -- well as of about a year ago, last October, the amount in question was $283,000, and with interest, um, it was $319,000 as of last spring, and I imagine the total is higher now. The amount is not disputed.

Essential was a subcontractor, um, it says to Rise Construction. The general contractor, Rise Construction, it says, has not paid it, so it does not have the funds to make the contributions. The plaintiffs sought to Reach and Apply funds that were owed by Rise Construction to Essential.

On May 13th of this year, I ordered Rise to pay $319,000 into escrow, which it failed to do. The plaintiff filed a motion for contempt. Rise opposed, on June 30th, claiming that it owed no more than $70,000 to Essential Demo, but in any event did not have the money. That opposition was not accompanied by any affidavits or evidence other than a copy of a check in the amount of about $51,000.

As I'm sure counsel are aware, the statement of a lawyer is not evidence, and there was no affidavit from Rise at that point indicating that, um, the amount in question, that is the amount that it was owed -- that it owed to Essential was lower or that it did not have the

money.

I found Rise in contempt on September 22nd, I ordered, as an initial remedy, the production of various documents. In an accounting, by October 3rd, Rise did not comply with that order. And as of October 15th, I issued a further order finding Rise in contempt for violating the earlier order and imposing fines of $1,000 a day until it was in compliance. And on October 24th, I issued a further order concerning the payment of those fines, which was to be made weekly, and to my knowledge that has not happened either.

At our last hearing there was a suggestion, um, that Rise Construction was one of a number of related companies and that funds had been transferred out of Rise Construction and eventually into, um, the pocket of its principal, James Grossman, and plaintiff suggested, and I agreed, that it would be useful to have an evidentiary hearing to explore those matters. I don't know whether we're going to accomplish all of that today or not, but I think certainly we need to get started.

In the record, um, so far, or I will deem it to be part of the record of this hearing, because it's on file with the Court, among other things I have the declaration of Colin McInnary in support of the motion for TRO, filed more than a year ago, last October 9th,

Docket Number 24, with various exhibits, and two affidavits from Christopher Grossman, the Director and Treasurer of Essential Demo, with exhibits setting forth, um, various information concerning the amount of the unpaid contribution, which again is not disputed, and the amount owed to, um, Essential by Rise Construction, which as of this moment has not been opposed by any actual evidence in the record.

Well let me pause there.

Ms. Gillin, do I have that right?

MS. GILLIN: Yes, thank you for a thorough overview, I think everything is accurate. I agree that, you know, the amount that Essential owes to the funds is higher now. We also, um -- well I don't know how you, um -- I guess I'll leave it there, that it's accurate.

THE COURT: All right.

Mr. Calandra?

MR. CALANDRA: Yes, your Honor, that sounds accurate.

THE COURT: Okay.

Mr. DiNicola?

MR. DiNICOLA: That is incomplete, I would say, your Honor.

THE COURT: How so?

MR. DiNICOLA: Because Rise opposed the motion for

Temporary Restraining Order/Preliminary Injunction and included an affidavit of Mr. Grossman that disputed the amounts due to Essential, and also claimed that it didn't have the funds to pay that money. I think that is in the record.

THE COURT: All right, I stand corrected. But I believe there were no documents attached to that, it was simply a general and conclusory statement, if I recall, like it was a couple of paragraphs long.

MR. DiNICOLA: I don't have that in front of me. I know that the statement that Rise doesn't have the money to pay what was requested, that was only in the affidavit.

THE COURT: All right.

MR. DiNICOLA: And I believe that the affidavit referred to a spreadsheet with respect to the amounts that Rise claimed was due Essential. There were no subcontracts and things of that nature because there was a lot of invoicing. So there was a spreadsheet that was attested to by Mr. Grossman.

THE COURT: All right.

Ms. Gillin, you're the plaintiff, and I guess the floor is yours, and, um, if you want to call a witness, um, now is the time.

MS. GILLIN: Sure. Thank you, your Honor.

Do you want us to do openings or anything? I'm not sure.

THE COURT: I think that's probably a sensible thing to do, yes.

MS. GILLIN: To do an opening?

THE COURT: Effectively an opening, yes.

MS. GILLIN: Okay, sure.

And where do you want me to do that?

THE COURT: Anywhere I can see and hear you.

MS. GILLIN: (Laughs.) Okay, that's simple.

THE COURT: And if you want to show things, documents, there's, you know, a document camera.

MS. GILLIN: I don't need to show things. But I do have binders though for you, the Clerk, the witness, and counsel.

THE COURT: Okay, you can do paper.

MS. GILLIN: Yes, they have paper. So I don't know if you want me to approach and give you those?

THE COURT: All right.

(Approaches, hands up binders.)

MS. GILLIN: Should I put this there, um, for the witness, does that make sense?

THE COURT: Yes, all right.

OPENING STATEMENT BY MS. GILLIN:

All right. So this case involves efforts by my client, Massachusetts Laborers' Benefit Funds, to collect delinquent employee contributions, or by the defendant, Essential Demo, Inc. Essential admits the contributions are due, but it's consistently claimed that its delinquency is attributable to the nonpayment by Rise Construction Management, the Reach and Apply defendant in this case.

In October of 2024, the Fund moved for a preliminary injunction to secure $319,000 that Rise then owed to Essential and applied the same to Essential's debt to the fund.

On May 13th, 2025, the Court granted the plaintiff's motion and ordered that amount to be deposited into escrow with the Court and to provide plaintiff with an accounting of the outstanding amounts owed to Essential. Rise repeatedly refused to comply with the Court's order and has been found in contempt on three occasions.

Rise has raised two defenses in the course of these contempt hearings. The first is that the amount owed to Essential, which Rise has claimed, is significantly lower than the amount ordered to be deposited into escrow. The second involves Rise's ability to pay and to its financial ability to comply

with the escrow provision of the Court's order. Rise has pleaded poverty, stating that it doesn't have the ability to pay anything into escrow. As plaintiff understands, this hearing is primarily directed at those two issues.

As to the first issue of the amount that Rise owes to Essential. The evidence here will show that Rise currently owes Essential, $360,595.44, for 33 unpaid or partially paid invoices for work on 7 different projects. These invoices date back as far as January 2022 and as recently as January 2025. So some of these are more recent, they came after the initial -- when plaintiff initially moved for the preliminary injunction. None of these invoices were rejected by Rise and Rise has never disputed Essential's performance of the work and the cost listed on the invoices. And there's no question here that Rise itself benefitted from the work that was performed by Essential's union laborers on these jobs.

As to Rise's ability to comply with the Court's escrow order. The bank documents that we've received so far showed that Rise Construction Management is part of a single integrated enterprise with a related entity called "Rise Development." There may be others. The documents show that right after the Court's order was

issued, Rise Construction Management had more than $25,000 --

THE COURT: Which order? I'm sorry.

MS. GILLIN: Excuse me?

THE COURT: Which order was that?

MS. GILLIN: Oh, the initial preliminary injunction order.

THE COURT: Okay.

MS. GILLIN: -- that Rise Construction Management had more than $25,000 in its account and Rise Development had $430,000 in its account. None of these funds in these accounts were used to pay the escrow order. The records show that at a time when Rise's counsel claimed that Rise couldn't pay anything into escrow, the companies actually transferred hundreds of thousands of dollars to insiders and related entities.

In fact, at the first contempt hearing in this matter, Rise's counsel told the Court, in no uncertain terms, that Jim Grossman, the principal of Rise, had not received any distributions since the Court's order. Yet the bank records show that on June 2nd, less than 2 weeks after the Court's order, Development wired $120,000 to Mr. Grossman, and a month later, Grossman incorporated a new out-of-state investment LLC and transferred another $160,000 to that entity.

The records show that these companies do not operate at arm's length. The companies used the accounts interchangeably, they received and made payments on behalf of one another, and transferred funds between themselves with no clear business purpose and no documentation supporting the transactions. They have tried now to characterize some of these transfers as loans after the fact, but there's no evidence that repayment was ever made or expected to be made.

There's a reason why Rise resisted producing these documents for so long. Essential currently owes the funds $434,840, which includes $152,345 in principal contributions owed on Rise's projects. The rest of that amount constitutes contractual and statutory interest, liquidated damages, and attorneys fees and costs. A significant portion of those costs are directly attributable to Rise's conduct in this litigation and its noncompliance with the Court's order.

The plaintiff respectfully requests -- suggests that based on the bank records produced so far, the obvious conclusion that one would draw is that the companies used the corporate form to siphon funds away from the enjoined entity for the purpose of evading the Court's order. There's sufficient evidence to pierce the corporate veil between Rise Construction Management

and Rise Development. At a minimum we would request that the Court use its equitable power here to extend the injunction's development and to claw back the fraudulent transfers made after the Court's injunction order.

Thank you.

THE COURT: Um, just a second.

(Pause.)

THE COURT: Do you now have a copy of any contract between Rise Construction and Essential?

MS. GILLIN: Do I have copies of the contract?

THE COURT: Yes, the contracts.

MS. GILLIN: We have some of them, yes.

THE COURT: Are they in the binder?

MS. GILLIN: The ones we have are.

THE COURT: A representation has been made that Rise, um, Construction owed no obligation to Essential unless it was paid first by the owner/developer. Is that set forth in any of those contracts?

MS. GILLIN: No, it is not. In fact, they're all -- the contracts that we do have between the -- the owner of these projects and Rise, specifically refers to the Prompt Pay Act, which does not allow a company to not pay a subcontractor unless it's been paid.

THE COURT: Okay. And that's between the owner

and Rise, and then so Rise and Essential doesn't say, "Oh, by the way, we're only going to pay you, notwithstanding the statute, if we have the money"?

MS. GILLIN: That's correct.

THE COURT: Okay.

I saw something, I'm not sure I quite understood it, that, um, under the CBA, Rise might owe this obligation directly to the funds?

MS. GILLIN: So the CBA, um, which I regretfully did not bring a copy, I should have, but the CBA has a provision in it, it's Article 2, Section 7, and it states that -- which is an exhibit to our complaint, I believe, and it states that once notified of a subcontractor's delinquency, the general contractor will become liable for any subsequent delinquencies.

So here we -- when the Funds notified Rise of a delinquency, there were not subsequent delinquencies incurred after that, they were all incurred -- we were trying to collect this amount. And so the amounts that are due still from Rise are from 2024, I think March 2024, or March -- well late 2023 or 2024. So they're all old amounts.

We did not have the ability to hold Rise -- I mean if they continued to work on Rise's projects, we would have, you know, invoked that right, but we didn't have,

um -- Rise didn't continue to employ Essential on its jobs after that.

THE COURT: All right, Mr. DiNicola, do you want to do an opening of some sort?

MR. DiNICOLA: Sure, your Honor, and I'll be brief.

OPENING STATEMENT BY MR. DiNICOLA:

There are two primary issues that the Court has laid out, how much is due from, um, Rise to Essential, and the second is does Rise actually have the money? That's I guess what we're trying to figure out here, what the Court is trying to figure out here. But what we don't have here is a direct claim from Essential against Rise for breach of contract or anything else.

The attempt is the Mass Laborers are trying to enforce some sort of contractual obligation through Essential against Rise and pin them down to the ground in this situation. What we don't have anywhere is Essential versus Rise for the underlying alleged debt. That's one issue.

The second issue is how much is going to be -- how much is due Rise to Essential? And there are two aspects of it. One is a contractual aspect, but the second thing, which I believe is the much more important

aspect of this, is that Rise is a Reach and Apply defendant, and for the Reach and Apply to -- the whole essence of Reach and Apply is that to the extent you have assets or money due to the defendant, you are to hold that and not pay it to them until the underlying case is resolved.

Now there are -- I don't have the subcontracts between Essential and Rise here. My understanding is that there are several. Some of them may have the pay-if-paid provision in them, some of them I think were just P & M, "Please come out and do this work," which does not have the pay-if-paid. The pay-if-paid provisions are enforceable under certain circumstances under the lien law. The Prompt Pay Act does not change that.

But the bigger issue is how much money did Rise receive from the owners on behalf of Essential? That's really the issue as to how much money -- for a Reach and Apply defendant, how much money are they not -- are they not allowed to release to the defendant, and in this case pay over to the, um -- to the Court in escrow? So that's one issue.

The second issue is how much money does Rise have -- what is going on with the company? There are separate entities, and Mr. Grossman can testify to all

of these situations, but there's been no distributions, there's been payment of loans, and the company is, for all intents and purposes, out of business. My understanding is that there is one current project that they're about to be terminated from and then there's nothing, there's nothing left for the company.

THE COURT: When you say "the company," you mean "Rise Construction Management"?

MR. DiNICOLA: Correct.

THE COURT: But there are other Rise entities of different names, "Rise Development," um, and so forth, dealing with different projects, right? There are companies -- there are multiple entities?

MR. DiNICOLA: There are multiple entities, they are not construction contractors, they are different entities doing different things. They are also not a party to this case. And if Ms. Gillin wants to try to implead them, she can certainly do so. But they are not parties to this case.

THE COURT: And your client's position continues to be that Rise Construction had no obligation to pay Essential, the subcontractor, unless it was paid?

MR. DiNICOLA: That is generally how it works. But there are four, I believe four primary projects that are dealt with in this relationship between Essential

and Rise. Four of them.

35 Braintree is one of them, that's what it's called, 35 Braintree. Ms. Gillin was directly involved in negotiations with the owner, and Rise CM, and Essential, and Mass Laborers, where the owners paid directly, um, money that was going to go to Rise directly through joint checks with Essential and Mass Laborers. That took care of one of them.

7-9 Central is another one. Rise was terminated from that and the owner took over negotiations with all subs. Whether they settled with Essential or not, we don't know, but what we do know is that the money that they billed us, that they, being Essential, billed us, was not received by Rise from the owner.

Nevins is the third. Nevins, Rise was terminated for default on that case, on that project, and they hadn't been paid for 3 months prior to that. The amount claimed due, from Essential to Rise, was never received by Rise, the owner had that money. And I believe Essential has been, at least in the past, trying to get that money and alleged or threatened to put a lien on that project. Now I don't know -- I don't represent Essential, I don't know where that situation is, all I know is the amount, and what Mr. Grossman can testify to, the amount claimed, from Essential to Rise, was

never received by Rise to the owner.

The last -- I forgot the -- I think it's Essex Street, the last 1 or 2, we agreed, we owed 70. That's what we agreed to.

Thank you, your Honor.

THE COURT: And am I correct that, um, James Grossman, who's the principal of Rise, is the brother of Christopher Grossman, who's the principal of Essential?

MR. DiNICOLA: Yes, your Honor.

THE COURT: All right.

All right, Mr. Calandra, anything you want to add?

MR. CALANDRA: Yes, your Honor. I don't have an opening statement, but just a couple of comments.

I have a current affidavit from Mr. Chris Grossman of Essential, um, establishing the current amount owed at $360,595.44, and it involves 6 projects, um, 11 Parker, 35 Braintree, 7-9 Central, 52 School Street, 55 India, 86 Essex, and 1 Nevins Hill Way, some of which were just mentioned.

The second thing I have is the, um --

THE COURT: Okay. Well before I forget, why don't you hand that up and we'll make it part of the record.

(Hands up.)

MR. CALANDRA: The question of what --

THE COURT: We'll call it just Exhibit 1 to this

proceeding.

(Exhibit 1, marked.)

MR. CALANDRA: So that in your summary, at the outset of the hearing today, you mentioned two things, right? The amount that was owed from Rise to Essential, and then whether or not Rise can actually pay the amount, um, that it was ordered to pay into the trust.

A third question has been raised here as to whether or not -- as to the question of what the owner owes Rise on behalf of its, um, subcontractors or on account of its subcontractors. That's a completely new question that was raised before the Court, um, in the opening you just heard.

Essential argues that Rise had received monies on behalf of its subcontractors without paying that money to the subcontractors, including Essential, that basically Rise absconded with the money. And included in the affidavit is an Exhibit A, from one of the owners that was mentioned on 1 Nevins Hill, that describes -- this was a letter received by Essential from the owner, or from Rise, um, that describes why the owner wasn't paying its subs anymore and why Rise was terminated on the project.

So Essential argues that happened on multiple jobs, Rise stopped paying because it was terminated

and/or the owner stopped paying Rise because the owner was terminating Rise or was aware of the practice of not paying its subs. It's a letter, Exhibit B.

THE COURT: All right.

MR. CALANDRA: So that's all I have, your Honor.

THE COURT: Thank you.

THE COURT: All right, Ms. Gillin, how do you want to proceed?

MS. GILLIN: Yes, um, we are ready to call our first witness, um, and it would be Jim Grossman.

THE COURT: Okay.

Please take the stand.

(JIM GROSSMAN, sworn.)

THE COURT: All right. Because Mr. Grossman is an adverse witness, um, this is direct examination in name only and you can use leading questions, and, um, cross is effectively a form of direct, so leading questions will not be permitted.

Go ahead.

MS. GILLIN: Okay, thank you, your Honor.

************

JIM GROSSMAN

************

DIRECT EXAMINATION BY MS. GILLIN:

Q. Good morning, Mr. Grossman.

A. Good morning.

Q. Can you tell us, um, who you're employed by?

A. Rise Construction Management.

Q. Anybody else? Do you have employees?

A. No.

Q. Are you employed as an employee?

A. Correct.

Q. And what are your job duties? Well let me just back up.

What is your actual title with Rise Construction Management?

A. "Principal."

Q. "Principal," okay.

What are your job duties as principal?

A. These days we're a very small organization, just a few of us, so it's everything from, um, project management, financial accounting, construction management, um, running the day-to-day operations that exist currently.

THE COURT: And "Rise Construction Management, Inc." is a corporation?

THE WITNESS: Yes.

THE COURT: Do you own 100 percent of the stock?

THE WITNESS: I do not.

THE COURT: Who owns the stock?

THE WITNESS: Brian Anderson owns 50 percent --

THE COURT: Who does?

THE WITNESS: I'm sorry, sir. Brian Anderson, um, owns 50 percent, and I own 50 percent.

THE COURT: And who is Brian Anderson?

THE WITNESS: A partner who started Rise Construction Management with me in 2020.

THE COURT: Go ahead, Ms. Gillin.

Q. And does Mr. Anderson have any role in the management of the company?

A. Mr. Anderson, um, stopped participating in November of 2023. We began a dissolution process, but he's never signed it.

Q. You began a dissolution process in November of 2023?

A. Yes.

Q. Okay.

THE COURT: Does that mean he's not involved in the day-to-day affairs of Rise Construction Management and has not been since at least November of 2023?

THE WITNESS: Yes, sir.

THE COURT: Okay.

Q. What does Rise Construction Management do, its business purpose?

A. Building construction projects.
Q. Can you flip to Tab 10 of your binder.
A. (Turns.)
MS. GILLIN: Logistically do you want me to call these "Exhibits," should I number them consecutively?
THE COURT: Actually that's a, um -- let's try to make this as nonconfusing as possible. Let's call this Exhibit 10, because it's in the binder at Tab 10. And the third affidavit, um, why don't we stop calling that "Exhibit 1," let's change that to "Exhibit 38," because the last tab is 37. Okay?
THE CLERK: Yes.
MR. DiNICOLA: So 38 is going to be the -- Chris Grossman?
THE COURT: Yes.
MR. DiNICOLA: Thank you.
(Exhibits 10 and 38, marked.)
THE COURT: Go ahead. This is Exhibit 10.
MS. GILLIN: Okay.
Q. So, um, do you recognize this document?
A. I understand what it is, yes.
Q. What is this?
A. It's a document from the Secretary, um, the Secretary of the Commonwealth for the business entity.
Q. Did you provide information for the filing of this

document, the annual reports and so forth?
A. Um, no, those were provided by Rosemary Traney, who is an attorney.
Q. She's an attorney?
A. Correct.
Q. Is she the attorney for Rise Construction Management?
A. She was, yes.
Q. If you look at -- I tried to number the bottom of these documents so they would be easy to follow.
If you look at Page 29 of this exhibit, which I believe is the most recent annual report.
A. (Looks.)
Q. Do you see you're listed as the sole officer, President, Treasurer, Secretary, CEO, and Director of this company, is that correct?
A. I do see that, yes.
Q. And do you actually hold those titles?
A. I do not. I'm "Principal," these are not on the -- so day to day I do not. But here they are. But I see them here. I acknowledge it.
Q. Does Rise Construction Management, Inc. hold corporate meetings?
A. It has not, in the last year.
Q. When was the last time that you did?

A. Um, I don't recall, but it's probably -- my guess would be, um, 12 to 16 months ago.
Q. And is Rise Construction Management still located at 12 Erickson Street in Boston?
A. Yes.
Q. Okay. As the Principal do you have, um, authority to negotiate contracts?
A. Yes.
Q. Ability to issue payments?
A. Yes.
Q. Does Rise Construction Management directly employ anybody?
A. It does not now. It did though, yes.
Q. When was the last time it directly employed anybody?
A. Oh, I don't know, off the top of my head, but it is, um -- it's been unwinding over the last year. So maybe 6 months.
Q. And who was the last person that was employed by the company?
A. There were 12 of them. Should I list them?
Q. Were they laid off 6 months ago?
A. They were switched to contract.
Q. What -- what contract -- what -- I don't understand.
A. Like an employment contract.
Q. Okay. Could you explain that to me, is the company

winding down?
A. Yes, we are insolvent, we have a bankruptcy attorney, um, Attorney Madoff, um, who was imminently going to file. Yes.
Q. Okay. All right. So Rise Construction Management is insolvent and is planning on, but has not filed bankruptcy?
A. Yes.
Q. Okay. Is it continuing to perform work?
A. We are on one project, Rise Construction Management is on one project, 55 India Street.
Q. Is there a project at Curtis Street?
A. There is a development project at Curtis Street, but Rise Construction Management is not on that.
Q. All right. Did you pull the permit for that project?
A. I did.
Q. And did you pull the permit for that project as "Rise Construction Management, Inc."?
A. No, um, permits in Boston are based on an individual's, um, license. Corporations don't have licenses.
THE COURT: When you say "the project," you mean 55 India Street?
MS. GILLIN: I was referring to the Curtis Street

project.
Q. I believe it's 7211 Curtis Street?
A. Yes.
Q. Okay. Can you --
THE COURT: Let's back up for a moment.
The former employees of Rise Construction Management who were switched to having contracts, do they work for other Rise entities?
THE WITNESS: Rise Development pays those, yes, your Honor.
THE COURT: Rise Development pays --
THE WITNESS: Those contracts.
THE COURT: -- those contracts. Okay.
Q. When they were directly employed by Rise Construction Management, did they receive paychecks from Rise Construction Management or was it Development?
A. Rise Construction Management.
Q. Does Rise Construction Management have a payroll account, or did it?
A. It did, yes.
Q. Has that been produced to us, do you know?
A. That's at Invidia Bank, those accounts have been frozen. They did reach out, um, letting me know that they're sending them to you directly.
Q. Can you take, um -- turn to Tab 2, which I guess

would be Exhibit 2, please.
A. (Turns.)
MS. GILLIN: Just one logistical question.
Do I need to move to admit these documents, one by one? I'm not sure how formally the Rules of Evidence apply in an evidentiary hearing.
THE COURT: Why don't we, um -- let's take them one at a time. This will be admitted as Exhibit 2. And if counsel has an objection --
MR. DiNICOLA: No objection, your Honor.
THE COURT: -- I'm just going to admit them relatively informally, but if there's an objection, don't sit quietly, raise it. Okay?
It's admitted as Exhibit 2.
(Exhibit 2, marked.)
MS. GILLIN: Thank you.
Q. Do you recognize this document?
A. I do.
Q. And is this an affidavit that you filed in this case back in October of 2024?
A. Yes.
Q. And this document identifies you as the CEO of Rise Construction Management?
A. Correct.
Q. And in Paragraph 2, um, you are averring that you

are making the affidavit on your personal knowledge and based on information contained in business records. Do you see that?
A. Yes.
Q. And is that correct, um, when you made this affidavit?
A. Yes.
Q. All right. On Page, um, I mean, on, yeah, Page 2 of this exhibit, Paragraph 8, um, you note that you're making the affidavit -- or that Chris Grossman claims, in his affidavit, that Rise owes Essential $319,744.74, is that correct?
A. Correct.
Q. Did you, um -- did you do anything to secure or make any arrangements for the possibly of the funds claimed at this time in October?
A. Um --
Q. If you could --
A. I don't understand the question?
Q. Sure. I didn't ask it very articulately.
So in October of 2024, you were at least aware that the funds we're seeking to secure are $319,000, correct?
A. Correct.
Q. Okay. Did you do anything to set those funds aside

or make any arrangements in case the funds get a judgment against Rise and aren't able to -- in case this motion, for instance, was successful?
A. Um, I don't recall. I don't believe so.
Q. (Pause.) Do you know how much money Rise Construction Management had in its bank account as of October of 2024?
A. I do not.
Q. Do you have an idea?
A. No.
Q. Was it insolvent at the time?
A. Um, we were on our way to becoming insolvent, but I don't know that number. We all have it, I'm sure.
Q. How long, in your estimation, has Rise Construction Management been insolvent?
A. Um, from a pure, um, mathematical perspective, back to 2023. It was upwards of $19 million that was due us in outstanding -- that was due to Rise Construction Management in outstanding lenders, um, and we've been taking the last two years, um, to, um, reconcile with folks who owed us and in companies we owed to, to get that down. So we have been, since that timeframe, trying to manage through that. But I would say, technically speaking, from an asset to a liability, it goes back to 2023.

Q. Is it correct that Rise was actually placed in an involuntary bankruptcy in 2023?
A. It was, that's correct.
Q. And Rise fought to get out of the involuntary bankruptcy, is that correct?
A. Um, we settled.
Q. You settled. But you moved to, um, not have the involuntary bankruptcy proceed formally, correct?
A. I don't recall what was filed by, um, Attorney Madoff, um, but we eventually settled with, um, the party requesting that. I don't know if you call that a plaintiff.
Q. Well I guess my question is if you -- and when I say "you," I mean Rise Construction Management, or your estimation of Rise Construction Management, if you were insolvent, going back to 2023, why then did you not let the involuntary bankruptcy proceed and have the affair settled by a bankruptcy trustee?
A. It's a great question, one in hindsight I ask myself every day. I don't have, um, a straightforward answer to that. I believed, um, we were doing the right thing, trying to, um, make sure that as much as that $19 million plus or minus made its way to vendors, and I truly believed at the time, um, that was the correct action to take. With hindsight, I ask myself that

question, you know should I have -- should we have, in 2023, um, claimed bankruptcy? I think we've done a lot of good since then, but it's a fair question that I don't have a straightforward answer to.
Q. Um, did your, um, evaluation of that situation have anything to do with the, um, power a bankruptcy trustee would have to look into the financial conditions of Rise Construction Management and related entities?
A. Absolutely not.
Q. Why hasn't Rise Construction Management filed for bankruptcy between then and now?
A. Because we're taking the projects we're on, working with those owners, the final one being 55 India Street, and transferring those to construction managers to avoid disruption. And so that project is currently going to be terminated, probably tomorrow or Monday, and given to a construction manager so that there's no further damages to, um, the ownership group.
Q. Who is the construction manager that that project will be transferred to?
A. ESG.
Q. Do you have any relationship with that company?
A. I do not.
Q. When did the 55 India Street job begin?
A. Well the contract was signed in October of -- yes,

October of '24.

Q. Okay. So it was a year after you said -- you just testified that Rise Construction Management was insolvent?

A. Correct.

Q. So you took on another job even though you were not in a financial position to be able to pay subcontractors?

A. So the conditions of that job are important. We took on that job with the condition to the owner that the owner was paying subcontractors directly. So on that project our contract is such that we don't have that obligation, the owner is paying that directly.

Q. Was --

A. We had talked about this, when I met you.

THE COURT: But I wasn't there, so.

THE WITNESS: Oh, I'm sorry, your Honor. Sorry.

Q. Do you have contracts with the -- do you have copies of contracts that the owner executed with subcontractors that worked on those jobs for direct payment?

A. No, your traditional, or "typical," I'll say, um, owner/construction manager contracts have -- they all have provisions that have assignability and/or direct payments. And so, in our contract, that owner is exercising those direct payments.

Q. Have you produced any of the contracts related to that job to us, do you know?
A. I don't believe so. We can --
MR. DiNICOLA: We have not.
Q. Were you asked to look for responsive documents for this case?
A. I believe the answer to that is "Yes."
Q. Um, I'm going to skip ahead just a minute here. Can you please take a look at Tab 6, Exhibit 6.
A. (Looks.)
Q. Have you seen this document before?
A. I have. I have.
Q. Have you read it?
A. (Looks.) Yes.
Q. And this is a copy of our, plaintiff's interrogatories, first set of interrogatories to Rise Construction Management, is it not?
A. I believe so.
Q. Did you, um, make any effort to provide answers to these questions?
A. I do not recall.
Q. Can you please turn to Tab 7.
A. (Turns.)
THE COURT: Exhibits 6 and 7 are admitted.
(Exhibits 6 and 7, marked.)

THE COURT: And backing up, just to be clear, so is Exhibit 10, which was the corporation registration.

MS. GILLIN: Thank you.

Q. Have you seen this document before?

A. (Looks.) I believe so.

Q. This is the "Plaintiff's First Request for Production of Documents to Reach and Apply Defendant, Rise Construction Management, Inc.," is it not?

A. Yes.

Q. And if you flip to Page 6 of this document, do you see it is dated August 12th, 2025?

A. (Looks.) Yes.

Q. Did you -- do you know whether or not this has been responded to, by Rise?

A. I do not know.

Q. Were you ever asked to look for responsive documents for this, for responding to our discovery requests?

A. I don't recall, but I'm sure I was. Yes.

Q. Can you please flip to Exhibit 8.

A. (Looks.)

Q. Have you seen this document before?

A. Again, there's so many documents that I don't recall. But, yes, I'm sure I have.

Q. And this is "Plaintiff's Second Set of Interrogatories to the Reach and Apply Defendant, Rise

Construction Management, Inc.," is it not?
A. Correct.
Q. And if you turn to Page, um -- I guess these aren't numbered, but it would be the third or fourth page, you would see a date of October 3rd, 2025?
A. Yes.
Q. Did you make any efforts to answer these interrogatories?
A. I don't recall.
Q. Okay. And finally, if you turn to Exhibit 9.
A. (Turns.)
THE COURT: Exhibit 8 is admitted, as is Exhibit 9.
(Exhibits 8 and 9, marked.)
Q. Have you seen this document before?
A. As I answered this previously, but, yes.
Q. And this is "Plaintiff's Second Request for Production of Documents to Rise Construction Management," is it not?
A. Yes.
Q. Okay. Do you see on the third page -- I apologize, they're not numbered at the bottom. Do you see Request Number 34, "Request all documents evidencing payments received by Rise from project owners and developers." Do you see that?

A. I do.
Q. Did you ever make an effort to look for responsive documents to that request?
A. I don't recall.
Q. Okay. Did you -- on Request Number 35, do you see where, um, it states, um, for the time period, August 13th, 2025 to present, "All documents reflecting any payments made to James Grossman or any entity in which James Grossman served as an officer and shareholder"?
A. I do see that.
Q. Did you make any efforts to look for responsive documents for that question?
A. I don't recall.
Q. Okay. If I stated that the plaintiff hasn't received responses from Rise to any of these discovery requests, would you agree with that?
A. I would.
Q. Okay.
A. It's to my knowledge, but I would, yes.
Q. And is there a reason why Rise hasn't responded to our discovery requests?
A. Um, no. From my perspective just, um, life is a bit chaotic and I'm sure I missed this, and I'm more than happy to provide everything that's required in there. This is not -- I understand the line. But this is just,

um, me trying to make it through. And so I'm happy to revisit those, if it's necessary.

Q. Would you agree that many of the requests would be, um, relevant to Rise's own defenses in this case?

MR. DiNICOLA: Objection, your Honor, it's asking the witness to answer a legal question.

THE COURT: That's a fair objection. Sustained.

(Pause.)

Q. Okay. Can you please turn to Tab 1, Exhibit -- I guess it will be Exhibit 1.

A. (Turns.)

Q. Can you identify this document, have you seen it before?

A. I don't recall seeing this.

Q. If you could turn to Page 3, it may look a little more familiar.

Have you seen this document?

A. Um, again I've seen so many of these documents, but, um, yes.

Q. Do you know when you first saw this document?

A. I don't. I'm sorry.

Q. Would you agree with me that this is the, um, Court's order on our -- the plaintiff's Reach and Apply request for a preliminary injunction?

A. Um, yes.

Q. Did you read this order?
A. I don't recall. I'm sure. (Pause.) No, I don't recall.
Q. Would you agree with me that this order is dated May 13th, 2025?
A. Yes.
Q. Okay. So after that time did you do anything to comply with this order?
A. Um, I had numerous conversations with my attorney on the inability to --
THE COURT: Don't Get into the subject matter of those conversations. But otherwise you may answer.
Q. So without revealing your attorney-client communications, did you do anything to verify whether Rise Construction Management, for instance, had money in any of its accounts?
A. I don't recall that specifically. But, yes, we were working on behalf of what could be met within this order, or could not.
Q. Did you, um, ever make a determination that there was some money in Rise's accounts that could be used to comply with some part of this order?
A. I don't recall.
Q. What about the -- with respect to the directive ordering the accounting, did you make any efforts to

comply with that part of the Court's order?
A. I did.
Q. Okay. Do you know when you first looked for documents, um, relating to what Rise owes to Essential?
A. I don't recall. As it applies to this?
Q. Yes.
A. I don't recall.
Q. Okay. Can you please, um, flip to tab, or Exhibit 3.
A. (Turns.)
THE COURT: 1 and 3 are admitted, and they're court pleadings anyway. But 1 and 3 are admitted.
Q. Um --
THE COURT: As is 4, I'm assuming you're getting to that.
(Exhibits 3 and 4, marked.)
Q. Have you seen this document before?
A. It's similar to before, I'm sure I have, but I don't recall it.
Q. Were you provided -- were you aware that the Court was issuing orders at this time finding Rise in contempt?
MR. DiNICOLA: Objection, your Honor. To the extent that she's trying to implicate whether or not I had discussions with Mr. Grossman, those are

attorney-client information.

THE COURT: Well she hasn't asked how you learned. I think it's a fair question, "Were you aware?" So I'll allow that.

Q. Were you aware that Rise was, um, in contempt proceedings at this time as of September 22nd, 2025?

A. Um, yes.

Q. Okay. On the first page of this order, do you see where it says, "As an initial remedy, a subject or further remedial or other orders, the Court hereby orders that, by close of business on October 3rd, 2025, Rise Construction Management shall produce to opposing counsel" -- and it goes on to list in bulleted -- in the two bullets there, "documents that were required to be produced, including bank statements of all accounts in the May 13th, 2025, injunction order."

Do you see that?

A. I do see that.

Q. Okay. Did you make any attempts to provide -- to gather -- search for or gather documents that would be responsive to this order as of October 3rd, 2025?

A. Yes.

Q. Okay. What did you -- what specifically did you do to -- what specifically did you do to comply with this order?

A. I was putting in an effort to find bank accounts. So some of these accounts, um, I didn't have access to, meaning I wasn't a, um, like an authorized -- it was Brian Anderson, and so I had -- I was working to get these -- some of them had, um -- so I was working with the different banks to get these statements.

Q. Okay. So did you make requests to the bank themselves to provide the statements?

A. Yeah. Yes.

Q. Okay. And if you flip to Exhibit 4, which is the Remedial Order Number 2.

A. (Turns.)

Q. Have you seen this document?

A. I don't recall, but I believe so, yes.

Q. In the second paragraph, do you see where it states, "On October 15th, 2025, the Court held a status conference, and at that conference the parties indicated that, as of October 15th, Rise Construction Management has still not provided the documents and information to the plaintiff"?

A. I do see that.

Q. And is that correct?

A. I believe it to be, yes.

Q. Okay. And then, um, in the paragraph under that, do you see where the Court orders a fine of $1,000 per day,

beginning on October 16th, until full compliance is obtained?
A. I do.
Q. Okay. Did you -- when did you first became aware -- when did you first become aware that the Court had issued a $1,000 daily fine?
A. Um, I think it was -- I don't recall the exact date, but it was that, um -- it was when I was with my son in Florida, that case with the court session where I zoomed in.
Q. Okay. Has Rise paid any money into escrow or deposited any money with the Clerk for payment of the daily fine?
A. It has not.
Q. Okay. (Pause.) Okay. And can you please turn to Exhibit 5, which is an affidavit -- a second affidavit from you, I believe.
A. (Turns.)
THE COURT: It's also admitted.
Q. Okay. Are you familiar with this document?
A. Yes.
Q. And is this an affidavit that you executed on October 14th, 2025?
A. Yes.
Q. Okay. If you turn to Page 4 of this exhibit --

actually, Page 2 of the exhibit, there's Paragraph 4.
A. (Turns.)
Q. Do you see where it refers to Exhibit 1, which is a summary of Rise's bank accounts, past and present, with Citizen's Bank, Avidia, and Salem 5, and the other accounts -- and other accounts that are not Rise accounts but with affiliates.
Do you see that?
A. Yes.
Q. Okay. If you turn to Page 5, I believe this is an exhibit -- an exhibit that you had referred to?
A. Yes.
Q. Is this a document that you created?
A. Yes.
Q. Okay. And what is, um -- to create this document, did you, um -- I guess is there a place that you looked to come up with these accounts, this list of accounts, a centralized place where you have a list of accounts, or did you have to go through, um, from personal knowledge and go to the bank's website or whatever?
A. From personal knowledge and pulled this together.
Q. Okay. So I wanted to just go through these a little bit.
So this first -- the first entry on here, this Citizen's account, it looks like it's a Rise

Construction Management operating account ending in 1589. Do you see that?
A. Yes.
Q. Okay. Do you have signing authority over that account?
A. I do.
Q. Does anyone else?
A. I believe Brian Anderson still does.
Q. Is this account still open?
A. Yes.
Q. Do you know how much money is in that account?
A. I do not, but it's frozen by, um -- the Invidia lender.
Q. And when did that happen?
A. I don't recall, but within the past 6 months probably.
Q. Do you know whether it was before or after the Court's order in this case of May 13th?
A. I can get those dates. I don't know specifically.
Q. And the next one, an Invidia account that says it's a Rise Construction Management operating account, and it's ending 4509. Do you see that?
A. Yes.
Q. Okay. Do you have access to that account?
A. I do not.

Q. Who has access to it?
A. It's closed.
Q. It's closed?
A. Yes.
Q. Okay. Do you have signing authority for that account?
A. I did -- well I did when it was open beginning in, um, November of 2023.
Q. And then the next one looks like a payroll account that is the same number, the same, you know, account number, it looks like. Is there a separate payroll account for that?
A. They're both payroll accounts. This was a little, um, confusing to me as well. The setup -- the way Invidia takes payroll in, it comes into a named account, which is the same account as the payroll account. And so those are -- they have the same number.
Q. Okay. So there are two accounts that are operating as a payroll account that have the same number?
A. Correct. So I guess the way to explain that is technically it's the same account. When you transfer payroll in, it comes in a named operating, um, but it's the same account number.

So I'm trying to -- because this was confusing to me as well. If I opened up a portal for Invidia, it

would be one account on that portal. When transfers were made historically, they were Invidia Rise CM Operating, but it was the same account. So there's two names for the same account. I think it's an internal process to them, but it was unique for me as well. But they are the same number.

Q. And was the payroll account used for purposes other than payroll?

A. Um, no.

Q. And this Salem line of credit indicates that that was closed in 2024. Do you know when that was closed?

A. I don't know the exact date, it might have actually been a little bit before that too.

Q. And then going down this list. I want to ask you a little bit about these companies and their relationship to Rise Construction Management.

So the next one, it appears to be a Citizen's account for a company called Urban Lift. Are you involved with that company?

A. Yes.

Q. And what does that company do?

A. That company did installation of, um, motorized parking equipment.

Q. Is that company operational?

A. No.

Q. When was the last time it was operational?
A. In 2024.
Q. And do you know when in 2024?
A. Um, the last operation was right around the termination, so maybe 6 months after the termination.
Q. Okay. Um, the next one, "Rise Together," an account ending 0539. Is this a company that you are involved with?
A. Yes.
Q. Okay. What is your role with that company?
A. As a manager.
Q. "Asset Manager"?
A. A manager.
Q. A manager?
A. Yes. Sorry.
THE COURT: Is it a corporation? LLC? Partnership?
THE WITNESS: It's an LLC.
THE COURT: And are you the only member?
THE WITNESS: No.
THE COURT: Who are the other members?
THE WITNESS: Herbie Dubeniere owns 60 percent. Brian Anderson, 20. And myself, 20.
Q. Okay. Do you have signing authority over this account?

A. I do. But that account is closed though.
Q. Is "Rise Together" a, um, still in business?
A. No.
Q. When did that, um -- when did that company cease operations?
A. It's last project was close to a year ago.
Q. What did that company do?
A. Development Management.
Q. Okay.
THE COURT: Let me, um --
After the building is already constructed and developed or is it development in the sense of building the building and --
THE WITNESS: It's a great question, your Honor. It's both. It's both a Development Manager during entitlement, so permitting, um, management of the development itself, and then what you would call an "Asset Management," once -- but we hadn't finished any projects at that time. But the intent was to be an Asset Manager as well.
THE COURT: Okay.
Q. Does Rise Together, did it contract with Rise Construction Management or Rise Development?
A. I don't recall if it ever contracted with Rise Construction Management. I do not believe so. But I --

it did with different development entities, yes.
Q. Okay, I am going to probably have some further questions about that later.
The next one is an account ending 3191, which appears to belong to "Rise Dev 1 LLC." Do you see that?
A. Yes.
Q. Okay. And what is "Rise Dev 1 LLC"?
A. An entity created to, um, manage development.
Q. I mean what is the company, is it "Rise Development" or is it called "Rise Dev"?
A. Oh, um, I don't know technically, we would refer to it as "Rise Development."
Q. Okay. Is this account still open?
A. I believe so, yes.
Q. Do you know what is in the account as of today?
A. I do not.
Q. Are you involved with Rise Development?
A. Yes.
Q. What is, um -- what is your role?
A. A manager.
Q. Are you a, um, a member?
A. Oh, within the LLC, yes.
Q. What is your percentage, um, your ownership percentage?
A. 50 percent.

Q. 50?
A. 5-0. Sorry.
Q. And who is the other -- I'm sorry, are there others?
A. Brian Anderson.
Q. And what does Rise Development do?
A. Um, contracts with the lender, so Rise Development would contract with the lender and manages the development process.
Q. Does Rise Development contract with Rise Construction Management?
A. Yes.
Q. On what jobs did Rise Development and Rise Construction Management contract?
A. School Street. 52 School Street.
Q. Uh-huh. Any others?
A. No, they would be some of the other Rise Development entities or the actual signatory, if there was another one. We can get to that. So there are no other ones, sorry. I don't mean to confuse you.
Q. Okay. So there are other Rise Development entities?
A. They're listed here, right, "Rise Dev 2."
Q. Okay, so I see the next one is also "Rise Dev 1 LLC." Do you see that one, 3183?
A. Correct.
Q. Okay. Is that account still open?

A. No.
Q. Okay. And, um, I guess, um, I'm confused as to why there are two different accounts by the same entity?
MR. DiNICOLA: If I may? I think that's just a typo. If you look to the left of the name on the account you'll see "Rise Dev," "Rise Dev 1," "Rise Dev 2." So I think that column -- who owns the account is just a typo.
A. It's a typo. Thank you. Correct.
Q. So is your testimony that the first one, "Rise Dev," and it ends "3191," is just "Rise Development LLC"?
A. Yes. Sorry.
Q. Thank you. And the next one is "Rise Dev 1"?
A. Correct.
Q. Okay. What does that company do?
A. It's no longer -- it was a development entity for, um, a project that was getting entitled, permitted.
Q. Um, what project was it?
A. Sullivan Square, um, in Charlestown.
Q. And does that, um -- does "Rise Dev 1" as an entity continue to exist?
A. No.
Q. It was dissolved?
A. Dissolved? I don't know if Rosemary -- if Attorney Traney actually dissolved it, but I think after 2 years

the Secretary of State, um, I guess dissolved it automatically. That was her strategy.
Q. Okay. And were you a member of that?
A. I was a member, yes.
Q. And what was your ownership stake?
A. Um, it was below 10 percent. Maybe 7.
Q. Do you have records for, um, ownership records for all these -- for your, um, ownership stake in these various companies?
A. I do.
Q. Okay. Are they accessible to you?
A. Yes.
Q. The next one, "Rise" --
THE COURT: I'm sorry.
Were you the manager of "Rise Development 1 LLC"?
THE WITNESS: Correct, manager and member.
THE COURT: All right.
THE WITNESS: Yes. Sorry, sir.
THE COURT: And was this, um -- am I correct, um, I think you said "Rise Development," you contracted with the lender as opposed to the owner to do that, to manage the development process. Was that also the situation with Rise Development 1?
THE WITNESS: Yes.
THE COURT: You contracted with the lender as

opposed to the owner.
THE WITNESS: Yes. But in real estate these are single-use entities that, um, sign with banks, et cetera.
Q. Did either of those Rise Development 1, 2, 3, 4, whatever, do they contract with Rise Development LLC?
A. I don't recall. I don't recall.
Q. Um, so just for clarification. So is "Rise Development LLC," that is not a single use entity, is that correct?
A. Correct. We, um -- it has grown. It's original intent was a single-use entity, but it has grown over time.
Q. Is that company still operating?
A. Correct.
Q. Does that company employ people?
A. That is the contracts for, um, the employees.
Q. I thought that was Rise Construction Management's employees?
A. Um, no, you had asked earlier and I explained how the employees transitioned, that's the entity that pays, um, those amounts.
Q. Rise Development pays?
A. Correct.
Q. Does Development have its own employees that have

always worked for Development?
A. There were, but when all of this turmoil started, we went from 80 people down to 10 or so. And so they were all let go.
Q. Did you say 80 people?
A. We were up to 80 people, yes.
Q. And those 80 people, did they work for Rise Development?
A. Oh, I'm sorry, I don't recall the exact number, but let's um -- marginally 15 of those people, 12 of those people.
Q. Worked for Development?
A. Correct.
Q. And the rest of them worked for?
A. The construction management firm.
Q. Okay.
A. Sorry.
Q. No, thank you for clarifying. I appreciate it.
Okay. And just to be clear, for the record, so Rise Construction Management had 10, 15 employees, it transferred those employees over to, what, 1099s?
A. Yes. Yes.
Q. Okay. And those employees, the 1099s are paid, they're paid by Development?
A. Correct. Correct.

Q. Okay. What do those employees do, or contractors do?
A. Project management.
Q. Okay, so is it the same position they had at Rise Construction Management?
A. A little bit different, but, um, yes, similar. Project management, whether a development entity is managing say like a designer, which is not typical of a construction manager, so there's a little bit of a nuance to that. But likewise, as a development management, you also have to manage the construction manager, right? So you are managing construction as well, in that role.
Q. Okay. So were all these employees, they're all like project managers or something similar?
A. Something along those lines, yes. We have, um, one accountant.
Q. One accountant. Okay.
Can you tell me the accountant's name?
A. Cam Richey.
Q. Richey?
A. Yes.
THE COURT: And that's an accountant for all the different entities, he handles accounting duties for all of the entities?

THE WITNESS: He handles accounting duties for all of the entities, yes, sir.

THE COURT: Am I right that none of these entities that you were involved with actually was an owner and did the actual development in that sense, but that you were managing these projects for lenders, was that your basic business model?

THE WITNESS: Um, no, not for lenders, it would sign with the lenders. So, um --

Is it okay to expand? Because I think it will bring clarity.

THE COURT: It would be.

THE WITNESS: So let's take School Street, because it's a great example.

School Street has upwards of 12 or so investors. Rise Dev owns 5 percent of that development. So, you know, the 50/50 is 2 1/2 percent for Brian Anderson, 2 1/2 percent for Jim Grossman. And then the vast majority of the ownership is in more passive, um, investment. And what Rise Development does is manage that process on behalf of that group.

And so that -- in the world of, um, who I guess the client is, it's the investment group, which would be another -- in real estate, another single-use LLC that that investment group has created. And it manages -- in

that operating agreement it would lay out that, um, Rise Dev would be the manager of that process.

THE COURT: The manager and minority owner?

THE WITNESS: Yes.

THE COURT: Why don't we take a moment and stretch our legs.

(Stretch pause.)

THE COURT: In terms of the timetable going forward, I was asked to cover a naturalization ceremony, which is at 1:30, and it's, um, the first one in the -- I'm not sure what the right word is, but the refurbished/repaired Faneuil Hall, um, so it's not in this building. The ceremony itself is not very long, but I have to get there and get back, and that's at 1:30, and, um, it would be best if I were able to wolf down a sandwich at some point before that happens.

So why don't we go until, um, 12:30, 12:40, and I assume we're not going to get done this morning, and then let's assume we'll pick up again probably at 2:30 to be safe. And I have a brief telephone call that I need to make at 3:00, but it won't take very long, and I'm available the rest of the day. And if we don't get done, we'll find a date to continue.

Okay?

MS. GILLIN: That works for us, your Honor.

THE COURT: Okay, thank you.
Q. So, Mr. Grossman, on School Street, who's the owner of that project?
A. That investment group. I believe it's "School Street LLC." But I don't recall.
Q. Does "School Street Development LLC" sound right?
A. Yes.
Q. Okay. And are you the manager of that?
A. I am one of them.
Q. Okay. And, um, do you have an ownership stake in that LLC? Do you remember?
A. Rise Dev does.
Q. Okay. So Rise Development has an ownership stake in School Street Development LLC. And who are the other members?
A. Um, a group called "BTCRE." And then, um, I believe 7 individual -- 7 individuals.
Q. Oh, 7 individuals?
A. Correct.
Q. Not an entity called "7 individuals"?
A. No, sorry. (Laughs.) I'm sorry.
Q. Okay. All right. So just going back to this, moving down. Did we go -- I don't know if we went through Rise Development 2, this "1316." Do you see that?

A. I do.
Q. What does that account for?
A. I believe that was, um, for a development in East Boston that never materialized.
Q. What was the development?
A. Mount Carmen.
Q. And is that, um -- is that bank account open?
A. No.
Q. What about the next one, where it says "SFQ 1103," is that Sullivan Square?
A. Correct.
Q. Is that bank account still open?
A. No.
Q. When was that closed?
A. Um, well over a year ago. Probably closer to 2 years ago.
Q. Was that, um, a single-use entity account?
A. Correct.
Q. And what is the project?
A. It's, um -- it was the entitlement of, um, a Sullivan Square development. So we entitled what was planned to be a lab into residential buildings.
Q. Did that project not happen?
A. It did not.
Q. And the next one says "Rise Capital," what is that?

A. Brian Anderson was anticipating creating a fund and never did, there was never, to my knowledge, any money in that account. In real estate sometimes you create a fund for investors to enter into and that was the, um, genesis of that.

Q. Did you have signing authority on that?

A. I did not.

THE COURT: And I'm sorry if these are stupid questions, but I'm old enough that I'm envisioning real estate development as you have a lender, like Charlestown Savings Bank or something, and the owner, and then whoever is doing the construction for the owner. And this is -- and as I understand it, this is a somewhat different model. You have investors, most of whom are passive, who create an entity that owns and develops the project and funds it, and your role, or the role of these entities, is to manage that fund. And also you have an ownership stake, a minority ownership stake.

Is that roughly right, sir?

THE WITNESS: Correct.

Can I just add to that?

THE COURT: Yes.

THE WITNESS: So a typical development project for anyone is, um, somewhere between 60 and 70 percent a

loan, so whether that's a private lender and/or a bank. So most of these, um, once you get into construction, like School Street, is Needham Bank, and so that's why you see that account, that's an actual loan. So you have a loan, um, that you get, and then the remaining 30 to 40 percent is to investors.

And what you would call it, your Honor, is you have general partners and limited partners. The limited partners would be those passive investors generally and the limited partners would be the operating partner inside of that.

THE COURT: But you use LLCs, not partnerships, I would assume?

THE WITNESS: Correct, all LLCs, for the most part. I don't know of any partnerships that anyone has ever used in that world.

And so, um, generally the breakdown of that is somewhere of that 30 percent, let's call it, is somewhere in the realm of 90 percent Passive LP, 10 percent General Partner. And this is fairly standard in the industry. And so that's what makes up that ownership.

But that 10-percent entity, it gets paid a fee to manage, um, the development. And then also, as you alluded to earlier, is the asset side of that, if it's

complete. So you earn a fee and you have a minority stake inside of it. But you are the operating partner.

THE COURT: All right.

Ms. Gillin, go ahead.

THE WITNESS: Yes, sorry.

THE COURT: Thank you.

Q. All right. The next two looks like they say "MVP." Is this "Mystic Valley Parkway"?

A. Yes.

Q. Is that a project that, um, happened?

A. No.

Q. Are those accounts closed?

A. Yes.

Q. Did you have signing authority over those accounts?

A. I did not, those are -- those are, I believe, a loan. So that the first one is a loan, an actual loan for the lien. And the second one, when you see "Reserve Savings," when you, um -- when you get a loan with a bank in real estate development, they, um, put their payments, their interest reserve on the side.

Q. Okay. So that's what the second one is?

A. Yes.

Q. And then I think you alluded to the next one down, ending 0375, which is School Street. And this job -- this was a job that Rise Construction Management did

work on?
A. Correct.
Q. Is that job complete?
A. It is not.
Q. Is Rise Construction Management's role in it complete?
A. Rise Construction Management was terminated 10 months ago.
Q. And why was, um, Rise terminated from that job?
A. An inability to do its work.
Q. So on that one is it -- maybe I'm not getting it, but isn't Rise also the developer on that job?
A. Correct, the Rise Dev, yes.
Q. So was Rise Construction Management terminated by Rise Development?
A. Yes.
Q. Okay. Aren't you the managing, um, the principal of both entities?
A. I'm the Manager within both, yes.
Q. Okay. And you have at least a, um, 50-percent stake in both, correct?
A. Um, correct.
Q. So what happened there?
A. It was part of the unwinding in heading towards bankruptcy. And again, that's what I did on all of

these, whether 55 India was for a third-party client, um, or for Rise Construction Management. And the unwinding, it's about finding a solution to make sure that the job gets complete. Because in that --

If I can expand? Because it may help make sense of this.

In the world of -- I understand your line of questioning is like, "Hey, you're on both sides of this, how does that work?" In the world of that construction loan, that would be 70 percent. What happens on these smaller projects -- not so much the bigger ones, like in Boston, but on the smaller ones, you sign on that personally, and banks do that to make sure that, you know, Jim Grossman and Brian Anderson are, um, committed to getting it done. And so when you think about fiscal responsibility on something like School Street, ultimately you have to complete that job to get that loan paid off, and make it an asset, an earning asset for the investors.

And so in the world of what I felt like was my obligation, it was finding a construction team that could, um, complete that job and was better suited than Rise Construction Management. And knowing that Rise Construction Management was heading towards bankruptcy.

Q. Um, so who took over that job?

A. So there's two, what we call, "prime subs" on that. Um, I have it written down, but it's, um -- it's, um -- it's a subcontractor who took on multiple trades, and it behaves as or operates -- not behaves, it operates as essentially a construction manager.
Q. Do you have any involvement with that?
A. I did not, um, that entity. I do not.
Q. When was Rise Construction Management terminated on the School Street project?
A. I can get the exact date, but I believe 10 months ago.
Q. And what was the reason given for the termination?
A. "Convenience." "Contracts allowed." Termination for cause and termination for convenience.
Q. When Rise Construction Management was terminated from that job, were there outstanding invoices that Rise Construction Management owed, um, you know owed to subcontractors that worked on that job?
A. I believe so, yes.
Q. And what happened after the, um -- after the termination, like who was responsible for paying those, um, those invoices?
A. So through the -- through the development, um, pays those invoices.
Q. So Rise Development is responsible for paying the

invoices?
A. Correct, for work completed onsite. Yes.
Q. Do you know how many -- the amount of outstanding invoices that, um, currently that are owed on this job?
A. Um, I don't know that exact number. I can get that. If we take a break, I can. Once we take a break.
Q. Okay. And the next, um, 1, 2, 3, 4, it looks like they're "DWRT Ellery." Do you see that?
A. I do.
Q. And they seem to be all Santander?
A. Correct.
Q. Is this a job, um, the Ellery job, is this a job that was completed?
A. It was and sold, yes.
Q. And was Rise Construction Management the, um, the general contractor on that job?
A. It was terminated right around the same time of these other terminations.
Q. When was Rise Construction Management terminated?
A. 2023. I don't know the exact date.
Q. Do you know about like what months these were?
A. During this timeframe you can see -- even the projects in question, with Essential, you can see that November of 2023, October of 2023, there were successive, either partial terminations or terminations

of Rise Construction Management, and much of it had to do with that, um, the headlines of the forced or, um, involuntary bankruptcy, and I think that made a lot of owners nervous. There was also concern about Rise Construction Management's performance on some of these. And so a lot of those terminations happened around those. And we can find the exact date, but I don't know it.

Q. Okay. Was Rise Development involved in this project, "The Ellery"?

A. Not Rise Development, it was another single-use entity that Brian Anderson and I were an owner.

Q. What was your percentage, um, stake in that ownership?

A. It was closer to 2 percent. It was very small.

Q. And then, um, there's one for 86 Essex, and it looks like it's ending, um, 2789, with Enterprise Bank. Do you see that one?

A. Correct.

Q. Is that a project that was completed?

A. That is.

Q. And was Rise Construction Management a general contractor on that job?

A. They were.

Q. Was Rise Development involved in that job?

A. No, um, but another entity where Brian and I were.
Q. What was the entity for that -- the ownership entity for that job?
A. I don't -- I don't recall. The owner is, um, Ryan Denver, um, and his partner, John. I forget. But they owned 80 percent of it. Brian and I owned 10 percent. And then there were a few other investors that were in. And that account is a loan, that's not, um, an account, I believe.
Q. Was Rise terminated from that job?
A. We were not.
Q. Was Rise paid by the owner?
A. We were not. So the last -- the last, um, 8 months of that project, the ownership entity was paying directly.
Q. Did Rise Construction Management, um, receive its fee?
A. We did not.
Q. Is it pursuing payment of that fee?
A. We are not.
Q. Is there a reason?
A. Um, no other than, um, the ownership group is, um, it was amicable, and so we're not litigating.
THE COURT: Was that the job in which you agree that, um, Rise Construction Management owes $70,000 or

so to Essential?

THE WITNESS: That's the loan that's -- within that 70. It's a, I believe, like $7,000. I could be off there, your Honor. It's a smaller portion of that.

Q. Do you know what, um, Rise Construction Management, um, was owed on that, what's outstanding?

A. I don't. I don't have that in front of me. I believe -- if I can expand a bit? That's one -- when we had previously met, I let you know that owner is a signatory and would make that payment, um, if we asked them, so.

Q. All right, I do not recall this.

A. Oh, okay.

Q. But I don't know, um -- who is the owner for that job?

A. Um, that ownership group is as I laid out. So Ryan Denver who is select -- the select companies.

Q. Are they -- they're an owner of the Essex --

A. Correct.

Q. That company is an owner of the Essex --

A. Not the company, but the individuals themselves, um, within that LLC.

Q. Okay. And, um, the next two, with Bank of New England, 24 to 32 Spice, and 33 Cambridge, are these jobs that were completed?

A. No.
Q. What is, um -- what is the status of those two jobs?
A. Um, those are land loans that are, um, defaulted.
Q. Did, um, Rise Construction Management serve as the General Contractor on one or both?
A. There was no work on either one ever those.
Q. They never started?
A. It never started. Sorry.
Q. And then the last one, 7211 Curtis, um, and the account ending 2539. Do you see that one?
A. I do.
Q. Is that account still open?
A. No.
Q. Is that project still going on?
A. It is. So, you know, this account here was a land loan that was closed.
Q. Um, is Rise Construction Management working on that project?
A. No.
Q. Is Rise Development involved in this project?
A. No.
THE COURT: When you say a "land loan," do you mean a loan to purchase the real estate, the land itself as opposed to fund the development of the --
THE WITNESS: Yes, your Honor. And so -- and then

you get a construction loan that would then satisfy that loan and take it over essentially.

Q. So who is the ownership entity?

A. "Saugen."

Q. Are you involved with that company?

A. Um, correct. Yes.

Q. And what is your ownership stake?

A. I, um -- so Seth Williams owns 50 percent. I own 25 percent. And Brian Anderson owns 25 percent.

Q. Who is performing the work on that project?

A. It's, um -- oh, it will come back to me. Um, this is a little bit --

Who's, um, the site guy?

MR. DiNICOLA: We can't answer you.

THE WITNESS: Oh, sorry.

A. I can get that name.

Q. Okay.

MS. GILLIN: Do you mind if I take a quick break, is that okay?

THE COURT: No, that's fine. Why don't we take a, um -- why don't we take a 5-minute-plus break.

THE CLERK: All Rise.

(Short recess, 11:40 a.m.)

(Resumed, 11:45 a.m.)

THE COURT: All right, counsel.

MS. GILLIN: Yes. Thank you.
Q. So could you please take a look at Exhibit 14, Tab 14 in your binder.
A. (Looks.)
THE COURT: 14 is admitted.
(Exhibit 14, marked.)
Q. Are you familiar with this document?
A. I understand what it's saying, yes.
Q. Okay. And, um, is, um -- I'm sorry to -- yes, 14. I guess Page 15. So it looks like it might be cut off there.
This is an annual report for 2023. Do you see that?
A. I do.
Q. Is that the last annual report that Rise Development has filed?
A. I don't handle that, um, but I assume he got it off the website, that is, um, Brian Anderson or Rosemary Traney.
Q. And, um, Rise Development is also, um, is located at 12 Erickson Street, is that correct?
A. Correct.
Q. And is it still located there?
A. Yes.
Q. Okay. Um, does it --

THE COURT: So all these single-use LLCs that we've been talking about, they're also -- to the extent they have a location, it's 12 Erickson Street?

THE WITNESS: Yes.

(Pause.)

THE WITNESS: I'm sorry, your Honor, with the one correction of Saugen is not, I believe.

THE COURT: Okay.

Q. Okay. Do you have -- who has control of, um, Development's bank accounts?

A. Um, myself, Brian Anderson, um, with Citizen's.

Q. Does Development have any other bank accounts other than a Citizen's bank account?

A. No.

Q. Can you take a look at, um, Tab 17, Exhibit 17, which is the Secretary of State's, um, records for Rise Together LLC?

THE COURT: That is also admitted.

THE WITNESS: Yes.

(Exhibit 17, marked.)

Q. Is this -- where's Rise Development -- Rise Together, where was that company located?

A. I believe, um, in Herbie's -- Herbie Dunez's office in Charlestown.

Q. Okay. And is this company still active?

A. It is not.
Q. It is not. Okay.
Can you look at Page 21.
A. (Looks.) Yes.
Q. Do you -- it appears that this document -- this document was filed on August 4th, 2025, is that correct?
A. I don't see the date, but, yes. Sorry.
Q. There's a date at the top, and then on the page after that, I believe.
A. Oh, okay.
THE COURT: Yeah, but that's the date it was -- oh, yes, I'm sorry.
Go ahead.
Q. Okay. It looks like, on Page 22, that there was a change in managers.
It appears that you were removed as the Manager of this company, is that correct?
A. I don't believe so, no.
Q. Okay. So if you go to --
A. It could be wrong.
Q. If you go to right before that, on Page 19, which was filed the same day, you're listed on that one. Oh, I see, this one looks like it may be for a different filing year.
So you were added to this company, is that

correct?
A. It was from inception.
Q. Okay. So what is the difference between the Annual Report filed for, um -- or the Certificate of Amendment and the Annual Report filed for 2025, other than the removal of your name as Manager?
A. I don't know. I didn't file these.
Q. Who filed these?
A. I believe it says Herbie's lawyer, Joel Solavasky.
Q. Okay. Did Together contract with, um -- when I say "Together," I mean "Rise Together."
A. Yes.
Q. Did that entity contract with Rise Construction Management?
A. You asked that earlier. I don't recall any -- at any time contracting with them. I don't believe so.
Q. Can you, um, explain the difference between Rise Together and Rise Development again?
A. It's a -- from an operational perspective, very analogous, it was created to do the same. The difference being that Herbie owned 60 percent of this and didn't own Rise Development.
Q. Were Rise Together and Development ever on the same project or did they do separate --
A. Separate. Separate.

Q. Okay. And who has control of, um, Rise Together's bank accounts?
A. I don't think they exist anywhere.
Q. Who did?
A. Herbie and Brian.
Q. Did you have any, um, control over those accounts?
A. No. No.
Q. I want to ask you a little bit about the specific projects that we've been talking about and, um, specifically the projects that I understand Essential worked on. And I'm going to start with 35 Braintree.
Can you identify the location of that project? I know it's 35 Braintree, but what city or town?
A. So 35 Braintree Street in Boston. But Allston.
Q. And who is the owner of that project?
A. Jones Street. Again, um, the owner is an LLC, but Jones Street essentially is the owner.
Q. Jones Street is like the development company?
A. Correct. Correct.
Q. Um, did -- and Rise Construction Management worked as the General Contractor on that project?
A. Correct.
Q. And there was a written contract for their work?
A. Correct.
Q. Okay. Can you take a look at Tab 33, Exhibit 33.

A. (Looks.)
Q. Okay. Is this the contract between JSIP Braintree Street Development and Rise Construction Management?
A. Um, correct. I believe so, yes.
MR. DiNICOLA: Your Honor, I do have an objection to this exhibit. I just want to note that this is not the full contract, this is only a part of the contract.
THE COURT: I'll admit it for what's it's worth. I know sometimes these AIA contracts have all kinds of add-ons and --
MR. DiNICOLA: That's correct, your Honor. This is the A133, there's an A201 that goes with it, with several other exhibits.
THE COURT: But, um, in any event, it's admitted, for what it's worth.
(Exhibit 33, marked.)
Q. If you -- if you turn to Page 17.
A. (Turns.) Yes.
Q. Would you take a look, please, at Section 11.1.3.
A. (Looks.)
Q. And, um, I'd like to direct your attention to the sentence, the last sentence that begins with, "Notwithstanding any provision of this contract." Do you see that?
A. I do.

Q. Okay. And it says "The Construction Manager shall be responsible for complying with the provisions of MGL Chapter 149, Section 29(e), in administering all subcontracts."

Do you see that?

A. I do.

Q. Okay. Do you know what MGL Chapter 149, Section 29(e) is?

A. I do not, but I would imagine it's the Prompt Pay Act that you referenced earlier.

Q. As a Construction Manager, um, are you familiar with the Prompt Pay Act?

A. I am.

Q. Okay. What is required by the Prompt Pay Act with regard to subcontractors?

MR. DiNICOLA: Objection, your Honor. This is again asking a legal opinion of a lay person.

THE COURT: I'll allow him to testify as to his basic understanding, recognizing that he's not a lawyer.

Go ahead.

THE WITNESS: Yes, thank you.

A. So, um, any contract, I believe, over $3 million, um, is subject to this, and what it does is lay out a payment process.

The beginning of it -- and I've read it so I know

it's fairly simple to digest, but the beginning of it lays out timelines and how to submit requisitions, very similar to this. Meaning like if it's in on the 25th of the month, there's a certain time period where you need to, um, either comment on it or go back and forth with a payment application. It then lays out timelines for paying that payment application. But barring that, there's no other contractual requirements. And again, I'm saying this as a lay person.

And then it does have a provision, um, and I don't know the exact wording, but essentially saying, um, "If a contract has pay-when and pay-if-paid policies, that the Prompt Pay Act stands in front of that.

Q. Okay.

A. Was that okay? Did I explain that? Sorry.

Q. Well I guess I'm just asking more about your --

So your understanding of the Prompt Pay Act -- well let me back up.

MR. DiNICOLA: Objection, your Honor. Again the understanding of a statute.

THE COURT: I'll allow it, this is his -- it's his business. I understand it's not a legal opinion. But, um, I'm allowing him to testify about what his understanding is.

MS. GILLIN: Thank you.

Q. So when you read this contract, and I'm assuming that -- well let me just check.

Did you sign this contract?

A. I believe it was signed by Brian Regan, but I would have to look. (Looks.) I did. I did. Yes.

Q. Okay. And, um, did you read this contract?

A. Yes.

Q. Okay. And is your understanding of this sentence, do you take that to mean that the Prompt Pay Act applies to any subcontract that, um, is entered into under this agreement?

MR. DiNICOLA: Objection again, your Honor.

THE COURT: It's a question about his understanding of the contract, which I assume he signed. So --

A. I believe this clause specifically is between Rise Construction Management -- I believe this note -- I'm not trying to dodge the question, I think I understand where you're going. But I think this note specifically is talking about the Prompt Pay Act being applicable to this contract.

Q. And when it says here, "in administering all subcontracts," what do you take that to mean?

A. (Pause.) In conducting my duty. But, um, I -- I think I understand where you're going. There are --

anything this contract tells me, anything within here has to pass through to the subcontractors. So if that's kind of what you're trying to get to, I'll acknowledge that.

Q. Okay. So the Prompt Pay Act applied to subcontracts under this agreement, is that what you're --

MR. DiNICOLA: Objection, your Honor.

THE COURT: Overruled. Overruled. Overruled. Let me try it.

I mean basically what it's saying is you have to comply with the Prompt Pay Act even if there's something else in the contract that might be interpreted to provide otherwise, right?

THE WITNESS: I agree, your Honor.

THE COURT: And is it fair to say, at least your understanding of the Prompt Pay Act is, you have to pay the subs in a timely manner, the idea being, um, developers, owners, whatever, can't fund a construction project by not paying their subs, they have to pay the subs on time.

THE WITNESS: Correct. Yes, sir. There's nuances, yes, sir, and I'm not trying to --

THE COURT: But the basic thrust of it is, putting aside disputes, which of course arise, um, obviously the basic notion is that you have to pay your subs every

month, or whatever?

THE WITNESS: Correct, and likewise the owner has to as well. Yes, all of us in there. Yes.

THE COURT: All right.

Go ahead.

Q. Okay. Do you know if there was a Prompt Pay Act provision in the subcontract between Rise Construction Management and Essential?

A. I don't -- I don't know. I think -- it should -- it should have. But I -- I don't know if it's an exhibit here and we can look. I don't know.

Q. Okay, I think we have the, um, the exhibit under -- the subcontract under Exhibit 25.

A. (Looks.)

Q. And if you look at Page 5.

A. (Looks.)

THE COURT: So Exhibit 25 is admitted.

(Exhibit 25, marked.)

MS. GILLIN: It's actually Page 4 at the bottom and Page 5 at the header at the top. And it's Page 4 of the subcontract.

THE COURT: And just to be clear, this is the subcontract between Rise Construction Management and Essential Demo Services for the 35 Braintree project, right?

Q. Is that correct, Mr. Grossman?
A. (Looks.) Yes.
THE COURT: Okay, I'm sorry.
Now go ahead.
Q. Okay. And did you negotiate this contract with Essential?
A. I did not.
Q. Who did?
A. Brian Regan and John Hernan.
Q. Okay, if you look at Page 4 of this contract. Again, it's Page 5 of the header, it says "Page 5 of 66." Can you look at, um, I guess it's, um, 7 -- it starts with the page before, but 7(g). So I'm looking at specifically Subparagraph G on Page 4. Where it says, um -- well, I guess F and G.
Do you see those?
A. I do.
Q. And they both refer to MGL 149, Section 29(e), which you've already established is the Prompt Pay Act?
A. Correct.
Q. Okay. So that, um -- by the way, did you read this agreement, have you read it before?
A. Um, yes, I've read this agreement before.
Q. Okay, so you have personal knowledge at least of this agreement even though you didn't sign it?

A. Correct.
Q. Okay. So is it your understanding that this language in F and G, um, means that the Prompt Pay Act does apply to this subcontract?
A. Correct.
MR. DiNICOLA: Objection, your Honor, that's not what it says.
THE COURT: All right, I'll let you cross.
(Pause.)
Q. Do you know, um -- well let me step back.
Does Rise Construction Management provide any training to, um, its Project Managers or anybody else regarding the provisions of the Prompt Pay Act?
A. It did, yes.
Q. And who conducts those trainings?
A. It's any number of people. But, um, it would be internal. Sometimes podcasts and things of those nature.
Q. Do you know whether Rise Construction Management complied with the Prompt Pay Act with regard to Essential's work on this project?
A. I do not know.
Q. Who would know?
A. Not -- um, I don't know. They're not around anymore.

Q. Who was it -- who was responsible for issuing payments or approving, um, payment requests?
A. It would be the Project Manager, the Project Executive, in this case John Hernan, and Brian Regan. And then we had a CFO at the time, um, Scott Holmes.
Q. Okay. Did you have any involvement with that process?
A. Um, on the periphery, but, yes.
Q. Did you, um -- when you say "on the periphery," did you have to give final approval to anything?
A. No.
Q. Okay. Who was the person that makes decisions on whether or not a contract is -- a request for payment is approved?
A. So it would happen at a project level, and then the CFO. And then at the time of this contract, um, Brian Anderson controlled the, um, the bank accounts. So then the funds would be, um, would be approved, I suppose, by Scott Holmes and Brian Anderson.
Q. How much was the prime contract for this job?
A. I don't recall.
THE COURT: Was it over $3 million?
THE WITNESS: Um, yes, sir.
Q. Okay. Was, um, Development involved in this project at 35 Braintree?

A. It was not.
Q. Was Rise Together involved?
A. It was not.
Q. Was Rise Construction Management terminated from this job?
A. Partially. It was a partial termination.
Q. What does that mean?
A. Um, so a partial termination for convenience was issued by Jones Street whereby Jones Street paid all subcontractors directly. And, um, and Rise stayed on the job to complete the job, from a management perspective, but all payments were done by Jones Street.
Q. Did Rise -- after this partial termination, did Rise receive a payment, any payment --
A. It did not.
Q. Well let me just finish my question.
A. Oh, sorry. Sorry.
Q. Like was there a fee, another fee? You know if you stayed on the job, presumably there was some payment?
A. We were not. And so you're -- I understand the line of questioning, but just to explain it a little bit further.

Your Construction Manager receives general conditions, that's like staff costs and, you know, ancillary that goes into that staff cost, and then a

fee, and then insurances. The insurances were paid at the beginning before the termination, so those insurance payments went out. And then as part of that partial termination, Rise Construction Management received no other compensation, no fee, no general conditions. Um, and those funds were used by ownership.

Q. Okay. So, um, I'd like to move on to just the next project here, Nevin Hills?

A. Yes.

Q. What is the location of that project?

A. Um, I forget the exact address.

THE COURT: Take your time.

A. It's in Allston. It's in Boston.

Q. Is this something like "Fidelis Way"?

A. Yes. Yes. It might be "199 Fidelis Way." But I might have the number wrong.

Q. Okay. Who is the owner on this job?

A. Again, a single-use entity. But, um, maybe Boston Ventures was the developer.

Q. Can you please take a look at -- I'm sorry, we didn't have room here in our binders, but sort of appended to the end here there's a Tab 35. And we tried our best to make them findable.

A. (Looks.)

Q. So, um, does this document look familiar to you?

A. (Looks.) Yes.
Q. Yes, it does?
A. Yes. Yes.
Q. And this -- and it looks like the owner on this is -- there's an entity named "143 Washington," is that correct?
A. Yes. And now that I see this, that might be the address, not -- well Fidelis Way is a side street. I believe the actual address might be 143 Washington Street.
Q. Okay. Do you know the price for this contract?
A. I do not.
Q. Do you know if it was over $3 million?
A. Yes.
Q. All right. And, um --
THE COURT: 35 is admitted.
(Exhibit 35, marked.)
Q. What were the, um -- well let me back up.
Was Rise Construction Management terminated from this job?
A. Yes.
Q. When was that termination effective?
A. In November of 2023.
Q. And what was the reason given for the termination?
A. There were several, lack of performance, schedule,

and nonpayment of subcontractors.
Q. Okay. And what is your position on the nonpayment to subcontractors?
A. Um, that it was false, that we had a counterclaim for change orders as part of, um, the defense.
Q. Is that, um, in litigation?
A. Um, yes, arbitration.
Q. Arbitration?
A. Yes. Sorry.
Q. Is it still an active case?
A. Yes.
Q. Was Development involved in this job?
A. It was not.
Q. What about Rise Together?
A. It was not.
Q. Um, Essential did work on this job, correct?
A. Correct.
Q. Was there a written subcontract?
A. I believe it was Time-and-Material, as Jack had alluded to earlier. But in our records I could not find one. So I don't believe so.
Q. Okay. And was -- Rise was aware that Essential was using union labor, correct?
A. Correct.
Q. And that included, um -- the labor was priced at the

union rates and with the benefit package, correct?
A. Correct, I believe the residential rate. But, yes.
Q. And then I'd like to move on to a job, um, we know as 729 Central Street.
A. Yes.
Q. Are you familiar with that job?
A. Yes. Yes.
Q. Okay. What city or town was that in?
A. That was in Somerville.
Q. Okay, so 729 Central is in Somerville?
A. Yes.
Q. Who was the owner of that project?
A. Um, again, a single-use entity, but GFC.
Q. Okay. And if you, um -- if you take a look at Tab 34, and again this is at the very end, that this appears to be the contracts between Rise Construction Management and 729 Central LLC, and GFC, is that correct?
A. Correct.
Q. Okay. And what was the price for this contract?
A. I don't recall, but it was above $3 million.
Q. Um --
THE COURT: 34 is admitted.
MS. GILLIN: Thank you.
(Exhibit 34, marked.)
Q. Okay. Was Rise terminated from this job?

A. Um, I don't know the technical -- I don't recall the technical term, but Rise was issued a -- issued a, um -- oh, actually it was, it was terminated for convenience. Sorry.

Q. Um, okay, terminated for convenience. Were there any pay disputes involved in this project?

A. There were a number of change orders in dispute, yes.

Q. Was that part of the termination with -- between Rise's termination from the project?

A. Um, meaning that we had open change orders. Yes.

Q. Okay. Was Development involved in this job?

A. It was not.

Q. What about Rise Together?

A. It was not.

Q. Was Essential involved?

A. Yes.

Q. What was Essential's role?

A. General clean-up, Time and Materials, um, and there were -- there was part of the open change orders. And there was water damage, a builder's risk claim. And so an insurance, um, claim that I believe, um, Essential did work on.

Q. Okay. And was there a written contract for Essential's work or was it just Time and Materials?

A. I believe it was Time and Materials.
Q. And when you say "Time and Materials," is there like a written document that lays that out?
A. I would -- I would say, um, in researching this, sometimes with Essential, because we had Essential on other projects we did, and on projects such as this, I couldn't find it. So I could not find that. But sometimes we did.
Q. Okay. So is there, um -- was -- when you were talking about Time and Materials, um, for these contracts, was the amount Essential was paid, was it the same on each no matter what project? You know so there it had Time and Materials on 729 central and they had Time and Materials on Nevin Hills. Was the amount they quoted you the same, like you know the amount per laborer per hour?
A. Right, so generally, you know, escalation pay raises, it may have changed project to project, but nominally though.
Q. Okay, so maybe I'm misunderstanding.
Did you say that you didn't necessarily have a separate Time and Materials contract with Essential for each job, because you basically used them on a bunch of different jobs and it was the same conditions?
A. Yeah, with the -- I guess the clarity on that is I

did find, on other projects that weren't part of this Time and Material contract, where we actually gave Central a contract that says, "You'll do clean-up at the direction of the Superintendent and here's the hourly rate," um, to your point. And then on these two specific jobs, I could not find that.

Q. Okay.

THE COURT: I'm sorry, which two specific jobs, the Central and --

THE WITNESS: Nevins. Nevins Hills.

THE COURT: Oh, yes.

Q. Okay. But in any case, Essential did work on the job, they were allowed to work on the job, they were contracted to work on the job, we just don't have a copy of the contract, right?

A. I don't know if they were ever contracted. So I agree with everything you said up to that point, but I just don't have knowledge.

Q. Well they didn't just show up and do the work, right?

A. Oh, no, correct. So everything you said, um, was allowed on the job. Understood.

Q. Okay, thanks, I just wanted to clarify that.

A. Yes.

Q. Okay. So the next one I have is 52 School Street,

and we went over that a little bit.

And was this one in Boston as well?

A. It is in Everett.

Q. In Everett. Okay. And the owner was this "School Street Development LLC," correct?

A. Correct.

Q. Okay. And you have -- you just read it, you have some involvement with that company, but it's a limited ownership stake with the entity?

A. Correct.

Q. Um, was there a written contract for Rise's work on this job?

A. Yes.

Q. Do you -- were you able to find that contract?

A. Yes, and I thought we transmitted it. But we can get it to you if it did not.

Q. Okay, that would be helpful.

A. Yes.

Q. Do you know the price of that contract?

A. It's above $3 million.

Q. Okay. And, um, I don't remember if we talked about this, but was Rise terminated from that job?

A. Yes.

Q. This was the partial termination, correct?

A. Um, this is the full. But you had asked, "Hey, Jim,

you're on both sides of that, how did that work?" Yes, that's the --
Q. And Development was involved in this job, right?
A. Yes.
Q. All right. Was Together also involved in this job?
A. No.
Q. And Essential did have a contract on this job, correct?
A. Um, correct.
Q. All right. And that subcontract, I would submit is at Tab 27. I'd like you to identify it or authenticate it, if you can.
It appears that this is a Contract 221043-027, and it's an interim cleaning contract. Is that correct?
A. Correct.
Q. Okay.
THE COURT: 37 is admitted.
(Exhibit 37, marked.)
A. And this is a Time and Material contract as well, so it gives you a good example of what a Time and Material contract would look like.
Q. Okay. So this might be sort of similar to what the other contracts --
A. If it existed, yes. Yes.
Q. Okay. And, um, is there a -- do you know if there's

a Prompt Pay Act, um, provision in this subcontract?
A. (Looks.) That same Page 4.
Q. Okay. So we're talking about, um, Subparagraphs F and G, is that correct?
A. Correct in that, yes.
Q. Okay. And is that, um -- this appears to be a sort of a standard form. Is that, um -- it is a standard form that Rise uses with its subcontractors?
A. Correct.
Q. Okay. The next project I have is a project called "11 Parker." Are you familiar with that job?
A. I am.
Q. Where is "11 Parker" located?
A. I believe Newburyport.
Q. And, um, who is the owner of that job?
A. I don't know. It's -- it's a, um, pasta sauce manufacturer. I don't recall the name. Sorry.
Q. It's like a warehouse or something?
A. It actually makes, um, pasta sauce.
Q. Okay. What are the dates of that job, roughly?
A. 2023 to 2024. I don't recall, exactly.
Q. Did you have any, um, ownership stake or any involvement with the owner?
A. I did not.
Q. Is there a written contract for Rise's work on that

job?
A. There is.
Q. Um, do you know if you were able to locate that contract?
A. Again, I thought it was. We can get you that, absolutely. Sorry.
Q. Do you know the cost -- do you know the cost of that job?
A. It was above $3 million.
Q. And, um, was Development involved in that job?
A. No.
Q. Rise Together?
A. No.
Q. As you can tell, I'm --
A. (Laughs.)
Q. Okay. And Essential was involved in that job, correct?
A. I believe so, yes.
Q. And was their role demolition and clean-up?
A. I don't recall the exact scope, but it was -- um, more than likely, as we're speaking about, um -- because there were numerous Essential entities, flooring and things like that, but we're speaking about demo, I believe. But there was probably a Time and Material situation there as well.

Q. Okay. So I'll say, we don't have a copy of a subcontract for that, so is that one that you also --
A. I could not find it, correct.
Q. Okay.
Was Rise terminated on that job?
A. We were.
Q. You were. Okay. Do you know when the termination date was?
A. Um, I could not find that. We've asked the owner for a copy.
Q. Um, the next one I have, and we have talked about this a little bit, is the "86 Essex Street"?
A. Yes.
Q. And that is in?
A. Haverhill.
Q. Haverhill. Okay. And who was the owner of that job?
A. Again, it's a single-use entity.
Q. Oh, right.
A. And it might have been 86 Essex LLC, um, but the owners were, um, Ryan Denver, John, um -- I forget his last name, I'm sorry. But Ryan Denver was the day-to-day contact there. And myself and Brian Anderson.
Q. What was the job, what was it, a residential building or --

A. It's an old brick building that was converted to residential, so like an old office brick building that was converted.

Q. Was there a written contract for Rise's work on that job?

A. It was.

Q. And what was the cost of that?

A. It was $11 million. Above $3 million.

Q. Um, I would ask that that -- if you're looking for these --

A. Oh, I'm sorry. I thought maybe you had it. But, yes.

Q. And was Rise terminated from that job?

A. Um, yeah, partially. Like Jones Street, the owner took over the payments.

Q. Okay. And was Development involved?

A. Yes.

Q. And what was Development's role?

A. Um, the Development Manager.

Q. Um, and was there a contract between, um, Development and Rise Construction Management on this?

A. I believe Rise Construction Management's contract was direct with 86 Essex LLC. Much like you'd just seen here, the single-use entity is the contracting party.

Q. So one question I have is how does it work as far as

payment? If Development is, for instance on this job, is a developer, let's just call it that, it's easy --
A. Okay, yes.
Q. -- and Construction Management is the Construction Manager, and Construction Management's contract kind of goes around Development and directly to the owner. Does -- how does -- does Rise Construction Management get paid by the owner or does it flow through Development and then onto the owner?
A. Yeah, so -- and I know we had talked about a little of this previously, but in Development, there's a lot of LLCs, and it does get confusing. So the way the flow of funds, say it's from a bank, is a requisition comes in, we all sit down as a group, it gets approved, it goes to a bank, and a bank then makes a payment. The bank makes a payment to the entity that it has the loan with, and typically that's a single-use LLC. And so many of those accounts, um, School Street, is just that. And so it makes a payment to that.
From there the Development entity -- think about the third-party work in the case of Jones Street, Jones Street then pays the Construction Manager, and then the architect, and vendors, and taxes, and everything else that they have to pay as part of that. And it's very similar, um, the exact same for us.

So the Development entity gets paid, Rise Dev, then manages those funds, and it paid the Construction Manager money, it pays to the Construction Manager.

Q. So in this specific -- this specific project, Rise Development was paid by the owner and then paid the Construction Manager and --

A. Correct, till the spot of partial termination where the owner then made direct payments not to Rise Development, but as well made direct payments to vendors.

Q. And does Rise Development have its own contract with the owner?

A. Um, no, it does not.

Q. So is it just sort of operating like, you know, defacto, they're kind of like --

A. It's a great question. The operating agreements lay that out. So that development entity, that LLC, um, has an operating agreement, that operating agreement lays out what the development entity does, that managing partner, um, the "operating partner," if you will, that GP. So it's the operating agreement that dictates that.

Q. And on this job, 86 Essex, um, Essential does have a written contract, a subcontract, um, which I believe is under Tab -- Exhibit, um, 32, and I'd ask you to identify, um, to authenticate this.

Is this the Time and Materials contract for Essential Demo's work on this job?
A. Yes, it appears to be. Yes.
THE COURT: Exhibit 32.
(Exhibit 32, marked.)
Q. And this guy, McAdams, who's listed here, "Created By," is that the, um, Head Project Manager or something?
A. (Looks.) Can you say the name again? I can't see it. It's too small.
Q. McAdams.
A. McAdams was on the job. I believe this is signed by Brendan Moynihan and Brian Regan.
Q. Okay.
A. So this might be like an assistant PM who loaded this. This is a software, this cover sheet.
Q. Oh, I see. I see. Okay. So it's the cover sheet and then the actual subcontract starts on the next page?
A. Correct.
Q. All right. How many units was the 86 Essex Street project?
A. 42.
Q. 42. A pretty good job.
A. Yes.
Q. Um, the next job I have is, um, India Street, "55 India," in which you've mentioned.

A. Yes.
Q. And this is in Boston, correct?
A. Correct.
Q. And the owner is -- is that "BRG" or something?
A. Correct. So the owner again was a -- I hate to keep saying this, but a single-use entity, and the developer behind that is Boston Residential Group.
Q. Okay. Do you or does Rise have any, um, involvement with Boston Development?
A. We do not.
Q. Okay.
THE COURT: Is that the kind of triangular piece of property?
THE WITNESS: Yes, sir.
THE COURT: It's like next to Paneira Bread or something like that?
THE WITNESS: It's a terrible site, but, yes. It's tricky.
Q. Okay. And, um, does Rise have a written contract for that work?
A. We do.
Q. Have you produced it or were you able to find it?
A. We can, yes.
Q. What is the cost of that job?
A. $51 million.

Q. And that job is still going on, is that --
A. Correct.
Q. All right. Is -- has Rise been terminated? And I apologize if I already asked this.
A. We spoke about it earlier, it's either tomorrow or Monday, there'll be a termination for convenience. You had asked who is stepping in, and that's the ESG.
Q. Okay. And is Development involved with this?
A. No.
Q. Together?
A. No.
Q. And Essential was involved in this job?
A. No.
Q. Essential didn't work on this job?
A. Essential did no work on this project.
Q. (Pause.) Okay. I just want to be conscious of time here.
We're at 12:30, so I would --
THE COURT: Is this a sensible place to pause?
MS. GILLIN: I think it is, yes.
THE COURT: Okay, why don't we pause, let's regroup at 2:30. Again I'll have to take a brief, um -- pause at 3:00. I can do a telephone call from the lobby, it won't take very long, and we'll go till 4:30 or 5:00, whatever we need today. And if we don't get it

completed, we'll find another date.

And again, I'm going into the -- into Faneuil Hall, and I expect to be back by 2:30. But if I'm running late, I'll try to let Matt know, and I'll get here when I get here.

MS. GILLIN: Okay, thank you.

THE COURT: Okay, thank you. And we'll stand in recess.

(Recess, 12:30 p.m.)

(Resumed, 2:30 p.m.)

THE COURT: All right, back on the record.

Ms. Gillin, are you ready? And we're going to take a break at about 3:00 p.m., I'll do a quick phone call, and then we'll reconvene.

MS. GILLIN: Okay, thank you.

DIRECT EXAMINATION BY MS. GILLIN: (Continued.)

Q. So I would just like to turn to some of the bank statements that you produced in response to the Court's orders.

A. Okay.

Q. If you could take a look at Tab 11, Exhibit 11, um, in the binder.

THE COURT: Exhibit 11 will be admitted.

(Exhibit 11, marked.)

Q. So the first page here, Mr. Grossman, says, um, "Rise Construction Management bank statements, May 2025 through September 2025," and it also included -- also included is a Transaction Summary Detail for every transaction.
Do you see that?
A. Yes.
Q. And I believe if you turn to Page 18, this is possibly the Transaction Summary, is that correct?
A. Correct.
Q. And, um -- did you put this document together?
A. I did.
Q. Okay. And what is the source of this information?
A. These sheets, um, the bank statements. Sorry.
Q. Okay, so how, um -- I guess there's a description here.
Did you look at, um -- is there something else you consulted to make sure -- to, um, be able to indicate what the actual payment was for?
A. No.
Q. So it's just -- so is this just from memory?
A. No, it's, um --
Q. Well maybe it would help if we went through it.
A. Uh-huh.
Q. Okay. So if you look at Page 2 of the document.

A. (Looks.)
Q. It looks like, as of May 31st, 2025, Rise Construction Management had $26,906.26. Do you agree with that?
A. Um, I'm looking for it.
Q. Page 2.
A. Oh, sorry. Yes.
Q. Okay. And there's a list of checks here on that page, and if you, um, turn to page -- yeah, turn to Tab 12, I believe these are the checks. These were also produced. I wanted to see if you could confirm that?
A. Correct.
Q. Okay. Did, um, Rise have a -- this, um -- is this a payroll account or an operating account?
A. Operating.
Q. Did Rise have a payroll, a separate payroll account?
A. It did in Invidia.
Q. Okay, but not at Citizen's?
A. Not at Citizen's.
Q. Okay. So on Page 3, um, like just taking the top transaction, there's a $35 transaction, it says "Benefits Strategic Claim." Do you know what that payment is for?
A. Yes, that is for benefit admins. So Benefit Strategies is, um, the Administrator of the benefits.

Q. The benefits for Rise Construction Management's --
A. Um, correct, it -- yes. Yes.
Q. Okay. So those would be administrative personnel?
A. No, um, so employees -- when we went to contract, employees carried over their benefit, so that nobody lost their benefits. This is the administrator for those benefits.
Q. Okay.
A. It's a monthly fee. I think you see it in every month. It's a monthly fee that they charge.
Q. Okay. So what's that paid for -- it pays for the benefits that are carried over from --
A. So when you get health insurance, there's like a broker essentially you go through.
Q. I see.
A. This is the -- they call them "administrators," but they're essentially brokers. So that's the "Administrator."
Q. Okay. So you know you see here, and there's a transaction on, for instance, 5-27, that's $2,162, and it looks like it's an ACH transfer?
A. Uh-huh.
Q. And this is, um, amounts paid, right, this is the amount paid.
Can you tell, from looking at Page 18, what

that -- who that went to and what it was for?
A. Um, no, you have to go to the online portal and look into that.
Q. So if you look at Page 18, it seems to indicate that there's an entry for that, and it says "Transfer Loan Repayment." Do you see that?
A. I do.
Q. So I'm just wondering, that information, that loan repayment, where is the -- what's the source of that information?
A. So in the Citizen's portal, you can click on that and see where it went to.
Q. Okay. Do you know who this went to?
A. I can get that information. I don't, off the top of my head.
Q. And then, um, if we look at the deposits and credits, the first one, it says, there's a $1500 online transfer from a checking account ending 3191.
You'd agree with me that that is Rise Development's account?
A. Correct.
Q. Okay. Do you know what that payment was for?
A. It was a loan.
Q. And what was the loan for?
A. Rise Construction Management has, since its

inception, a loan agreement to borrow from Brian Anderson, Jim Grossman, and/or any affiliates for working capital of up to $25,000. So this was a regular occurrence for the past 5 years where, um, to help with, um, the cash flow needs. It was essentially a line of credit used.

Q. So was this $1500, um, did this, um, correspond to some specific need that Rise Construction Management had?

A. A lot of these like small monthly, um, employee costs, you know, like benefits, that's what these were covering.

Q. So is this account, um, this Citizen's Bank account ending 1589, is this account solely funded by payments from Rise Development and other entities?

A. That's correct.

Q. And is it the case that Rise Development, and these other related entities, will deposit or transfer, um, just enough funds into this account that Rise Construction can pay some sort of administrative expenses or regular expenses?

A. Correct, because, um -- yes.

Q. Um --

A. And part of what you're seeing here, um, if I can just expand a little bit, we were trying to -- these are

reoccurring, um, like existing -- that come out automatically, like the electric company, that comes out automatically, and during this period we're trying to transfer those to other accounts, as we were, um -- because like the office is used by Rise Dev, so that's not really a Rise -- historically it was a Rise Construction Management partial cost. So we're winding down and bankrupting, um, Rise Construction Management. We're trying to move those reoccuring, um, automatic, um, to another account, and that's why you're seeing these small things. And to make sure that those were covered, we're moving small amounts to cover those reoccurring costs.

Q. And I may return to that in just a minute. But just on this page here, there's another, um -- there's another online transfer from a checking account ending 0539.

Would you agree with me that that's an account owned by Rise Together?

A. Um, I don't know exactly, but, yes, um, if you look at that.

Q. Well I don't want you to guess. But if you look at -- if you look at -- if you look at Exhibit 5, Page 5, there's a list of the accounts.

A. Yes.

Q. And it appears that that one corresponds to Rise Together. Do you see that?
A. (Looks.) Yes.
Q. And then, um, the next one, there's another transfer from a checking account ending 5864. Would you agree with me that that's an account owned by Urban Lift? And again it's on -- you can cross-reference it.
A. Yes. Yes.
Q. Okay. And then we already established that the 3191 is Rise Development, correct?
A. Correct.
Q. Okay. So I see a transfer from Rise Development, the last one here on May 30th, for $25,000. Do you know what that transfer was for?
A. It was for the New England Carpenters.
Q. And what was, um, the debt for the -- what was the payment to the New England Carpenters for?
A. They had a subcontractor go out of business, um, and were owed dues.
Q. You were owed dues?
A. We didn't, the project at School Street did.
Q. Okay. Would you agree that this was after the Court's preliminary injunction order?
A. Yes.
Q. Okay. Was there an order to pay the Carpenters?

A. No.
Q. If you look at Page 6, I think this is what you were referring to, there's a payment to the Carpenters for $25,000?
A. Correct.
Q. Okay. So this was from Development, um, they transferred money into Rise Construction Management's account, $25,000, and then Rise Construction Management paid the same amount to the Carpenters?
A. Correct.
Q. Okay. Was the debt owed to the Carpenters, was it owed by Construction Management or Development?
A. Development. And again, the Carpenters received theirs through a portal, and the only account on that portal at the time was this. And that's why you don't see any in the future, I believe, because the portal was since moved.
Q. I'm not sure what that means?
A. How you pay to the Carpenters has an account, it's similar to the benefits of the laborers, I imagine. That account was set up as Rise Construction Management, it's off of the School Street project, not due by Rise Construction Management.
The reason why that money was transferred -- it would have been easier to have done it to Rise Dev, but

we didn't because the portal wasn't transferred to Rise Development yet with the New England Carpenters. Hopefully that made sense. And I'm not asking you to agree, but that's why it's here.
Q. Okay, um, there's another transfer, and I'm looking at Page 6, another transfer. This look like it's a transfer to Development for $5,000 on June 20th. Do you see that?
A. I do.
Q. Do you know what that was for?
A. That is remaining balances to repay that loan.
Q. To repay which loan?
A. The "Rise Dev" one listed there.
Q. Is that the Carpenters?
A. No. Rise Development, and/or affiliates, will make a loan to Rise Construction Management for, um, cash-flow purposes, like a minor credit, and when there are excess funds, because it's owed, that is returned. And that's a return to Rise Development.
Q. Is there any, um, paperwork at Construction Management or Development complete to keep track of these -- these loans and repayments?
A. There's a monthly reconciliation, yes. And there's a loan agreement that goes back to, I believe, 2021.
Q. Do you have a copy of the reconciliation?

A. I don't here, but I can get it. It's just a simple reconciliation agreement, um, much like this, but just with those transactions.
Q. And then there's a deposit on June 11th, it looks like it's $9,420.31. Do you know what that deposit was, what it was from?
A. I do not. I do not. And I have asked, um, Citizen's for that, like the canceled check, um, and that request is to our administrator. I don't have that.
Q. And then on Page 9 --
A. Uh-huh.
Q. -- there's another series of payments from Development, and I'm referring to a payment -- a deposit from Development on July 10th for $27,000. And then it looks like, on the same day, there was a payment to the Carpenters for the same amount.
Do you see that?
A. I do.
Q. Okay. And what was that for?
A. It's similar to the month before. It's exactly the same as the month before.
Q. Okay. Was there a court order for you to pay the Carpenters?
A. There was not. But this again was School Street,

Rise Development, and this was a portal issue, and I believe this is the last month.
Q. But what I'm trying to get at is that $27,000 did not, to me, sound like a monthly benefit contributions amount. So what is that?
A. It's a monthly benefits contribution amount.
Q. It's a round number?
A. Yes.
Q. It is?
A. Yes.
Q. Okay.
A. We do not employ Carpenters directly, as I mentioned, this was a subcontractor who went out of business.
Q. So why you paying --
A. Because the Development itself had that payment through -- because Rise was terminated, had that payment within it, and the only reason it went through Rise Construction Management was because of the portal.
Q. But what I'm trying to get at is, if this is a subcontractor that went out of business for the Carpenters, isn't Essential a subcontractor that was owed money by Rise Construction Management?
A. Yes. And when I went to visit you, I explained to you that School Street can make that --

THE COURT: I wasn't there.

THE WITNESS: I'm sorry, sir. I'm sorry.

Q. Just for the record, this was a meeting that was held with the benefit funds in that union last year?

THE COURT: Let's answer the --

THE WITNESS: Yes, directly. I'm sorry, sir.

THE COURT: In other words, um -- well maybe back up.

In my experience, people don't normally pay other people's bills, well maybe your spouse or child or something.

So you're paying a benefits bill essentially that was incurred by a sub?

THE WITNESS: Yes.

THE COURT: And why -- and $25,000, why are you doing that?

THE WITNESS: Because the project itself did not, um, pay that subcontractor, and so we had the funds.

THE COURT: And you were worried they would walk off the job?

THE WITNESS: No, no, no, they were out of business, sir. It was a subcontractor that went out of business and did not pay, and so the Carpenters, um, much like this --

THE COURT: Were you legally obligated to pay that

amount?

THE WITNESS: Yes.

THE COURT: And why was that?

THE WITNESS: Because of the agreement, um -- because the money was due to the subcontractor. So much like money is due Essential -- it is very analogous, money was due from the project to the benefits.

THE COURT: Okay. And I think her question was, I've already issued my court order, um, you paid the Carpenters instead of Essential, like you say it's analogous, so how come?

THE WITNESS: Because that was Rise Development that owed that money because at the time Rise Construction Management was terminated. And in that case, um, the only reason it went through this bank account is because it was the only -- and you couldn't get the administrators to change the portal. They don't take checks, they don't take -- you have to pay through a portal, sir, an ACH portal. And that's why it was done here, more for convenience.

THE COURT: Okay.

Ms. Gillin.

Q. Okay. So your testimony is that Rise Development was going to pay a subcontractor on the School Street project and Rise Development is a signatory to the

Carpenters' union, is that correct?
A. No.
Q. No. Okay. So Rise Development, the subcontractor, is a signatory to the Carpenters' union?
A. Correct.
Q. And Rise Development was simply using Rise Construction Management's account as a pass-through entity in order to, um, pay online?
A. Facilitate online, yes.
Q. Okay. There's a $15,000 incoming wire transfer from, um, it looks like a company called "Three Light Coat." Do you know who that is?
A. That is, um, someone who subleases our office space.
Q. (Pause.) Someone that subleases your office space. Could Rise Construction Management have the lease to the --
A. Um, no, I don't know who's on the lease. Brian Anderson signed it. They lease -- they sublease at 12 Erickson.
THE COURT: Is "Three Light," um, like a related entity in any way?
THE WITNESS: No, sir, just a vendor who sells architectural products.
THE COURT: And is that an annual rent payment or monthly?

THE WITNESS: That was 6 months.

THE COURT: 6 months?

THE WITNESS: Yes.

Q. Okay. And then on Page 15, there is a payment to Rise Development for an amount of $2,237.66. This looks like it must be for something specific. Do you know what that was for?

A. (Looks.) I do not.

Q. Okay. (Pause.) All right. So the checks on Exhibit 12, there's one here to a Karen O'Leary. Do you know who that is?

A. Yes.

Q. Who is that?

A. A superintendent.

Q. And what was this payment for?

A. Expenses.

THE COURT: Exhibit 12 is admitted.

(Exhibit 12, marked.)

Q. The next one is a payment to Cameron Richey. Do you know who that is?

A. Yes.

Q. Who is that?

A. An accountant.

Q. And what is that payment for?

A. Expenses.

Q. And then there's a payment for Vanguard on Page 3.
A. Yes.
Q. Can you tell me what this is for?
A. That is a 401K administrator.
Q. And who is covered by that, um, 401K, what participants are in that? Who is covered by the plan?
A. The old employees.
Q. Okay. Are you covered by that plan?
A. I do not have any money in the 401K.
Q. Okay. And then there's a, um, check to National Construction Rental on Page 5, and this payment was made on -- it looks like June 23rd. Do you see that?
A. I do.
Q. Okay. Who is that?
A. I don't know. Um -- I don't know.
Q. And this is, um, for the record, your signature on all these checks?
A. Yes. Yes.
Q. Okay. The next one is for "Eagle Leasing."
A. Yes.
Q. Do you know who that is?
A. That is a trailer that is out at, um, School Street. Like a storage box.
Q. Um, I'd like to look at, um, Tab 13, or Exhibit 13. Now this appears to be the payroll account that you

were, um, talking about earlier with a bank called Avidia Bank, and it says at the top is a payroll account.

Do you see that?

A. I do.

Q. Okay. And there's a number of these transfers here, but I'm going to just pick one out at random.

If you look at Page 28, there's the top, um, the top entry here, it looks like it's from January 31st, and there is a, um, transfer from an account ending in 8250. Do you see that?

A. (Looks.) I do not. I'm sorry. On Page 28?

Q. 28, yes.

A. And what's the amount?

Q. It's $29,000.

A. Oh, yes, I see that. Yes.

Q. Okay. And what is Account 8250?

A. (Looks.) Again, I'm sorry, I'm not seeing the account. I'm not trying to be difficult.

Q. So if you look at the bottom there it says "DET" and then it looks like, um, it's a 417, and this matches up with an Avidia Bank account number?

THE COURT: 848 of Exhibit 13, which is admitted, and up at the top, the first entry, January 31st --

THE WITNESS: Yes.

THE COURT: -- it says "Cash management transfer of credit," and I'm assuming that's what it says, "$29,000 of funds transferred from," what appears to be the account number, ending in 8250. I think the question is, what's that account?

THE WITNESS: I don't know. I don't know if that is even an account number.

Q. I'm sorry. If you --

THE COURT: Well $29,000 is a lot of money. Where did it come from?

THE WITNESS: Um, I don't know the, um, specifics of it, it never clicked. I can find that out through Avidia.

Q. If I told you that this was another Rise Construction Management operating account, would you -- does that sound correct to you?

MR. DiNICOLA: Objection, your Honor, facts that are clearly not in evidence.

THE COURT: I'll allow it.

Q. Do you have any reason for thinking that's not --

MR. DiNICOLA: The same objection, your Honor.

Q. -- an account number?

THE COURT: Overruled.

A. (Pause.) You know I don't know if that's a transaction number or what that number is? But it could

be an account number though, I think, if that's what you're asking.

Q. Yeah, I apologize that I don't have this with me today, last night I got a subpoena response from Avidia Bank and, um, I didn't have time to make the copies. But it appears that that is an account and it's an operating account, and I can frame the --

A. Okay.

MR. DiNICOLA: Objection, your Honor.

THE COURT: Well we'll take that up in due course. You're not the one testifying, so I'm not taking that as evidence.

MS. GILLIN: Yes.

THE COURT: But I think the witness's answer is that he doesn't know where that money came from.

MS. GILLIN: Okay.

Q. And there's a number of these. If you look on Page 40, there's another one for $78,000?

A. (Looks.)

THE COURT: What's that, Page 40?

THE WITNESS: Yes.

Q. Yes, it's Page 40, right in the middle for, um, December 20th and December 30th, $78,000. Do you see that?

A. I do.

Q. Okay. And again, you don't know who that came from?
A. I don't. Um, can I, um, make a supposition a little bit?
Q. Well if you don't know, that's fine, and we can take more evidence on it later.
A. Oh, okay. Okay.
MR. DiNICOLA: Can he finish his answer, your Honor?
THE COURT: Well there's no jury, so I'll allow him to make a supposition, but with the understanding that it's a supposition, that it's not really evidence. But it may move this forward.
Go ahead.
A. That looks to me like incoming payroll, so to pay the payroll, and that's the two accounts we were talking about earlier when we were talking about the accounts where I had -- in that account list, there's two Avidia, and one was the operating and one was the payroll, and it was how they set it up. It could be that account.
THE COURT: And coming in from where?
THE WITNESS: Rise Construction Management, at the time, paying for that payroll.
THE COURT: All right, we're going to take a brief pause here, um, and I'm going to do this telephone conference. Don't go anywhere. I'll be right back.

THE CLERK: All rise.

(Short recess, 3:00 p.m.)

(Resumed, 3:15 p.m.)

THE COURT: That took a little longer than expected, because one of the lawyers couldn't be bothered to phone in on time. But we're done now anyway, so let's resume, Ms. Gillin.

MS. GILLIN: Okay, thank you.

Q. So I'd like to direct your attention to Page 43 of the same exhibit.

THE COURT: We're on Exhibit 13 still?

MS. GILLIN: Um, yes.

Q. And there's a transaction on November 6th for $38,000 that appears to be going to Rise Development. Do you see that?

A. I do.

Q. Do you know what that was for?

A. I do not. I don't recall. It's November of last year.

Q. And then on Page 47, there's a transaction on November 26th, it's $10,000 going to you. Do you know what that was for?

A. That was for expenses.

Q. Do you have documentation of that?

A. We do.

THE COURT: Okay, can we back up?

So is this the payroll account?

THE WITNESS: Yes.

THE COURT: So why, if it's a payroll account, is there $38,000 going out to Rise Development?

THE WITNESS: Um, I can get the specifics on that transaction, um, my -- my intuition's telling me we were short on payroll and Rise Development had loaned it into payroll. I would imagine you could find a corresponding one coming in.

THE COURT: Okay.

Q. And then on Page 57, there's a -- there is a payment coming in, but I don't think it's the same amount. But there's a payment coming in from Rise Development, on September 4th, for $63,000.

Do you see that?

A. I do.

THE COURT: And on what page?

MS. GILLIN: Page 57.

THE COURT: Page 57. Okay. (Looks.)

Q. Is it your testimony that that's -- is that for payroll expenses?

A. Yes.

Q. And then on Page 59, there are two transactions on September 19th, there's an incoming wire from Rise

Development for $49,000, and a wire transfer from you for $4900. Do you see that?
A. I do.
Q. Do you know what those are for?
A. For payroll.
Q. Are those loans?
A. Yes.
Q. On Page 60, on September 25th there's a $330, um, transfer from an account ending 7469.
Would you agree with me that that is the account for a Mystic Valley Parkway, um, on page, um, is it Exhibit 5? Page 5?
A. (Looks.) Yes.
Q. Do you know what that was for?
A. Those accounts were closed out.
Q. Okay. And then on Page 66, there's a series of, um -- there is a wire transfer on August 21st and another one on August 28th. The first one is from Rise Together, for $60,000, and the second one is from Rise Development, for $63,000.
Do you know what those are for?
A. Um, again, loans to payroll.
Q. Is there documentation of the loans?
A. Um, I'm not sure. I haven't looked it up. But I can research that, um, absolutely.

Q. On many of these --
A. It typically would be.
Q. On many of these pages there are, um -- there are transactions to something called "Avenza Capital"?
A. Correct.
Q. What is that?
A. It's a lender, a private lender.
Q. And then there's some to a company called "Lazarus," do you know what that is?
A. A private lender. In the corresponding outs, those are daily take-outs when you take those types of loans.
Q. (Pause.) All right. So, um, I'd like to turn to, um, Rise Development's accounts. It's Tab 15.
MR. DiNICOLA: Your Honor, before we get to there, I've an objection, or at least a note on this Exhibit 13.
THE COURT: Yes.
MR. DiNICOLA: These are all bank accounts prior to May of 2025.
THE COURT: (Looks.) All right.
Q. So, um, did you -- so this appears to be Rise Development's bank statements at Citizen's Bank from May 2025 through September 2025, is that correct?
A. Correct.
Q. Okay. And there's a similar transaction summary,

which is the last three pages of this exhibit. Is this something that you put together?
A. I did.
THE COURT: I'm sorry, is this Exhibit 15?
MS. GILLIN: Excuse me?
THE COURT: 15?
MS. GILLIN: 15, yes.
THE COURT: Okay, 15. It's admitted. All right.
(Exhibit 15, marked.)
Q. Okay. On the first page of this exhibit, I guess it's the second page, um, this is Account Number 3191, is that correct?
A. Correct.
Q. Okay. And this is an operating account, is that correct?
A. I don't -- we don't call it an "operating account," I don't think it's classified as that by the bank, it's just the checking account.
Q. Okay. And you would agree with me that, as of this statement date, May 31st, 2025, there's $430,784.01 in this account?
A. Yes.
Q. Okay. Okay, I'm going to try to move quickly here to save some time.
Okay, so on Page 4 there are two incoming wire

transfers on May 19th and May 29th, there's a $400,000 transfer and a $470,000 transfer. Do you see those?
A. I do.
Q. Do you know who those are from?
A. Those are from School Street Loan.
Q. School Street Loan. Okay. And is that School Street Development?
A. Um, yes.
Q. On, um, Page 6, would you agree with me that, as of June 30th, Development had $128,512.42 in their bank account?
A. Yes.
Q. Okay. And then there's some checks at the bottom, and we do have copies of the checks which are listed here as Exhibit 16. And, um, I have a question about Check Number 55 -- I'm sorry, my eyesight's getting bad, 5558 for $20,000.
Do you know who that was for?
A. (Looks.)
Q. It's on Page 9 of Exhibit 16. It looks like a Johnson, O'Connor, Ferrin & Carucci?
A. Yes.
Q. And who is that?
A. That's an accountant.
Q. Okay. And what accounting services did they

provide?
A. School Street Development.
Q. Okay. On Page 7, at the very top of this page, and I'm back to Tab 15.
A. Oh, sorry. Right.
Q. Okay. There's a transaction on June 2nd for $120,000 to you, an outgoing wire transfer. Do you know what this was for?
A. Yes.
Q. What was it for?
A. A reimbursement of capital contributions earlier.
Q. Okay. Do you have documentation of it?
A. Absolutely, yes.
Q. Okay. And, um, what was, um -- tell me about the timing of this, um, this transaction, why was it made on this date?
A. So at the beginning of the project there was a shortfall in equity, and when that happens, inside of your operating agreement, the Development entity then makes a capital call. Now the contingency use, because the project wasn't -- per the loan documents the project wasn't complete enough, we could not access the contingency, so I input -- and it was more than this, but I input, I believe it was $300,000. And then as the contingency -- as the project completed and passed its

milestone with the bank, and that contingency was available, this was a return of that capital.

Q. Okay. So, um, on Page --

THE COURT: The date is June 2nd, 2025, right?

THE WITNESS: Yes.

THE COURT: And that's after I ordered Rise to deposit $319,000?

THE WITNESS: Yes, sir.

THE COURT: And I think you said that it didn't have the money?

MR. DiNICOLA: This is a different account, your Honor, a different entity.

THE COURT: A different entity. I'm sorry.

So this is Rise Development?

THE WITNESS: Oh, yes. I'm sorry.

THE COURT: Okay.

MR. DiNICOLA: Exhibit 15 is all Rise Development LLC.

THE COURT: All right.

And, um, is ADP your payroll vendor?

THE WITNESS: Yes, sir.

THE COURT: Okay.

I'm sorry. Go ahead.

Q. Okay. And you'll see, on many of these pages, but, for instance, there's one -- there's a transfer on June

20th, um, for $5,000 -- well maybe it's $6,104.60, and it's to Ascensus, and it's the, um, the information there says it's for "Rise Construction 401K."

Do you see that?

A. I do.

Q. Is Rise Development paying Rise Construction's 401K contributions?

A. Those employees were moved over and that carried over. So that is for the employees that are under contract, that is their 401K.

Q. So are they employees or contractors?

A. Contractors.

Q. Contractors. So why is Rise Development making contributions to a 401K for independent contractors?

A. Because it's part of their contract.

Q. So they are still under Rise Construction's 401K?

A. The 401K did not roll over, correct. It takes a year.

Q. Okay. And on June 5th, there's a payment of $33,429.75. Do you see that?

A. I do.

Q. Okay. If you flip to Page 23 of this same exhibit, this is the -- their writing is very -- the font is very small, and so I apologize for that.

And you said this is something that, um, you had

put together, correct?
A. Yes.
Q. So if you look, um, there's, um -- it's sort of at the top, if you find that number, there is, um -- on June 5th, there's the $33,429.75, and this says "Payment to Guardian, Insurance for Properties."
Do you see that?
A. I do.
Q. Okay. If you would take a look at Exhibit 18, which I don't think we've talked about yet, but this is another thing that was produced by you?
A. Yes.
Q. Okay. Can you tell me what this document is?
A. I believe you had requested, um, a history of transaction details within these and I went and took screen shots.
Q. Okay. So at the top of this document -- is this something that you got from Citizen's?
A. In the portal, yes.
Q. Okay. So the name at the top of this says "Rise Construction Management." Do you see that?
A. I do.
Q. And at very bottom it says "Rise Construction Management." Do you see that?
A. I do.

Q. Okay. And there's the user and it says -- it looks like it says, "Paris CEE." Do you see that? It's very tiny at the very bottom.
A. Oh, yes. Yes.
Q. Is that you?
A. Um, no, I don't know what that is, um, from a user perspective. My user name is my first letter and --
Q. You don't need to tell me that.
A. Oh, yes. I'm sorry. Sorry.
Q. I just wanted to see if you put this in or somebody else pulled that website?
A. No. No.
Q. Okay. So this is directly from Citizen's Bank, their portal?
A. Yes. Yes.
Q. Okay. Now is there a reason why these transactions, which say "Rise Construction Management," match to the Rise Development account?
A. It's -- I don't know why that popped up there. Maybe I signed into the wrong account and can see both. I don't know.
Q. Okay. So I'd like to have you flip to Page 2 of that exhibit.
A. Yes, okay.
THE COURT: Exhibit 18 still?

MS. GILLIN: Um, yes.
THE COURT: All right, that's admitted.
(Exhibit 18, marked.)
Q. And we're looking for the same transaction, so it's on June 6th, 2025, there's the $33,000 and it's to Dinacola Law Group. Do you see that?
A. I do.
Q. So on the other document, which you also put together, you said this was a payment to Guardian?
A. Yes, and I had it wrong.
Q. Okay. So which one was it?
A. This would be correct, I transcribed it wrong or was looking at the wrong screen when I created that other sheet.
Q. Okay. So was, um -- so was this -- and you don't need to tell me anything about your attorney communications, but was this, um, Mr. Dinacola performing any services for Rise Development?
A. Yes, he has historically. Absolutely.
Q. Well for this payment?
A. Yes.
Q. This was for Rise Development work?
A. Um, I don't have the invoice in front of me, but, yes, it would have been.
And I don't know if I can say this, but --

MR. DiNICOLA: Objection. Objection to any form relevant to this.

THE COURT: Well I think whether it's -- there's certainly a potential issue anyway of commingling of funds and payment across corporate boundaries or corporate formalities, and, um, I think the witness can answer without revealing privileged materials, whether this was a payment for services made to Rise Construction, Rise Development, or some other entity, or some combination of those entities.

THE WITNESS: Well if I can answer that in general, sir?

THE COURT: Yes.

A. Attorney DiNicola, knowing that bankruptcy has been coming for Rise Construction Management, has not taken any payment anywhere. I don't -- again, I can go back and research this, but he hasn't taken any payment because he understands, and he's been working closely with my bankruptcy attorney, knowing that, um, those may need to go back. And so he hasn't been taking any payment.

THE COURT: Okay, so this was not a payment to the lawyer?

THE WITNESS: That's my belief, sir. I don't know that exact invoice, and I definitely transcribed it

wrong on the sheet, so I apologize. But I can research that.

THE COURT: Okay.

THE WITNESS: But I do know that Jack has refused to accept payment on any Rise Construction Management because of the pending -- um, the pending bankruptcy.

THE COURT: All right.

Ms. Gillin.

Q. All right. Going back to Exhibit 15, um, on Page 8.

A. (Turns.)

Q. There is, um -- there are some incoming transfers, one is from School Street Development, $115,117.60. Do you see that?

A. I do.

Q. And School Street is a project that, um, Essential worked on, correct?

A. Correct.

Q. And it's a project that Essential Construction -- I mean Essential Demo has an outstanding amount due on it, correct?

A. So that was part of a settlement. Essential never did any work on School Street, to be clear, there were never any labor hours on School Street. But, yes, as part of an overall settlement, and my discussions with the principal at -- well that was part of a settlement,

yes.
Q. What was part of a settlement?
A. The open invoice.
Q. Okay, we'll have some time to get into that later.
But, um, there's also a deposit from "BRG India LLC"?
A. Correct.
Q. And that is $209,000. Do you see that?
A. I do.
Q. Okay. And Essential worked on this project?
A. It did not.
Q. Do you know that, do you have personal knowledge of that?
A. I do.
Q. Okay. Would you be surprised if they had submitted invoices on that project?
A. Oh, they have and we've rejected them. They have no contract. They did bid the project. They did pursue it. And then the principal, my brother, did not want to do any work there. And his firm has been sending invoices and has not performed any work. As a matter of fact, the work that they're invoicing for was completed by Direnzo. That's factual.
Q. On Page 12 of this, um, this Exhibit 15 --
A. Yes.

Q. -- on, um, July 10th, there are two payments to something called "Muelly Law Office." Do you see that?
A. I do.
Q. Okay. Who is that?
A. That is an attorney.
Q. And where is that attorney located?
A. Montana.
Q. Okay. What were those payments for?
A. That we -- I am moving my ownership in real estate developments, that we talked about earlier, into an irrevocable trust.
Q. You're moving your -- I'm sorry, you're moving your what?
A. So, um, it may be best to explain with an example. So School Street, um, I have through Rise Development, in the operating agreement, a 2 1/2 percent share of that development. My ownership is getting moved to a family irrevocable trust. And this attorney is handling that transfer.
Q. And that's in Montana, you say?
A. Correct.
Q. Okay. Why in Montana?
A. I did a little research online, and when I looked at irrevocable trusts, there were several states at the top, and that was the Number 1.

Q. Why are you moving your --
A. I don't have a will.
Q. If you look at, um, and this is the same page, on 7-22, there's $150,000 transfer to something called "Ridarious Holding Corp." Do you see that?
A. I do.
Q. What is "Ridarious Holding Corp."?
A. That is the holding organization within the family trust.
Q. Okay. So if you, um -- if you look at, um, Exhibit 19.
A. (Looks.)
Q. Yes, it's here.
A. Yes.
Q. Are you familiar with these documents?
A. I am.
Q. Okay. And this is the Secretary of State's, um, printout from Wyoming?
A. Correct.
Q. And it's for Ridarious Holding Corp. Do you see that?
A. I do.
Q. The mailing address is 12 Erickson Street in Dorchester, do you see that?
A. I do, yes.

Q. And that's the address, your business address for Rise Construction Management & Development, correct?
A. Correct.
Q. Okay. And this was established on, um, May 21st, 2025. Do you see that?
A. I do.
Q. And it's right after the Court's order in this case, is that correct?
A. I -- I don't know the exact date of the court order.
Q. Well the court order was on May 15th.
A. Oh, okay. Yes.
Q. Okay. And then if you look at --
THE COURT: Exhibit 19's admitted.
(Exhibit 19, marked.)
Q. And if you look at Exhibit 20, who is "Ridarious LLC"?
A. It's nothing, it was me booking -- these are all done on an app, in business.
Q. And is this address of "401 William P. Morrissey Boulevard" in Dorchester, is that your personal address?
A. That is, yes, where I live.
Q. Okay. And if you --
THE COURT: 20 is admitted.
(Exhibit 20, marked.)
Q. And if you look at Page 21 -- I mean Exhibit 21,

there's a company, again Wyoming's Secretary of State, for "Ridarious Solutions LLC," again at 12 Erickson Street. Do you see that?

A. I do.

Q. Did you set this company up as well?

A. I did.

Q. Okay. And all of these are set up as LLCs, is that correct?

A. No, I'm sorry, "Holdings" is a corp.

Q. It's a corporation. Okay.

And did Ridarious Solutions -- I guess I should say that Ridarious Solutions was established on July 24th, 2025, is that correct?

A. Yes.

Q. Okay. What do these companies do?

A. Um, nothing. As part of an irrevocable trust, you have to have holding companies, and to save a few dollars I essentially locked in names of potential holding companies in the app. The trust is not finalized yet. The only one that will get used, the other two will get dissolved, will be the Holdings.

Q. But these two --

THE COURT: 21 is admitted.

(Exhibit 21, marked.)

Q. But these two companies -- that Ridarious Solutions

and, um, Ridarious LLC, were both made in July, um, two months after that. Why were these two LLCs incorporated two month after the first holding company if they're not going to do anything?
A. Again the -- because the attorney let me know that you have to have, as part of the trust, separate holding companies, and I was just trying to lock in names for those potential holding companies. But since then, um -- well the trust is not complete yet, but since then Muelly Law, um, actually created a -- had an existing name, "Helios," as a holding, and we'll use Ridarious Holdings as the holding, and that's it. And so those other two are getting dissolved.
Q. Did you set up a website for Ridarious Holdings -- um, Ridarious Holdings Corp?
A. Um, I did not, my son did.
Q. Okay. And are you familiar with the website?
A. Um, I know it a little bit, but, um, yes. Yes.
Q. Does it say something like "Investing in the Future"?
A. Um, it may. I don't know.
Q. Is Ridarious Holdings an investment company?
A. Um, we don't know what it is, um, yet. It's more for the family.
Q. Is it a way to conceal your assets from judgments?

A. Absolutely it is not.

Q. What is the business purpose of moving money, moving $150,000 from Development -- these are Development funds, to Ridarious Holdings Corp.?

A. So that is the replenishment --

MR. DiNICOLA: Objection, your Honor.

THE COURT: Overruled.

A. That is the replenishment of the infusion of capital when the remaining contingency became available. So you had asked a question about the 120. This is the remaining amount of that due to me from the infusion of capital at the beginning of the project.

Q. Okay, so if you look at Page 13, the very next page.

A. Sorry?

THE COURT: Where are we?

Q. Oh, I'm sorry. On Exhibit 15, I'm looking at Page 13.

A. (Looks.)

Q. Do you see there's a number of infusions of cash coming into Development in July. There is $250,000, um, from, um -- well there's $250,000, $250,000, $50,000, and 16 -- I mean that's $18,401.24, coming in from accounts ending 0539.

Would you agree with me that that is Rise Together's account?

A. I do not -- I don't. I'll look.
Q. Okay, well you can look right now, on Exhibit 5, Page 5.
A. (Looks.) Yes.
Q. So you would agree with me that on Exhibit 5, Page 5, you indicated that this account, ending 0539, was used for Development and was closed in January 2025, correct?
A. Correct.
Q. And now they are making -- we have evidence that they are depositing over $550,000 into Development's account in July 2025, correct?
A. Correct, it appears so, yes.
Q. So it cannot be -- so that account could not have been closed in January, right, correct?
A. I could be wrong there.
Q. Okay.
What did you do when you made this list of accounts to confirm that this information was correct?
A. I sent a request to, um, our account executives at, um, Citizen's, and I checked. And like if you went now, that Citizen's account does not exist. I don't know what these are. I can research them. But I don't believe that account existed.
Now maybe it's a typo by them, maybe it's not, or

maybe I had the date here wrong. But Citizen's, and Attorney DiNicola does keep up with this, but has not gotten back to us, because I am not the only person, they're waiting for Brian Anderson to confirm that they can give us a list with dates and officially give it to you, because you've requested that.
Q. Okay. So the top two, um, deposits into this account, on July 2nd, they're small amounts. But there's one for, um, $8,193 -- and I apologize, that may be a "6," I can't read up that close, um, and that account ends 1103.
Would you agree with me that, on Page 5 of Exhibit 5, this account is listed as an account for, um, "Sullivan Square and Rise Fund 4," which also says that those accounts were closed in January 2025 and 2023.
A. Correct.
Q. Okay. So how were those accounts making payments into Rise Development's account in July of 2025 if they were closed in 2023 and January of 2025?
A. Again I may have the dates wrong and that might be the closing of those accounts.
Q. And the same with the next one, an account ending 5864, which is an Urban Lift account, and it says it was closed in January of 2025, and it's making a deposit into this Development account on July 2nd, 2025.

Do you see that?

A. I do.

Q. Okay. And then if you go up to the top of the same page, of Page 13 of Exhibit 15, there is another payment on July 22nd of $5,000. Okay? And if we go to your vendor list here, at the end of your "transaction list," or whatever you call it, at the end of this same exhibit -- and so I'm looking at Page 24 of this same exhibit.

A. (Looks.)

Q. There's an indication here -- almost right in the middle of the page, right under the $150,000, it says "5,000 payment, School Street Vendors." Do you see that?

A. I do.

Q. Okay. Now if we go back to your other transaction list, Exhibit 18, and we look at Page 3, there's a $5,000 payment again to "Ridarious Holdings Corp." Do you see that?

A. I do.

Q. Okay. So which is it, is it a payment to School Street vendors or is it a deposit into Ridarious Holdings?

A. Well this sheet came afterwards, so I could have had that wrong, absolutely. Absolutely.

Q. Well did you just make it up? I mean I don't

understand how this sheet -- I mean you produced this?
A. Yeah, and I click inside and it doesn't give you the names in the transactions, some of it is done from me determining "Okay, that was a vendor," "It looked like a vendor," and that's why I don't put the vendor-specific name, because it doesn't give you a vendor specific name. But we did get this afterwards and I, um -- in fairness to you and to the Court, I never went back and reconciled. So I could have had that wrong.
Q. Okay. If you look at Page 17 of Exhibit 15.
A. (Looks.)
Q. There are three incoming transfers and one deposit. The three incoming transfers all say they're from Ridarious Holdings Corp. Do you see that?
A. I do.
Q. What is this for?
A. Loans back.
Q. Is there a written document allowing Ridarious Holdings Corp. and Rise Development to loan money back and forth?
A. It's not back and forth, that's just in the money that came out prior was, um, because of the infusion of cash, and the second version of that was to the holding company as part of the trust. But there is a -- there is, um -- similar to Rise Dev and Rise CM, there is a

loan agreement, yes.
Q. Okay. Has that been produced to us?
A. It has not.
Q. Okay. So you say things like "Paying benefits for BCBS." Do you see that?
A. I do.
Q. What is that?
A. That is health care benefits.
Q. And then "Paying rents." Do you see that?
A. I do.
Q. Okay. And Ridarious Holdings Corp. is sending $20,000 to Development to pay its rent?
A. Correct.
Q. Okay. Is it safe to say that you are using these companies as a personal piggy bank?
A. No.
Q. Is there any business reason for why Ridarious and Development are transacting business?
A. Yes, because -- say the two? I got Ridarious. What was the --

(Interruption.)

THE COURT: Well let him answer.

Go ahead.

A. So, um, yes, because Rise Development didn't have enough capital to pay the bills, so I loaned Rise Dev

the capital to pay the bills.
Q. Okay. (Pause.) I think I just have one other question.
On this Exhibit 18, um -- well, two questions I guess on this.
On Page 3 of that, um, Exhibit 18, um, on July 11th, there is a payment to somebody named Lisa Christopher for $29,720. Do you know who that is?
A. Yes.
Q. Who is that?
A. That is an employee of Rise Development.
Q. And what is that -- what is the almost $30,000 payment for?
A. Expenses for furniture at, um, 86 Essex Street.
Q. Is Rise Development, um, they're involved with that job?
A. Correct, through the Development Management.
Q. And who is "Ace Recovery Group"?
A. That is, um, those loans you had seen in the video, um, went to collections. Ace Recovery is the collection of those loans.
Q. And then, um, on Page 4, it seems like August transactions are missing. Do you know --
A. There weren't any.
Q. What was that?

A. There weren't any.
Q. Okay. And then the last question.
On Page 5, there's another $5,000 payment to Ridarious Holdings. Is it your testimony that this was a loan?
A. Yes.
Q. Okay.
MS. GILLIN: I, um -- if it's okay with you, your Honor, my colleague, Nico here, was going to ask some questions about the, um, the payment owed to Essential. If that's okay?
THE COURT: All right. But why don't we take a very quick break. We can continue till about 4:30 or 5:00 here.
Does that work?
MR. MARULLI: Yeah, I think it's possible to finish by that point, your Honor.
THE COURT: All right, we'll see how it goes. And if there's a natural breaking point, we'll break and we'll pick it up again. We'll just take a short break now.
MS. GILLIN: Thank you.
THE CLERK: All Rise.
(Recess, 3:50 a.m.)
(Resumed, 3:55 p.m.)

DIRECT EXAMINATION (Continued.) BY MR. MARULLI:

Q. Good afternoon, Mr. Grossman. I'll try to be quick here. Can you please turn your binder to Tab 5.

A. (Turns.)

Q. And please turn the page, um, starting on Page 5, Exhibit 1, to your affidavit.

A. (Turns.) Yes.

Q. Would you please explain what this document is, please?

A. A list of accounts.

Q. All right. Who made it?

A. I did.

Q. How did you do it?

A. I gathered information --

MR. DiNICOLA: Objection, your Honor, we've already been over this.

THE COURT: Overruled. I'll allow it.

A. I gathered information, um, some from memory, some from documents internal, and some from the actual accounts.

Q. So did you review some documents when making this?

A. I did.

Q. What did you review?

A. Like, um, spreadsheets that were left over from our

CFO.
Q. Okay. Did you review anything else?
A. I can't recall. But I'm sure I did.
Q. Did you look back at -- oh, you know what? I'm terribly sorry. Starting on Page 7, that's --
You were right, Brother Counsel, on this document. Yes, this document.
What is this document?
A. (Looks.) I don't know.
Q. You don't know?
A. This looks like an account, an account of -- a statement of account from Essential.
Q. Okay. Turn back to the second page of your affidavit.
A. (Turns.) Yes.
Q. Can you please read Paragraph 5.
A. "Attached hereto as Exhibit 2 is Rise vendors." So it's our account status.
Q. Okay. Did you create this document?
A. Cam Richey did.
Q. Who?
A. Our accountant.
Q. Okay. Did you review it?
A. I did.
Q. And to the best of your knowledge it's accurate?

A. To the best of my knowledge, yes.
Q. Okay. Did you review invoices when going through this?
A. I did not.
Q. Did you review invoices at any part during this, um, proceeding?
A. I have.
Q. Okay. So, for example, did you review any of these individual invoices that were marked as unpaid?
A. (Looks.) I have.
Q. Okay. You'll notice on this Page 7, um, you'll see where it says "Sequence," and then 1, 2, 3, but there's a few numbers missing. Do you see that?
A. I do.
Q. Do you know why that is?
A. I do not.
Q. Okay. So outside of, you know, reviewing this document that was produced by someone else, did you do anything else with regard to this document prior to it being filed as an affidavit?
A. I have not.
Q. Okay. Please turn to Tab 24.
A. (Turns.)
Q. And try not to break our binder here.
A. Yes. Okay.

Q. Do you recognize this document?
A. (Looks.) It looks like a vendor activity, yes.
Q. Okay. Did you produce this document?
A. I can't recall. I don't -- um, I may have. I don't know.
Q. If I represented to you that you did produce this document, would that be surprising?
A. It would not be.
Q. So you didn't create this document?
A. I'm sorry?
Q. You didn't create this document?
A. No, it would not be surprising. I'm sorry.
Q. But I'm asking. I'm sorry. It's been a long day.
So you didn't create this document?
A. I don't recall.
Q. Okay.
A. I think what you're asking is did you get this from me? And I don't recall. But I could have.
Q. Okay.
A. I'm acknowledging that.
Q. Okay. And the information that's contained in the document, since you did not create this, do you have any recollection of, you know, seeing it before it was produced?
A. I don't recall. Again I don't remember the specific

document, um, what it was attached to. But maybe a little context and I can remember it. I'm sorry.
Q. If I represented to you that it was put in a drop box by your counsel in October. (Pause.) Yes, in October. Does that sound right?
A. It could have, yes.
Q. Okay. And these notations on the side, did you write those?
A. Someone did, yes. Obviously, yes.
Q. Do you know if you reviewed them?
A. I don't recall. But, you know, reading them quick -- (Reads.) Yes, it's knowledge I know of. But, yes.
Q. Is it accurate, to the best of your knowledge?
A. Yes.
Q. Okay. So both the -- all the information on this page is accurate, to the best of your knowledge?
A. Um, correct.
Q. Okay. Okay. Now please move to Tab 28.
THE COURT: Well, 24 is admitted.
MR. MARULLI: Thank you.
(Exhibit 24, marked.)
Q. Now there's a few documents here. Do you recognize these documents?
A. (Looks.) I don't, but I understand what they are.
Q. Okay. So what do they look like to you?

A. Um, a requisition for School Street from Essential and, um, like the, um, what we would call the "backup" to that, like the signed slips and all.
Q. And the first page of this document, it says, um, Invoice Number 16, 17, correct?
A. I'm sure it does, but I can't find it. Oh, there it is, yes.
Q. Okay. Do you dispute the amounts owed on this document?
A. (Looks.) I do not.
Q. You don't?
A. I do not.
Q. Okay. So as we stand here today, these amounts are owed by Rise to Essential, um, Rise Construction to Essential?
A. Rise Construction, yes.
Q. Okay.
A. But can I just expand it real quick?
Q. Yeah, go ahead.
A. Sorry. (Enlarges on screen.) I don't recognize the slips on the back, but when I look at the, what we would call the G-702, the backup page to the actual requisition, things for billing like insurance and project management, permitting support and compliance, um, the Phase 1 I don't recognize. And I'm not saying

it's not accurate, but those were like, um, activities that Essential would have done in their home office. So yes.
Q. Does it -- the invoices, do they look like invoices that you normally receive -- that Rise Construction normally receives from Essential?
A. Yes, it seems like a Time and Materials slip, yes.
Q. Okay.
A. But what I don't understand is that these are -- again, I'm just trying to get clarity.
When you look at things like insurance and project management, permitting and support, um, those are lump-sum activities, meaning you don't track them on a slip, right? Because that's a -- I guess if you think about it this way, it's like a firm fixed price and it's just a level of effort against those. The slip itself could have been extra work out there that I was not aware of. It's not a lot of hours. But, um, I recognize the other two more so.
Q. Okay. Well just for the sake of convenience, if you could turn, please, back to Tab 24.
A. (Turns.) Yes.
Q. Do you see the bottom two numbers there are 1,617 and 1,665?
A. Yes.

Q. And do you see the notations next to those numbers?
A. (Looks.) Yes.
Q. So what does that mean?
A. That means that we acknowledge that that's money due.
Q. Okay.
THE COURT: Exhibit 24 is admitted.
MR. MARULLI: Thank you, your Honor.
Q. Moving on to Tab 29. Can you please review these documents. There's a few of them.
A. (Looks.) Yes.
Q. And what are they?
A. They are invoices.
Q. Did Rise Construction receive these invoices from Essential?
A. I don't know.
Q. Who would know?
A. Um, I assume John Hernan, the Project Manager. Well to move this along, I'll make the assumption, um, yes, we did.
Q. Okay.
A. Sorry.
Q. And does Rise Construction dispute the amounts owed -- I guess I'll rephrase it.
Does Rise Construction dispute that any of these

invoices were not paid?
A. I'd have to correlate them back.
Q. You can look back at the other tab, if you would like.
A. Well what number was that again?
Q. I'm sorry. Yes, it was Tab 24.
A. Yes. (Looks.) There seems to be just two, um, discrepancies, the first one for 8,464.
Q. Okay.
A. That we don't have. And the one for $11,130.28. While we have $11,177, we don't have the one for $11,130.28.
Q. Okay. So going back to that first one, the Invoice Number 1170, that was the one that has the balance due of 8,464?
A. Yes. Yes.
Q. So Rise Construction paid that amount?
A. I don't know where. So, um, I -- I don't know. And, um, I didn't mean to say that, so hopefully it didn't come across that way. I'm just saying that, um, we don't have it within our system. And I don't know who made the S7,800 -- you know it seems to have been a little bit short on this invoice. And I don't know the specifics behind that invoice, it's just that we didn't have it. Sorry.

Q. Understood. And, I'm sorry, the second invoice that you said, that was, um --
A. Yeah, 11,130.
Q. So was that Invoice Number 1391?
A. Yes.
Q. Okay. And you don't know either way whether or not that one was paid?
A. Correct.
Q. And the rest, um --
A. Or if it was submitted, correct.
Q. Okay. And the rest, there's no dispute that they were not paid?
A. Correct.
Q. And why were they not paid?
A. Because we were not paid.
Q. And that's the --
A. We were terminated. So on this project here, specific to Nevins, there were three requisitions that all of this work landed in. We were terminated. Essential was notified. Essential started to correspond directly with that owner to get those payments that were due them.
Q. And do you know if that was successful?
A. Um, the correspondence that Christopher Grossman shared seems to illustrate that it was not.

Q. And Christopher Grossman shared that correspondence with you?
A. Correct, and I believe we shared it with the Court. Yes.
Q. Okay. And for all these invoices, to the best of your knowledge, was there any dispute at the time whether or not Essential completed this work?
A. No, to my knowledge.
Q. Okay. So is it fair to say that the sole reason for nonpayment was, from your perspective, due to Rise Construction's termination from the project?
A. And the fact that we didn't receive that money.
Q. Okay. And if you would please turn to Tab 30.
A. (Turns.) Yes.
Q. And I'm going to ask you to do the same dance -- oh, sorry, the tab should be closer.
A. I should take it out. Be smarter.
THE COURT: And 29 is admitted.
(Exhibit 29, marked.)
MR. MARULLI: Thank you, your Honor.
A. (Looks.) Um, the first two are not on our sheet.
Q. So the 1,376 and 1,397, you don't know whether or not they were paid?
A. Correct.
Q. And the remainder?

A. Are captured on our list.
Q. As not being paid?
A. Correct.
Q. And why weren't they paid?
A. This was work we were not paid for, the owner partially terminated at the time and eventually terminated completely for convenience, and put a "Pay the Subcontractor Direct" notice on it. So they were paying the subcontractors directly.
Q. Do you know if all of these invoices were paid direct?
A. I do not know if they were or were not, the correspondence shared by Christopher Grossman with us did show a negotiation. But I don't know if it was eventually signed.
Q. Okay.
A. And paid. Sorry.
(Pause.)
THE COURT: 30 is admitted.
(Exhibit 30, marked.)
MR. MARULLI: Yes, thank you.
Q. Okay. So just for clarity, is the contention both that Rise Construction did not receive payment for these invoices -- or, excuse me, Rise Construction did not receive payment from the owner for the work that is

covered by these invoices, and also that the owner agreed to pay some of them direct?
A. Correct.
Q. Okay.
A. The owner put a demand to pay them direct.
Q. Okay. And do we have the -- does that have a document?
A. Actually Mr. Grossman sent me the documents. So I don't know if he shared it, but those are notices that went out.
Q. Okay, let's see.
A. But we have them and can get them to you.
Q. (Looks.) Oh, I have them.
A. Yes, okay. Sorry.
MR. MARULLI: Your Honor, may I approach?
THE COURT: You may.
(Hands to witness.)
MR. MARULLI: Your Honor, we only have a third copy. Would it be all right now if I use the document projector?
THE COURT: Yes.
MR. MARULLI: Sir, I'm going to put this on the screen for you.
THE COURT: So are these -- these are not in the binder?

MR. MARULLI: They are not in the binder, your Honor.

THE COURT: So what's our next exhibit number, Matt?

THE CLERK: 39 and 40.

THE COURT: 39 is what appears to be a text message on the front, and 40 is an e-mail from Charles Aggoras on the first page.

Yes, go ahead.

(Pause.)

(Hands to witness.)

MR. DiNICOLA: I'd like to be able to see these too.

THE COURT: Well let's display them for everyone. There's a document camera there.

(Pause.)

THE COURT: But for now let's use the document camera.

(Pause.)

MR. MARULLI: I apologize, your Honor, I don't know how to do this?

THE CLERK: It's on the top.

MR. MARULLI: Oh, I'm sorry, to be surprised about how I am with technology. Oh, yes, there we go. Thank you.

(On screen.)
Q. Okay. Mr. Grossman, are these the documents you're referring to?
A. Some of them, yes.
Q. Some of them?
A. Yes.
Q. What's missing?
A. Um, I don't know. I don't have his original, um, text to me. But, yes, these are the ones I was referring to. And I'm not trying to be difficult.
There were e-mails between the CFO of New Boston Ventures, um, I forget her name, and Chris Grossman, around payment, the fact that we were not paid. There were e-mails from John Hernan, who worked for Rise Construction at the time, and Christopher Grossman, showing the acknowledgement not to, um -- not to Essential, but the Project Manager for New Boston Ventures, acknowledging that we were not paid Requisition Numbers 27, 28, 29, which was when this work was done.
Q. And "New Boston Ventures" was "Nevins Hill," correct?
A. Yeah. I'm sorry, yes, sir.
Q. So for Central -- I apologize. We went to the Central invoices, so we're talking about Central now?

A. Oh, I'm sorry. Yes. Sorry about that.
Q. Okay. So are these the documents for Central?
A. Yes.
Q. Okay. And you see, um, texts -- this first document is a text to Charles Aggoras. Do you know who that is?
A. That is the owner, um, the developer.
Q. Okay.
THE COURT: I'm sorry, it's 7-9 Central Street?
MR. MARULLI: Um, yes, your Honor.
Q. And the remainder of these texts appear to be to a "Josh R." Do you know who "Josh R." is?
A. "Josh Russell."
Q. And who is that?
A. That is the owner's rep. So Josh worked for Rise Construction Management and, um, those layoffs I was speaking to earlier, he went to work directly for Charles.
Q. Okay. And you reference these documents previously, these communications. And can you turn to the very last page.
A. (Turns.)
Q. And this says, um -- and these texts, who are they from?
A. Christopher Grossman.
Q. All right. And this last text here says, "Okay,

need the Central Street payment next week or the union is leaning." Is that right?
A. Correct.
Q. And do you know if that went through?
A. I do not.
Q. Okay. And do you see here in the, um, Exhibit 40 -- and I'm sorry, these are not numbered. But 7 pages in. Yes, this document right here.
A. (Looks.) Yes.
Q. What is this?
A. It looks to be a final release of a mechanic's lien waiver. It's a pretty standard release of a lien upon a payment.
Q. Do you know if it was ever signed?
A. I do not.
Q. Okay. Can you read the first sentence following the --
MR. DiNICOLA: Objection, your Honor.
Can we at least have some sort of foundation that Rise had anything to do with this document?
MR. MARULLI: Well I think if he reads the first sentence, it will show what I'm referring to, your Honor.
MR. DiNICOLA: I apologize, your Honor. I just don't -- I don't even know what we're looking at. I

don't have a copy of it. All I'm seeing is what's on the screen.

So if this is an e-mail that Mr. Grossman actually received, then I wouldn't have an issue with it. But if this is an e-mail between somebody else, you know Person A and Person B, and he has no knowledge of it, why is he testifying about it?

MR. MARULLI: Mr. Grossman produced these e-mails, your Honor.

THE COURT: Hold on. Who? Let's lay a foundation. I'm in the dark here.

MR. MARULLI: Of course, your Honor. I apologize.

THE COURT: So what is Exhibit 40? You don't testify, ask him the question.

Q. So what is Exhibit 40, Mr. Grossman?

A. It's a series of e-mails between Charles Aggoras and Christopher Grossman laying out what seems to be a settlement for 7-9 Central Street.

Q. Okay.

A. It does speak of the union's leaning or Essential leaning, um, and lays out, um, the fact that they'll provide a lien release upon payment, is what it seems to be.

Q. Okay. If you go to Page 2. What is this e-mail?

A. (Looks.) "Essential A-2 Waiver for Cory Road."

Q. Okay. And who are the correspondents on the e-mail?
A. Charles Aggoras, Christopher Grossman, Josh Russell, Kristen at GFC Development, and Kevin Daly.
Q. And do you know Kevin Daly is?
A. Kevin Daly is the owner's rep.
MR. DiNICOLA: Your Honor, I object again to this document.
THE COURT: Well I'm still --
MR. DiNICOLA: Your Honor, I --
THE COURT: Hold on. Hold on. You know the way this works is you don't interrupt me. Okay, I'm sorry, I, you know --
MR. DiNICOLA: I apologize, your Honor. I didn't realize I had cut you off. I apologize.
THE COURT: I think he's still laying a foundation. I don't understand what this is either. And I'm waiting to go hear the testimony. I haven't admitted it yet, but there's no jury here, so I don't need to do this at sidebar.
I'm trying to figure out what this is. There's blank documents and e-mails going back and forth. I don't get it either. I'm waiting for the testimony. Let's hear what it is.
MR. MARULLI: Your Honor, if I may?
THE COURT: No, no, the witness gets to testify.

Q. Did you produce these documents to the plaintiff?
A. Um, correct. So Chris Grossman had sent -- I believe to the courts, but Chris Grossman had sent a packet on all of the jobs, and including these here, and we printed them and produced them, um, to this case. I don't know if that's the right terminology.
Q. And did you ask Chris Grossman for these documents?
A. I did.
Q. Why?
A. To support the fact that we were not paid.
Q. To support the fact that Rise Construction was not paid?
A. Yes. I'm sorry.
Q. Okay. So I guess I'll ask you this.
In these documents -- you reviewed these documents?
A. Correct, and I'm reviewing them now. Yes, sir.
Q. Okay. And you referenced these documents earlier when, you know, mentioning that the owner on Central agreed to pay direct, is that right?
A. Again I'm not trying to split hairs, but the owner directed to pay direct. So he exercised the clause within his contract with Rise Construction Management to make direct payments to the subs.
Q. And did you -- and in your testimony, did you say

that these documents contained that direct assumption?
A. I don't recall that. I don't think so. I didn't quite understand the question, but --
Q. Oh, okay.
A. But if I track it, I don't think so.
Q. So as far as you know, these documents do not contain the owner agreeing to pay Rise -- or, excuse me, to pay Essential direct?
A. It seems to be a negotiation to do so.
Q. Okay.
A. But again, the owner noticed us, we noticed the subcontractors that the owner exercised that they were paying direct.
Q. And my question to you was, was that documentation produced?
A. I don't -- I don't know.
Q. But it's not this?
A. It's not this, no.
Q. Okay. So it's possible that that documentation was not produced?
A. Um, correct.
Q. Okay.
MR. MARULLI: And that's all I have for Exhibits 39 and Exhibit 40. I apologize, your Honor.
THE COURT: All right, I'll admit 39, but I'm

going to hold Exhibit 40 in abeyance, because I'm still not sure what's going on, whether the owner, if it's Mr. Aggoras, um, directed that the payments be made directly. There does appear to be a negotiation, which suggests that he was taking responsibility for it, but I can't tell whether anything was paid or not. Maybe it's in here, but it's a reasonably lengthy document and I'm having some trouble following it. So, um, 39 is admitted, but 40, not yet.

(Exhibit 39, marked.)

THE COURT: All right.

Q. Now please move to, um, Tab 31, and we'll look at invoices from 86 Essex.

A. (Turns.)

Q. And again I apologize, if you have to flip back and forth.

A. (Looks.) Okay.

Q. Were either of these invoices paid by Rise?

A. They were not.

Q. They were not. Okay. Why not?

A. We were not paid.

Q. Okay.

A. Rise -- sorry, Construction Management was not paid.

Q. And Essential -- there's no dispute at the time that Essential did the work upon which these invoices are

based?
A. I don't recognize the $27,000 invoice. I do recognize the $5,311.87.
Q. Okay. So as to Invoice Number 1238, you don't know. And as to Invoice 1378, there was not a dispute as to Essential completing that work?
A. Um, correct.
Q. And we can move on to Tab 37.
THE COURT: 31 is admitted.
(Exhibit 31, marked.)
THE COURT: It says "11 Parker." Tab 37.
A. (Looks.)
Q. Do you recognize those invoices?
A. I do not. Um, but I believe we can talk about them.
Q. Do you know if they were paid?
A. Um, some of them show "Paid." And if I can expand on that, I think I know what's happening in these remaining balances.
Those are retainage. So in a subcontract, they'll be a 5 percent retainage. I can't mentally do the math fast enough, but it seems to be -- so when you see $24,678, and you see remaining $1,233, I believe that's retainage.
Q. Do you know that for a fact?
A. I do not know it for a fact, sorry. I don't have a

calculator.

THE COURT: So it looks like 5 percent?

THE WITNESS: Yes, sir. It just jumped out at me when I looked at these, that that's what it seems to be.

THE COURT: Is the amount held back by the owner until the job is complete and satisfactory and all the punchlist items satisfied?

THE WITNESS: Yes, sir. Yes, sir.

Q. Okay, please turn to the second-to-last invoice on there, Invoice 1025.

A. (Turns.)

Q. Does that look like it's for retainage?

A. It does not.

Q. And do you know if that one was paid?

A. I do not know if the owner paid that one.

Q. So for all of these, you don't know?

A. Um, meaning I do not know if the retainage or the remaining amount was paid, and I do not know if that amount was paid.

Q. All right. Would there -- but as far as you know was there any reason that these wouldn't be paid?

A. By the owner? I don't know.

Q. By Rise Construction?

A. We were not paid.

Q. So --

A. Rise Construction Management was not paid.
Q. So for clarity, to the extent that any of these invoices were not paid, it was because Rise Construction was not paid?
A. Correct.
Q. (Pause.) And we're almost there, Mr. Grossman. If you would go to Tab 36.
A. (Looks.)
Q. Okay. Have you seen these documents before?
A. (Looks.) I have.
Q. And what are they?
A. They're a requisition.
Q. For --
A. Of 55 India Street.
Q. All right. And you talked a little bit about this before. You claimed that Essential didn't do any work on this job?
A. Correct.
Q. Did Essential ever have a contract with you for this, with Rise Construction for this job?
A. They did not. To my knowledge.
Q. Do you have any idea why Essential would submit pay requisitions for a job they didn't do?
A. I do not.
Q. Did you have a conversation with anyone at Essential

at the time about them?

A. There was a talk between Christopher Grossman and myself about, um -- at the time we had the two organizations stopped working with one another, um, and there was a discussion around, you know that this could be helpful to sustain his business. And so he bid the job, he bid the flooring, he bid the general cleanup, he bid the logistics. It just never came to fruition and he didn't want to take the work on.

Q. So was his bid selected?

A. It was not.

Q. Okay.

A. Because Direnzo did this work, as I mentioned earlier.

Q. So -- just so I have it right, your testimony is that Chris Grossman, on behalf of Essential Demo, bid on this project, did not get the bid, did not have a contract with Rise Construction, and then submitted pay requisitions anyway?

A. Correct.

THE COURT: Why is that not fraud or a crime? Why would you do that? Is there any legitimate reason to do that, to submit a requisition for work you did not perform?

THE WITNESS: I'm sorry, your Honor, is that

towards me?

THE COURT: Yes.

THE WITNESS: Oh, yes. Sorry.

I don't know. At the time it was a little chaotic between Mr. Grossman and myself. When these did come in, I did talk to him. I also corresponded back to his office. There seemed to be a little discrepancy between Mr. Grossman and his partners, but, um, most certainly none of this work was done and, um, we have rejected these invoices as such. There's no contract and there's no work.

There was definitely, um, I think some of that, maybe he just -- maybe they were not communicating internally, but that's a supposition. There was -- we were trying to come to a global settlement where future work could help sustain and settle all of this. But it never, um -- it never was awarded.

And just for the record, the way the contract works at 55 India Street is the owner has to approve -- which is fairly typical on every project, that the owner has to approve an award to a subcontract. It was never approved.

THE COURT: I'll admit 36, for what it's worth.

(Exhibit 36, marked.)

Q. Are there daily jobsite reports for 55 India?

A. There are.
Q. Have they ever been produced?
A. No.
Q. Do you have them?
A. Yes, we use the software "Procor" and we can get those.
Q. Are there any communications in writing between Rise Construction and Essential Demo regarding these requests for payment?
A. Oh, yes, e-mails from myself rejecting them.
Q. Do you have those?
A. I do not on me. We can get those.
Q. All right. (Pause.) And Chris Grossman's affidavit, Exhibit 38. Do you have that? It was admitted, I believe, at the very beginning of the hearing.
A. Is it in the tabs?
Q. It's not.
A. Then sorry, I don't, on me. No.
THE COURT: I'll have the Clerk give you the exhibit.
(Hands to counsel.)
Q. Okay. Please turn to Exhibit, um, Page 30, it's marked in the top right corner.
A. (Turns.) Yes.

Q. Do you recognize this document?

A. Sorry. (Looks.) It looks to be 3 Braintree Street. Am I looking at the right one? Oh, yes.

Q. Do you recognize that invoice number?

A. I do not. But wait a second. (Looks.) I don't have that on my list.

Q. Do you have any personal knowledge regarding this invoice?

A. It does not look familiar to me, no.

Q. Do you know if it was paid?

A. According to this, it was.

Q. Oh, where?

A. Oh, it says "Credit to Bad Debt." So, sorry, I thought that was payment. So, no, I don't know if it was paid.

Q. Do you know if there was a dispute at the time whether Essential completed the work, upon which this invoice is based?

A. I do not know.

Q. Okay.

MR. MARULLI: Nothing further, your Honor.

A. Oh, just to explain 35 Braintree a bit?

Q. Oh, yes.

A. There was -- in our reconciliation Essential was saying that they had $76,000, um, in open invoices at

the time. I believe there was some correspondence back and forth directly with ownership. I believe that was clarified in an e-mail between Attorney Gillin and, um, David Andronico, the Managing Director, um, showing that 50 was what was open. And I think that's how that eventual joint check got paid.

Q. Do you know when that was?

A. I guess my point to this is -- oh, yes, that e-mail is from February, and it was paid, um, in April.

Q. February of?

A. Of 2025.

Q. And has that been produced?

A. I don't -- I don't know.

Q. Okay. You don't know?

A. I don't know. I have it in my stack.

Q. And so the basis upon which Rise Construction would dispute paying this invoice is due to that agreement?

A. Um, I guess my point of bringing it up here -- and I thought that was known, but my point of bringing it up here is I don't know if these invoices were in that settlement.

Q. Okay, so as to this invoice you don't know whether it was paid and you don't know whether or not it was supposed to be paid?

A. Correct.

Q. Okay, that's all.

MR. MARULLI: Thank you, your Honor.

THE COURT: Okay, great. Let's talk about whether we, um, pause there, um, it's 25 to 5:00, and where we go from here.

I do have a reasonably free day tomorrow, um, which I'm happy to keep going. But there were a couple of dozen instances in which the witness said, "I can get you certain information," and I'm wondering if it makes sense to try to get as much of that produced as the parties are willing to do, um, because it may fill in some blanks and save time at the end of the day. Or we could keep going with, um, cross by the two counsel and whatever other witness we may have.

But I'll ask counsel, what is your pleasure? The week after, I should say, I'm tied up in the mornings with a jury trial. I don't have any complete days, I don't think, next week. But, um, let me hear from counsel as to your preference.

Mr. DiNicola?

MR. DiNICOLA: Your Honor, I'm not available tomorrow. The following week I am not available Tuesday and Wednesday. I'm available the remaining days. The week after that is Thanksgiving.

THE COURT: Is that the week before Thanksgiving

or the week after that?

MR. DiNICOLA: Sorry?

THE COURT: Is the week after that the week before Thanksgiving?

MR. DiNICOLA: Yes.

THE COURT: Okay.

MR. DiNICOLA: So the 24th, um, I'm available the 24th, and the 26th, if you wish to do that, on a Wednesday.

THE COURT: Um, what does plaintiff say?

MS. GILLIN: I can be available next week on the 20th, the 21st, the 18th, um, and I can be available on the 24th and 25th. But I am concerned about the testimony that there is an imminent bankruptcy filing in the works. I'm concerned that that will be used to stay this litigation or stay these --

THE COURT: Well it will -- well I don't know how I can, um -- I don't have an easy answer for that. If it's literally imminent, meaning it could be filed tonight, tomorrow, um, there's nothing I can do about that. If "imminent" means a month from now, even if I make findings, further findings, I'm not sure that's going to make much difference except maybe as to the size of the claim perhaps that might be made in the bankruptcy proceeding. But, um, you know I'm not sure

what if anything -- I can't enjoin someone from filing bankruptcy.

MS. GILLIN: I agree with that. I was -- I don't know if there's enough evidence in front of you now, at this point, but, um, one of our requests is to expand the injunction to Development. So I think if that was possible, that would at least give us some protection. I don't mind staying the corporate bankruptcy, there's not a discharge of debt anyway. So, um, if there was a order of judgment, we may still be protected.

THE COURT: Well it depends on -- if Construction Management were to file, I don't think that protects development, assuming that you can pierce the corporate veil or through, um, fraudulent transfers or whatever, you know, the theory might be. If they both, um, offer bankruptcy, that, um, that doesn't insulate any other entity or Mr. Grossman personally, it just kind of depends, I guess is the answer.

But in the meantime, um -- well I'm kind of stating an obvious proposition, so what do you want to do on the schedule going forward? Mr. DiNicola says he's not available tomorrow. I can move things around the following week and I'm around the subweek before Thanksgiving. I don't want to wreck anyone's Thanksgiving travel plans, but I'm around.

MR. DiNICOLA: The next week for me is 17, 20, or 21.

THE COURT: The 17th is a Monday?

MR. DiNICOLA: Yes.

THE COURT: Matt, what is Monday afternoon?

(Talk off the record.)

THE COURT: Okay, why don't we say, um, let's regroup at 1:30 on Monday the 17th. I'm impaneling a jury in the morning. It's not a long trial. I've gone from being the most senior judge, as Chief Judge, to the most junior judge, so I get to impanel first instead of last. So we have that. But the impanelment will obviously take precedent. And if it spills over, it spills over.

So let's say, pending further direction, 1:30 on Monday. There were a whole bunch of comments by the witness, "I can get you that," "I can get you that," "I can get you that," so I think it would be a good thing to try to get those issues either resolved, because the documents are produced, or teed up, if the documents don't exist or are objected to, or what have you.

And um --

MR. DiNICOLA: Your Honor, if I may?

THE COURT: Yes.

MR. DiNICOLA: I'm out tomorrow. So if we want to

be able to do that and give Ms. Gillin the opportunity to review those documents and continue her examination of Mr. Grossman, then I would suggest we do it later in the week.

THE COURT: Why don't you start talking now and see where we are. We may not wrap everything up. But why don't you just see what you can accomplish right now. I mean a lot of this is, you know, the witness says, "We have that," "We have that," "We have that," well either you do or you don't. So let's make what headway we can now. And I'm not going to close the hearing until I'm satisfied that the parties have had a fair opportunity to present evidence and also to conduct cross-examinations.

So it's taken us a long time to get to this point, Mr. DiNicola, and I'm trying to be, um, reasonable here. A lot of this could have been forestalled or shortened had, um, things gone a different direction in May or June, but it's now November, so let's see what you can do. And, um, we will resume the hearing with Mr. Grossman on the stand at 1:30 p.m. on Monday, November 17th. Okay?

All right, we'll be in recess.

(Adjourned, 4:45 p.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the foregoing record is a true and accurate transcription of my stenographic notes before Judge F. Dennis Saylor, IV on Thursday, November 13, 2025, to the best of my skill and ability.

/s/ Richard H. Romanow 12-15-25
__________________________
RICHARD H. ROMANOW Date